**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

CENTRAL MAINE POWER COMPANY
and
MAINE ELECTRIC POWER COMPANY,

***Plaintiffs,***

v.

PHILIP L. BARTLETT II, in his official capacity as Chairman of the Maine Public Utilities Commission;[1] and

HEATHER SANBORN, in her official capacity as the Maine Public Advocate; and

CELINA CUNNINGHAM, in her official capacity as Acting Commissioner of the Maine Department of Energy Resources,

***Defendants.***

Civil Action No. ___________

## COMPLAINT

Plaintiffs Central Maine Power Company and Maine Electric Power Company allege as follows:

## INTRODUCTION

1. This lawsuit challenges state interference with federal oversight of interstate electric transmission. The State of Maine passed—and Defendants are currently seeking to enforce—a statute that is expressly targeted at changing the rates, terms and conditions for interstate transmission service[2] (the "Maine RTO Requirement"). But only the Federal Energy

[1] Defendant Bartlett has announced his resignation as Chairman of the Maine Public Utilities Commission. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, upon Bartlett's resignation, his successor in that role, anticipated to be Patrick Scully, will be automatically substituted as a defendant.
[2] 35-A Me. Rev. Stat. Ann. § 3133-B.

Regulatory Commission ("FERC" or the "Commission") can approve terms and rates for electric transmission service. Plaintiffs Central Maine Power Company ("CMP") and Maine Electric Power Company ("MEPCO") file this action seeking a declaratory judgment and permanent injunction to protect their rights under the Federal Power Act ("FPA") and U.S. Constitution and to restore the proper balance between federal and state oversight of electric transmission.

2. In the FPA, Congress set out a framework by which FERC has the exclusive authority to oversee the transmission of electricity in interstate commerce and the states oversee intrastate transmission of electricity. This bright-line division of responsibility between FERC as the federal regulator and the states has been recognized for nearly a century and reinforced through decades of judicial and agency precedent. Regulatory certainty has allowed electric transmission utilities to attract capital investment.

3. One area that Congress entrusted to FERC is the oversight of regional transmission organizations ("RTOs") and independent systems operators ("ISOs"), which are independent entities that administer the nation's transmission grid, generally on a regional basis, across state lines. Plaintiffs voluntarily worked to form and then joined ISO New England Inc. ("ISO-NE"), which is an RTO, thereby giving up significant control over their transmission assets, in exchange for certain contractual rights and protections, as well as an "adder" to the return on equity ("ROE") components of their transmission rates.

4. ISO-NE's governing document—approved by FERC as part of its broader approval of ISO-NE—is the Transmission Operating Agreement ("TOA"). The TOA voluntarily transfers some of Plaintiffs' rights to ISO-NE while protecting others. The TOA details Plaintiffs' protected rights, including the right to (i) terminate their memberships at any time under specified conditions and (ii) terminate their memberships at regular intervals for any reason.

5. All of these terms were reviewed and approved by FERC under the FPA as part of a carefully structured and comprehensive package that created ISO-NE as an RTO in 2004. Defendants' enforcement of Maine's new statute seeks to undo those contractual protections and rates.

**JURISDICTION & VENUE**

6. Plaintiffs' causes of action arise under the Federal Power Act, 16 U.S.C. § 791 *et seq.*, 42 U.S.C. § 1983, and the United States Constitution. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the causes of action arise under the Constitution and laws of the United States. This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. §§ 2201(a) and 2202.

7. Based upon the allegations, a present case and controversy exists as to the constitutionality of the Maine RTO Requirement.

8. This Court has the authority to grant the requested declaratory and injunctive relief under 28 U.S.C. § 2201, Federal Rule of Civil Procedure 57, 28 U.S.C. § 1651(a), and the Court's inherent equitable powers.

9. This Court has jurisdiction to order prospective relief in the form of a declaratory judgment or an injunction against Defendants in their official capacities as officers of an agency of the State of Maine. *Ex parte Young*, 209 U.S. 123, 129 (1908).

10. Venue is appropriate under 28 U.S.C. § 1391(b)(1) because Plaintiffs are headquartered and incorporated in this district and all defendants reside in Maine.

## PARTIES

11. Plaintiff Central Maine Power Company ("CMP") is a franchised public utility that is primarily engaged in transmitting and distributing electricity to more than 646,000 customers in central and southern Maine. CMP is incorporated in Maine and has its principal place of business in Maine. Central Maine Power Company provides electric transmission service pursuant to the rates, terms and conditions of the ISO NE Open Access Transmission Tariff (ISO-NE OATT) and owns approximately 2,900 miles of electric transmission lines.

12. Plaintiff Maine Electric Power Company ("MEPCO") is a transmission-only public utility that owns and operates a 186-mile, 345 kV transmission line connecting the New England transmission system and New Brunswick Power Corporation. MEPCO is incorporated in Maine and has its principal place of business in Maine. CMP owns 78.3% of MEPCO's common stock and Versant Power owns the remaining 21.7% of MEPCO's common stock.

13. Defendant BARTLETT is named in his official capacity as the Acting Chair of the Maine Public Utilities Commission, with an office at 26 Katherine Drive Hallowell, ME 04347. The Maine Public Utilities Commission regulates electric, natural gas, telecommunications, and water utilities in Maine. The Maine Public Utilities Commission is currently enforcing the Maine RTO Requirement via a complaint proceeding at FERC.

14. Defendant SANBORN is named in her official capacity as the Public Advocate of the Maine Office of the Public Advocate, with an office at 103 Water Street, 3rd Floor, Hallowell, ME 04347. The Maine Office of the Public Advocate's primary responsibility is to represent the interests of Maine's utility customers. The Maine Office of the Public Advocate is currently enforcing the Maine RTO Requirement via a complaint proceeding at FERC.

15. Defendant CUNNINGHAM is named in her official capacity as the Acting Commissioner of the Maine Department of Energy Resources, with an office at 111 Sewall Street August, ME 04330. The Maine Department of Energy Resources is a Maine cabinet-level agency responsible for leading the state's energy policy. The Maine Department of Energy Resources is currently enforcing the Maine RTO Requirement via a complaint proceeding at FERC.

## BACKGROUND

### **The Federal Power Act Provides FERC with Authority to Oversee the Terms and Rates of Interstate Transmission, Including RTO Formation**

16. Electricity is typically produced and delivered to customers in three steps. *First*, electricity is generated by electric generators. *Second*, that electricity is transmitted in bulk quantities and often over long distances across transmission facilities to substations that serve as a link between the transmission system and the local distribution system. *Third*, electricity is distributed from substations to end-use customers over lower voltage distribution facilities. This case concerns the operations and regulation of step two: electric transmission.

17. Pursuant to the FPA, 16 U.S.C. § 791 *et seq.*, wholesale sales of electricity, and any rules or practices affecting the rates thereof, are regulated by FERC. 16 U.S.C. §§ 824(b), 824e(a). Transmission of electricity in interstate commerce is also regulated exclusively by FERC. 16 U.S.C. § 824(b)(1). State authority, exercised by state utility commissions, includes the regulation of the rates and terms for intrastate transmission, distribution services, and retail service to end-use consumers. As a practical matter, because nearly all transmission of electricity within the conterminous United States (outside of Texas) in effect moves through the interconnected national electrical grid and electrons are commingled, transmission rates and services are wholly regulated by FERC.

18. Electric utilities are subject to extensive regulation by both FERC and the states, each acting within their appropriate realm. Even so, utilities have certain inviolable rights under both the U.S Constitution and the FPA. First and foremost, utilities maintain their property interests in the infrastructure they own, and therefore they have a constitutional right to recover a reasonable return through rates.[3] In addition, utilities have the right to propose changes to their rates, subject to review and approval by FERC for justness and reasonableness.

19. Under Section 205 of the FPA, a utility can propose a new rate or changes to existing rates or service terms. 16 U.S.C. § 824d. FERC then reviews that proposal and can reject it only if it finds that the changes proposed by the utility are not "just and reasonable."

20. Once approved, these rates can be changed only if the utility files new rates under FPA Section 205 or if the rates are challenged under FPA Section 206. In a Section 206 proceeding, the complainant (either FERC itself or a third party) can challenge an existing rate or rule as "unjust and unreasonable." 16 U.S.C. § 824e. The burden in that case is on the challenger (whether FERC or a third party) to demonstrate that the existing rates or service terms are no longer just and reasonable. And before FERC can reject or change an existing rate or service term, it must find that such rates are not "just and reasonable."

21. When FERC approves a utility's filed rate and associated terms of service, they take on the force of federal law and the rates are binding on both state governments and federal and state courts.

22. Historically, electric generation, transmission, and distribution to customers were all performed by vertically integrated utility companies. However, technological advancements in generation and transmission led to the development of integrated energy pools across large regions.

---

[3] *Bluefield Waterworks & Impr. Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 690 (1923).

By the 1990s, policymakers determined that electricity could in most instances be generated and delivered more efficiently and reliably as part of a regional grid, with coordinated operations by a neutral grid operator for each region. Today, this function is largely served by the nation's ISOs and RTOs.

23. ISO and RTO formation is a serious endeavor that requires participating utilities to cede significant rights to the ISO or RTO. RTOs require participating utilities to cede more rights to the system operator than an ISO. RTOs take over tariff responsibility and extensive operational control and planning responsibility from the transmission owners. The rights transferred to the RTO include the right to decide what, when, where, and by whom regional transmission facilities—for example, high-voltage power lines and associated infrastructure—are constructed on the property of transmission owners. Similarly, RTOs receive the right to determine whether and when third parties (like electricity generation facilities selling wholesale electricity) may access these facilities.

24. For example, under the TOA, ISO-NE is granted exclusive authority over dispatch, transmission outage scheduling, approval of new interconnections, and—pursuant to FERC Order No. 1000—broader control over transmission planning.

25. FERC has found that RTOs promote efficiency and reliability, ultimately resulting in lower electricity rates to consumers.[4]

26. Recognizing that utilities maintain property rights and that joining an RTO necessarily requires ceding certain of those property rights, Congress requires that ISO and RTO formation must be voluntary. Specifically, Section 202(a) of the FPA directs the Commission to

---

[4] *See generally* Order No. 2000, 89 FERC ¶ 61,285 (1999)

"divide up the country into regional districts for the *voluntary* interconnection and coordination of facilities" and "to promote and encourage such interconnection and coordination."[5]

27. In 1999, FERC issued Order No. 2000. 89 FERC ¶ 61,285 (1999). Order No. 2000 proposed the voluntary establishment of RTOs as a new type of independent regional grid operator. Pursuant to FERC regulations, RTOs must have (a) independence from transmission owners; (b) regional scope; (c) operational control over the transmission system and certain tariff functions; and (d) exclusive authority over short-term reliability.[6] Later, in Order No. 1000, RTOs were given authority over long-term transmission system planning.

28. In 2003, FERC issued a policy statement directed at RTO formation. FERC declared that "[t]o assure that transmission owners receive benefits from RTO formation, we believe that it is reasonable to allow an adjustment to be applied to the rates of transmission owners participating in an RTO[.]" 102 FERC ¶ 61,032, P 21 (2003). FERC subsequently began to grant incentives to transmission owners that participated in and worked to form RTOs in the form of adders to a utility's authorized ROE included in its rates. FERC encouraged transmission owners to cede additional operational control to transform existing ISOs to RTOs.

29. In 2005, Congress added Section 219(a) of the FPA as part of the Energy Policy Act of 2005 ("EPAct 2005"), directing the Commission to establish incentives for utilities to join ISOs, RTOs, and other transmission organizations. FERC implemented this directive by providing an opportunity for utilities to seek an "adder" (*i.e.*, an increase) to the utility's authorized ROE if they join an RTO or ISO, often referred to as an "RTO adder." *See* 18 C.F.R. § 35.35(c).[7]

---

[5] 16 U.S.C. § 824a(a) (emphasis added).

[6] According to FERC, grid reliability "is the provision of an adequate, secure, and stable flow of electricity as consumers may need it. In other words, when you flip the light switch, the lights turn on." *Reliability Explainer*, FERC, https://www.ferc.gov/reliability-explainer (last visited: June 29, 2026).

[7] A utility's FERC-authorized ROE determines the return a utility can earn on its invested capital. For example, if a utility has $1 billion in equity invested in its physical infrastructure and FERC authorizes a 1% ROE, the utility earns

30. In 2006, FERC implemented that provision in Order No. 679. 116 FERC ¶ 61,057 (2006).

31. FERC held that it would approve, "when justified, requests for ROE-based incentives for public utilities that join and/or continue to be a member of an ISO, RTO, or other Commission-approved Transmission Organization[.]" FERC further explained, "[a]n entity will be presumed to be eligible for the incentive if it can demonstrate that it has joined an RTO, ISO, or other Commission-approved Transmission Organization, and that its membership is on-going[,]" and that "entities that have already joined, and that remain members of, an RTO, ISO, or other Commission-approved Transmission Organization, are eligible to receive this incentive." 116 FERC ¶ 61,057, at P 327.

32. FERC has routinely granted incentives to transmission owners that joined ISOs or RTOs in the form of a 50 basis-point "adder" to the utility's authorized ROE included in its rates and ultimately billed to end-use customers.

33. These measures have been effective in spurring ISO and RTO formation and growth to include new transmission utilities. FERC reports that today, approximately two-thirds of the nation's electricity load is served in ISO and RTO regions.[8]

**<u>Voluntary Formation of ISO-NE as an RTO</u>**

34. The RTO that covers Maine, along with five other New England states, is ISO-NE.

35. ISO-NE was originally created as an ISO in 1997. In 2003, Plaintiff CMP and a group of other New England transmission owners (together, the "Founding Utilities"), along with ISO-NE, proposed to establish ISO-NE as an RTO. As noted above, FERC encouraged

---

$10 million annually as a return on that invested capital. This framework is designed to provide a return sufficient to attract capital and maintain investment in infrastructure.

[8] *See* FERC, Electric Power Markets: National Overview, *available at* https://www.ferc.gov/electric-power-markets (last visited Sept. 23, 2026).

transmission owners participating in existing ISOs to convert their ISO to an RTO. As part of that process, the Founding Utilities submitted to FERC a contract *voluntarily* ceding some rights inherent in transmission asset ownership to ISO-NE and a rate filing pursuant to FPA Section 205 containing, among other things, an incentive ROE of 50 basis points (0.50%) for RTO formation—what would become Plaintiffs' RTO Adder. Notably, Plaintiffs' RTO Adder predated EPAct 2005 and FERC's implementation of those directives in Order No. 679.

36. Among other things, the Founding Utilities expressly referenced the incentive rates the Commission awarded utilities for "the level of operational independence" that the utilities provided the Midcontinent Independent System Operator, Inc. ("MISO")[9] and PJM Interconnection, L.L.C. ("PJM") through joining those RTOs and surrendering operational control of their facilities, which was a material change from their former participation in the MISO and PJM ISOs. Similarly, the formation of the ISO-NE RTO included a transfer of operational control or independence that previously had not existed in the ISO context.

37. FERC approved the formation of ISO-NE as an RTO—including the RTO Adder—in 2004 when it approved a comprehensive settlement package, finding that the Founding Utilities' transmission service rates were just and reasonable with the RTO Adder included. Although end-users are not CMP or MEPCO transmission services customers under the ISO-NE OATT, for CMP, the 50 basis point incentive is ultimately passed through to end-use customers through their utility bills.

38. FERC also approved the RTO Adder that was included in the settlement package, finding that the Founding Utilities' "voluntary proposal to establish RTO-NE [coupled with] their commitment to transfer the day-to-day operational control authority over their transmission

[9] Then the Midwest Independent Transmission System Operator, Inc.

facilities to RTO-NE, [the Founding Utilities] warrants a 50-basis point incentive." 106 FERC ¶ 61,280, at P 235. FERC expressly held the resulting rates fell "within a zone of reasonableness based on [FERC's] RTO formation policies and the facts and record before [it]." *Id.* at P 236.

39. FERC's orders were appealed by parties who challenged, among other things, the amount of the RTO Adder. The D.C. Circuit Court of Appeals in *Maine Public Utilities Commission v. FERC*, 454 F.3d 278 (D.C. Cir. 2006), denied those challenges, reasoning that the Commission's findings were supported by substantial evidence and that "[the Commission] reasonably could conclude, as it did, that the transformation" of ISO-NE "to a[n] RTO would impose significant obligations on member TOs . . . [and that the] resulting benefit [would be] to the public."

40. Plaintiff MEPCO ceded operational control over its transmission facilities to ISO-NE shortly after ISO-NE's establishment as an RTO. *ISO New England Inc.*, 111 FERC ¶ 61,277, at P 9 (2005) ("Acceptance of the instant filing completes the process for bringing the MEPCO Transmission System under ISO-NE's operating authority."). While MEPCO was not itself a Founding Utility of NE-ISO, it is wholly owned and controlled by two Founding Utilities and its rates were rolled into the ISO-NE Open Access Transmission Tariff in 2007. *See ISO New England Inc.*, 121 FERC ¶ 61,097 (2007).

41. At all periods relevant to this action, Plaintiffs have been transmission-owning members of ISO-NE and have received the 50 basis point RTO Adder to which they are entitled by FERC's approval of the TOA and approval of the transmission owners' filed rate as part of a settlement package. The RTO Adder encourages outside investment by offsetting the risk to Plaintiffs of their continued membership in the RTO. The outside investment is critical to ensuring that Plaintiffs have the necessary capital to invest in the transmission projects required to ensure

reliability and handle growing demand for electricity from changing weather patterns due to climate change, the construction of data centers, and the rapid electrification of cars, heating and cooling, home appliances, and other consumer products.

42. The operative version of the TOA is dated February 1, 2005, although it has been amended since that date. A copy of the TOA is attached to the Complaint as Exhibit 1.[10]

43. Article X of the TOA discusses, among other issues, the potential termination of the agreement. The TOA establishes two mechanisms for member entities to leave ISO-NE.

44. *First*, member entities have a right to withdraw from ISO-NE without specific cause at regular intervals. As established by Section 10.01(a)(i) of the TOA:

> Subject to the terms set forth in this Section 10.01, the initial term of this Agreement (the "Initial Term") shall commence on the [specified date] and shall continue [for a period of five years]. Subject to the terms set forth in this Section 10.01, the Initial Term shall be extended automatically for additional two-year periods (each, an "Additional Term"). [Plaintiffs] may withdraw from this Agreement effective at the end of the Initial Term or the end of any Additional Term by providing no less than 180 days' prior notice of such withdrawal ….

45. *Second*, member entities may withdraw in the middle of a term if certain enumerated events occur, as established by section 10.01(b) of the TOA.

46. Section 10.01(b)(i) provides a right to withdraw when ISO-NE itself is in breach of its covenants and fails to perform its material obligations.

47. Section 10.01(b)(ii)(B) provides a right to withdraw when FERC or a court order results in a change in policy that would prevent recovery of transmission costs on a cost-of-service basis.

[10] MEPCO and ISO-NE submitted a separate transmission operating agreement to FERC on March 28, 2005 (the "MEPCO TOA"). The MEPCO TOA is the contract under which MEPCO transferred operational authority over its facilities to ISO-NE consistent with the TOA. A copy of the current version of the MEPCO TOA is attached to this Complaint as Exhibit 2. The provisions of the TOA and MEPCO TOA that are relevant to this Complaint are substantively identical except where noted and both are referred to collectively herein as the "TOA" unless otherwise specified.

48. Sections 10.01(b)(iv) and (v) provide a right to withdraw when a transmission owner like Plaintiffs wants to form or join another FERC-approved RTO.

49. Section 10.01(c)[11] gives a transmission owner the right to withdraw when other transmission owners are terminating their participation.

50. The termination provisions of the TOA were challenged by third parties when filed and were explicitly approved by FERC in the order approving the formation of ISO-NE as an RTO.

51. Thus, while Plaintiffs have not withdrawn from ISO-NE, they maintain the right to do so under the TOA that is on file with FERC.

**Multiple States, Including Maine, Target the RTO Adder**

52. On April 6, 2026, Maine Governor Janet Mills signed into law Public Law Chapter 646 (H.P. 1368, L.D. 2038), "An Act to Require Maine Transmission and Distribution Utility Participation in a Regional Transmission Organization" (the "Maine RTO Requirement").[12]

53. Both the text and the legislative history of the Maine RTO Requirement make clear that its sole purpose and intent is to eliminate FERC's ROE transmission rate RTO adder for Maine's transmission owner utilities by mandating the very RTO participation that the adder was designed to incentivize.

54. The legislation contains several "whereas" clauses that make this legislative purpose abundantly clear:

> Whereas, there is an immediate need to ensure that electricity rates charged to Maine electricity ratepayers for transmission and distribution service in Maine are just and reasonable; and
>
> Whereas, the United States Courts of Appeals for the Sixth Circuit and Ninth Circuit have recently issued decisions determining that electric utilities in states that require membership in a regional transmission organization are not eligible to recover a special bonus return on equity

[11] This provision is contained in the TOA, but not the MEPCO TOA.
[12] 35-A Me. Rev. Stat. Ann. § 3133-B.

> authorized under federal law for electric utilities that voluntarily join a regional transmission organization; and
>
> Whereas, delay in the implementation of this legislation would cause significant harm to Maine electricity ratepayers by allowing Maine electric utilities to continue to collect a special bonus return on equity on their transmission assets, unnecessarily inflating electricity rates paid by Maine electricity ratepayers…[13]

55. The operative provisions of the Maine RTO Requirement (subject to certain exceptions not relevant here) provide:

> 1. Regional transmission organization; definition. For the purposes of this section, "regional transmission organization" has the same meaning as in section 10102, subsection 8.
>
> 2. Participation mandatory. Except as provided in subsection 3, a transmission and distribution utility may not own or control a transmission and distribution plant located in the State unless the transmission and distribution utility participates in a regional transmission organization.[14]

56. That the Maine Legislature intended the Maine RTO Requirement to eliminate the FERC-approved RTO adder to electric transmission rates is confirmed by testimony from the Maine state agencies most directly involved in the RTO adder.

57. Maine's Office of the Public Advocate testified, "[e]nacting this legislation will enable Maine ratepayers to save more than $2 million from eliminating the return on equity bonus."[15]

58. The Maine Public Utilities Commission agreed, stating: "[t]he incentive FERC has approved for participation in a regional transmission organization (RTO) has been typically a

---

[13] *An Act Regarding the Participation of Transmission and Distribution Utilities with ISO-New England*, H.P. 1368, 132nd Leg. 2nd Reg. Sess., 1-2 (Me. 2025).

[14] 35-A Me. Rev. Stat. Ann. § 3133-B(2).

[15] *Testimony in Support LD2038, "An Act Regarding the Participation of Transmission and Distribution Utilities with ISO-New England"*, L.D. 2038, 132nd Leg. 2nd Reg. Sess. (Me. 2025) (Testimony of Heather Sanborn, Off. of Pub. Advoc.)

0.5% increase in the utility's approved return on equity. *This legislation aims to eliminate that adder* by requiring RTO participation."[16]

59. The Maine Department of Energy Resources went even further, stating: "[e]nacting the simple change this bill proposes requiring Maine's two investor-owned utilities to be members of ISO-NE would end this 'bonus' on ROE and save ratepayers several million dollars per year in the near term."[17]

60. The Maine RTO Requirement comes on the heels of efforts by multiple states to eliminate RTO adders from FERC-approved rates.

61. On July 1, 2025, Connecticut's Governor signed Senate Bill 4 into law as Public Act No. 25-173. This legislation similarly aimed to make RTO membership compulsory; as the author of the bill noted in her testimony, "this requirement, it is our hope, will give us the appropriate authority for FERC to deny that adder in the transmission planning cost."[18]

62. On May 12, 2026, Maryland Governor Wes Moore signed emergency legislation requiring electric companies and other transmission owners in the state to be members of an RTO.[19] As the Maryland Office of People's Counsel noted, the bill "thus eliminat[es] their claim to the financial incentive they currently receive for voluntary membership."[20]

[16] *Testimony in Support LD2038, "An Act Regarding the Participation of Transmission and Distribution Utilities with ISO-New England*," L.D. 2038, 132nd Leg. 2nd Reg. Sess. (Me. 2025) (Testimony of Amy Dumey, Admin. Dir., Me. Pub. Utilities Comm.) (emphasis added).

[17] *Testimony in Support LD2038, "An Act Regarding the Participation of Transmission and Distribution Utilities with ISO-New England*," L.D. 2038, 132nd Leg. 2nd Reg. Sess. (Me. 2025) (Testimony of Dan Burgess, Acting Comm'r, Dep't of Energy Res.)

[18] 2025 Hearing on S.B. 4 Before Conn. Gen. Assemb., 550 (June 3, 2025) (Test. of Rep. Jamie Foster).

[19] Utility RELIEF Act, H.B. 1532, 2026 Gen. Assem., Reg. Sess. (Md. 2026)

[20] Md. Off. of People's Counsel, 2026 Utility RELIEF Act (July 13, 2026), https://opc.maryland.gov/Publications/Legislative-Work/2026-Utility-RELIEF-Act.

63. Both Connecticut and Maryland have filed Section 206 complaints with FERC on the basis of those state laws.[21]

64. Most recently, on July 7, 2026, New Jersey Governor Mikie Sherrill signed into law *Repeal ROE Adder Act*, which similarly mandates RTO participation to revoke any claim by the transmission owners to the FERC granted incentive bonus.[22]

65. In addition, similar legislation has been proposed in Massachusetts.[23]

66. At the same time, New Hampshire has ordered a study of ISO participation and the relative benefits of leaving the ISO-NE, signaling a potential new state path for interfering with ISO/RTO participation and ultimately attempting to eliminate the adder.[24]

67. Taken together, these state efforts reflect a trend among states seeking to foreclose FERC-approved RTO participation adders by making RTO membership a matter of state compulsion rather than voluntary choice, and the Maine RTO Requirement represents the latest instance of this strategy.

**Defendants Filed the FERC Complaint to Enforce the Maine RTO Requirement**

68. On September 1, 2026, Defendants filed a complaint with FERC pursuant to FPA Section 206, seeking to enforce the Maine RTO Requirement (the "Section 206 Complaint"). Defendants' FERC complaint seeks an order declaring that Plaintiffs' RTO Adder is unjust and unreasonable and asking the Commission to set a replacement rate that eliminates the RTO Adder. A copy of the Section 206 Complaint is attached at Exhibit 3.

69. The sole basis for the Section 206 Complaint is the Maine RTO Requirement.

---

[21] Complaint of *Maryland Energy Administration, et al. v. Baltimore Gas and Electric Company, et al.*, Docket No. EL26-87-000 (filed Jul. 2, 2026); Complaint of *Connecticut Department of Energy and Environmental Protection, et al. v. The Connecticut Light & Power Company, et al.*, Docket No. EL26-79-000 (filed Jun. 11, 2026).

[22] Repeal ROE Adder, A.B. 2757, 2026 Assembly (N.J. 2026).

[23] An Act Relative to Energy Affordability, Clean Power and Economic Competitiveness, H.B. 5175, 194 Gen. Court (Mass. 2026).

[24] Frayer et al., *Investigating New Hampshire's Participation in ISO New England* (2026).

70. Thus, the Maine RTO Requirement undermines the federal policy regime of voluntary membership in RTOs and forces utilities like Plaintiffs to concede property interests and contracted-for rights without compensation.

71. The Maine RTO Requirement has numerous legal defects that require this Court's intervention.

**COUNT 1**
**<u>Filed Rate Doctrine</u>**
**(42 U.S.C. § 1983; *Ex parte Young*; Declaratory Judgment Act; 28 U.S.C. §§ 2201(a) and 2202)**

72. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

73. Federal law requires regulated entities to file any schedules (including contracts) with FERC that contain the rates and charges for FERC-jurisdictional services, as well as the classification, practices, and regulations affecting those rates and charges. 16 U.S.C. § 824d(c). Once filed, such schedules, known as tariffs, become the filed rate.

74. The filed rate doctrine is a core component of the federal regulatory framework under the FPA. Under the Supremacy Clause, the filed rate doctrine requires that FERC-approved tariffs must be given binding effect by states; the tariff carries the force of federal law and cannot be altered, undermined, or functionally displaced by state action. But the Maine RTO Requirement does precisely what the filed rate doctrine prohibits. It is designed to unravel the filed rate. The Maine RTO Requirement thus violates the filed rate doctrine and, therefore, the FPA and is invalid under the Supremacy Clause.

75. FERC's approval of the TOA means that its provisions, including the right to terminate membership in ISO-NE, constitute part of the filed rate and thus the tariff. By compelling transmission owners to participate in ISO-NE, the Maine RTO Requirement alters federally approved terms and conditions.

76. The filed rate doctrine also protects the RTO Adder, which FERC specifically approved as a component of Plaintiffs' return on equity.

77. Because the TOA, as part of the filed rate, has the force of federal law, state policies that directly contradict or interfere with the provisions of the filed rate are invalid.

78. The Maine RTO Requirement directly, personally, and substantially injures Plaintiffs. By design and intent, the Maine RTO Requirement eliminates the FERC-approved RTO adder Plaintiffs are entitled to under FERC's approval of the filed rate. Moreover, the Maine RTO Requirement removes Plaintiffs' right to terminate membership in ISO-NE, which also constitutes part of the filed rate.

79. Accordingly, Plaintiffs seek (a) a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Maine RTO Requirement is unlawful as applied to Plaintiffs pursuant to the filed rate doctrine, as applied to the states through the Supremacy Clause of the United States Constitution at Article IV, clause 2; and (b) a permanent injunction pursuant to 28 U.S.C. § 1651(a) prohibiting Defendants from enforcing or administering the Maine RTO Requirement.

**COUNT 2**
**Supremacy Clause – Preemption**
**(42 U.S.C. § 1983; *Ex parte Young*; Declaratory Judgment Act; 28 U.S.C. §§ 2201(a) and 2202)**

80. Plaintiffs repeat and reallege the preceding paragraphs, as if fully set forth herein.

81. The Supremacy Clause of the United States Constitution provides in relevant part that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const., Art. IV, cl. 2. This establishes that where state law conflicts with federal law, the latter preempts the former.

82. A state law may be preempted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress or interferes with the method by which

the federal statute was designed to reach this goal. This is called "conflict preemption." Similarly, a state law may be preempted if Congress enacts a federal law and regulatory scheme that intends to fully occupy the field it has chosen to regulate. This is called "field preemption."

83. The Maine RTO Requirement is conflict-preempted.

84. *First*, the Maine RTO Requirement violates Plaintiffs' express statutory right under FPA Section 205 to: (a) file rates and terms for services rendered with their assets; and (b) only voluntarily concede this right through contract. 16 U.S.C. § 824d. Individual utilities may choose to restrict their own exercise of these rights by contract, but neither FERC nor a state has authority to abridge those rights involuntarily.

85. Plaintiffs chose to cede some of these rights when they voluntarily agreed—along with other entities—to form and join the New England RTO under the TOA and cede some of their Section 205 filing rights to ISO-NE as the newly formed RTO. Although Plaintiffs voluntarily conceded certain rights in the past, they did so subject to a comprehensive FERC-approved framework that expressly preserves their right to terminate RTO membership. That termination right was a core provision of the parties' bargain and a central feature of the voluntary framework on which FERC's approval rests.

86. As pursuant to federal law Plaintiffs cannot be required to join ISO-NE and cede their Section 205 filing rights, the Maine RTO Requirement—which expressly instructs Plaintiffs to do so—is preempted. It is well-established that states do not have authority to limit or eliminate rights granted by federal statute.

87. *Second*, the plain language of FPA Section 219 conflicts with the Maine RTO Requirement. FPA Section 219 has three relevant components: (a) a requirement to make a rule providing incentive-based (including performance-based) rate treatments; (b) a requirement that

this rule, among other things, promote capital investment, provide a return on equity for new investment, encourage deployment of new technology, and other goals; and (c) a requirement that this rule incentivize RTO membership. 16 U.S.C. §§ 824s(a)-(c).

88. As implemented by FERC Order No. 679, FERC has chosen to incentivize RTO membership through an adder applicable to RTO membership. Consistent with the law, FERC expressly declined to make RTO membership mandatory. The Maine RTO Requirement thus directly conflicts with the FPA and FERC's implementing regulations.

89. *Third*, the broader purpose of FPA Section 219 is frustrated by the Maine RTO Requirement. To the extent mandating RTO membership prevents FERC from issuing or maintaining a previously issued RTO adder, such a mandate frustrates the federal policy choice to encourage RTO membership through incentives rather than to mandate membership. A state law that makes it mandatory to join the RTO directly conflicts with the FPA's purpose of *incentivizing* RTO membership, as well as the purpose of incentivizing and encouraging competition and investment in the electric transmission sector.

90. The Maine RTO Requirement is also field-preempted.

91. Transmission of electricity in interstate commerce is regulated exclusively by FERC. 16 U.S.C. § 824(b)(1). Jurisdiction over interstate transmission is therefore plenary and exclusive and cannot be overridden by any assertion of transmission-related jurisdiction by the states. Because RTO membership entails the transfer to the RTO of numerous FERC-regulated transmission activities, FERC was required to approve such membership terms under FPA Section 205 and did so, and states cannot regulate where FERC has exclusive jurisdiction.

92. Moreover, ISO-NE is an interstate entity, including participation of utilities from every one of the six states that its transmission system covers. ISO-NE also operates a wholesale

power market for all power sold within that transmission system. The Maine RTO Requirement forces Plaintiffs to join an interstate RTO, hand over control of their transmission assets to said RTO, and thus participate fully in the interstate trade of wholesale electricity.

93. The Maine RTO Requirement was passed for one reason and one reason only: to force a change to a FERC-jurisdictional rate and override the terms of a federally-approved tariff. The FPA grants the Commission plenary and exclusive authority over the rates, terms, and conditions of interstate transmission. That authority extends to ISO and RTO participation, which directly affects tariff administration, operational control, planning responsibilities, and rate-setting. The Maine RTO Requirement attempts to regulate those very matters by conditioning ownership and control of transmission facilities on participation in ISO-NE and thus improperly intrudes beyond the state's authority. Defendants' enforcement of that requirement is a direct attack on FERC-regulated rates that is preempted by the FPA.

94. The Maine RTO Requirement directly, personally, and substantially injures Plaintiffs by eliminating the ROE Adder that they have previously received and, if not for the Section 206 Complaint that is premised entirely on the Maine RTO Requirement, would continue to receive in the future.

95. Accordingly, Plaintiffs seek (a) a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Act's Maine RTO Requirement is facially unconstitutional under the Supremacy Clause of the United States Constitution at Article IV, clause 2; and (b) a permanent injunction pursuant to 28 U.S.C. § 1651(a) prohibiting Defendants from enforcing the Maine RTO Requirement.

**COUNT 3**
**Takings Clause**
**(42 U.S.C. § 1983; *Ex parte Young*; 28 U.S.C. §§ 2201(a) and 2202)**

96. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

97. The Takings Clause of the United States Constitution provides, in relevant part, that "private property [shall not] be taken for public use, without just compensation." U.S. Const., Am. 5.

**Physical Taking**

98. When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation.

99. Government regulations that physically appropriate property without compensation constitute unconstitutional takings under all circumstances. The property rights protected against takings are expansive, including the rights to possess, to use, to exclude, to profit, and to dispose of property. Takings occur where the government acquires property for a third party, where the intruded-upon right has limited cash value, and/or where the intrusion, such as mandated access, is intermittent. Takings also occur where the government has not seized title to property but rather commandeered it—directly or through an intermediary—to operate in a particular way.

100. Further, the fact that a party previously voluntarily conceded certain rights in their property does not immunize the state against a Takings claim when a new law renders those concessions mandatory.

101. The Maine RTO Requirement constitutes a physical taking.

102. The Maine RTO Requirement mandates continued and permanent membership in ISO-NE. Membership in ISO-NE requires Plaintiffs to cede substantial property rights to ISO-

NE, including: (1) operational control over their transmission facilities; (2) when and under what circumstances to allow outsiders to use those facilities; and (3) the loss of the final say over what, when, where, and by whom most transmission facilities are constructed on Plaintiffs' property.

103. Whether title is transferred or not, membership in ISO-NE and cession of these rights constitutes the removal of several "sticks" from the "bundle" that makes up Plaintiffs' property rights.

104. Moreover, the government engages in a physical taking when it commandeers or takes control of part or all of a business's facilities to use and operate for the government's purposes. By forcing Plaintiffs to remain within ISO-NE no matter what, Maine permanently commandeers Plaintiffs' property by proxy.

105. The permanent and irrevocable loss of these property rights under the Maine RTO Requirement constitutes a physical taking of Plaintiffs' property for the benefit of Maine's asserted interests. This taking has not been compensated, and there is no indication that the State of Maine plans to do so.

**Regulatory Taking**

106. The government may also violate the Takings Clause by engaging in an uncompensated regulatory taking. Regulatory takings occur where the government imposes regulations that restrict an owner's ability to use their own property without a physical taking, but in ways that go "too far" in restricting use such that it is constitutionally suspect.

107. In evaluating whether a regulatory burden constitutes a taking, courts assess (a) the economic impact of the regulation; (b) its interference with reasonable investment-backed expectations; and (c) the character of the restriction or government action.

108. The Maine RTO Requirement constitutes a regulatory taking.

109. The economic impact of the regulation is severe, substantially impairing Plaintiffs' ability to obtain the full return on equity to which it is entitled and upon which it relies for investment capital to maintain and improve transmission infrastructure and ensure system reliability and undermining the economic basis of its contractual relationship with ISO-NE.

110. The Maine RTO Requirement also contradicts Plaintiffs' reasonable investment-backed expectations. Plaintiffs, like other utilities, rely on predictable regulatory and pricing structures to engage in long-term planning for investment in infrastructure. Plaintiffs were granted the RTO Adder many years ago, under a still-extant regulatory scheme that incentivized voluntary RTO membership rather than mandating RTO membership.

111. In voluntarily choosing to form ISO-NE, Plaintiffs entered a bargain with FERC that they would voluntarily comply with Congress and FERC's preferences in exchange for the incentive payment. The Maine RTO Requirement revokes Plaintiffs' benefit from that bargain with no compensation and by unexpected means.

112. Moreover, Plaintiffs' Section 205 right to file rates and terms for services rendered with their assets, and avoid involuntary abridgement of those rights, creates a clear expectation that they would have the right to terminate their membership in the RTO and maintain any benefits associated with voluntary membership.

113. Finally, while Defendants have engaged in a physical taking, the character of the State of Maine's action also supports a finding that this is a regulatory taking. Mandating that Plaintiffs permanently hand over control of their transmission system to the RTO grants substantial control over Plaintiffs' property to the RTO. This is a significant trammeling of Plaintiffs' property rights.

114. The permanent and irrevocable loss of these property rights under the Maine RTO Requirement constitutes a regulatory taking of Plaintiffs' property for the benefit of Maine's asserted interests. This taking has not been compensated for, and there is no indication that the State of Maine plans to do so.

115. Accordingly, Plaintiffs seek (a) a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Maine RTO Requirement is unconstitutional under the Takings Clause of the Fifth Amendment to the United States Constitution, and (b) a permanent injunction pursuant to 28 U.S.C. § 1651(a) prohibiting Defendants from enforcing the Maine RTO Requirement.

**COUNT 4**
**Contracts Clause**
**(42 U.S.C. § 1983; *Ex parte Young*; 28 U.S.C. §§ 2201(a) and 2202)**

116. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

117. The Contracts Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10, cl. 1.

118. When determining whether a state law violates the Contracts Clause, the court looks to whether the law operates as a substantial impairment of a contractual relationship, and, if so, whether the law is drawn in a reasonable and necessary way to advance an important government interest.

119. The Maine RTO Requirement violates the Contracts Clause.

120. The TOA is a contract to which Plaintiffs are parties.

121. The Maine RTO Requirement functions as a substantial impairment on Plaintiffs' contractual rights. The Maine RTO Requirement voids the termination rights protected by the TOA, and the right to end a contract pursuant to its terms is a core contractual right.

122. The Maine RTO Requirement does not establish a legitimate government interest. Despite purporting to target the overall cost of electricity, the Maine RTO Requirement solely burdens a narrow group of transmission operators in a politically expedient fashion.

123. Moreover, the Maine RTO Requirement seeks to undermine FERC's program of voluntary compliance and incentives. The FPA broadly reserves substantial autonomy to market participants to determine their own economic relationships, and Congress' amendments to the FPA, FERC's implementation of that statute, and federal courts' review reinforces that the authority of states and FERC over utilities like Plaintiffs is constrained.

124. Finally, the Maine RTO Requirement is not an appropriate and reasonable way to achieve its ostensible goal. The law takes aim at a narrow class of individuals, whose transmission costs have a limited role in customers' overall cost of electricity, when its purported goals could be served equally by spreading the necessary sacrifice throughout a broader, and perhaps more politically powerful, base.

125. Further, the contractual impairment is a permanent response to a well-known and long-standing problem, *i.e.*, high electricity rates, as opposed to a temporary emergency response to a sudden change in circumstances.

126. Accordingly, Plaintiffs seek (a) a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Maine RTO Requirement is unconstitutional under the Contracts Clause of the United States Constitution at Article I, § 10, and (b) a permanent injunction pursuant to 28 U.S.C. § 1651(a) prohibiting Defendants from enforcing the Maine RTO Requirement.

**COUNT 5**
**Imposition of Unconstitutional Conditions**
**(42 U.S.C. § 1983; *Ex parte Young*; 28 U.S.C. §§ 2201(a) and 2202)**

127. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

128. The unconstitutional-conditions doctrine prohibits the government from arbitrarily conditioning the grant of a benefit on the surrender of a constitutional right, regardless of the fact that the government appropriately might have refused to grant the benefit at all.

129. For that reason, conditions on the use of property that could violate a party's constitutional rights must have an essential nexus with the government policy being advanced, *i.e.*, an actual relationship between the condition and the governmental purpose that would justify the curtailment of the property interest with no means of avoiding the condition. Such conditions must also demonstrate rough proportionality between the scope of the condition and of the issue being addressed.

130. Such an unconstitutional condition exists here. The Maine RTO Requirement does not merely regulate how Plaintiffs may use their property; it conditions whether Plaintiffs may continue to own that property at all on surrendering federally protected rights through compelled RTO membership. The Maine RTO Requirement plainly states, "a transmission and distribution utility may not *own or control*" transmission facilities in Maine unless it joins ISO-NE. This forces Plaintiffs to choose between on one hand surrendering core property rights, federally protected interests, and its contractual arrangement with ISO-NE, or on the other relinquishing its ownership of the facilities altogether.

131. While the ability for an electric transmission company to operate at all in Maine is up to the government, by prohibiting Plaintiffs from even owning transmission facilities absent compliance with the statute, the statute is not regulating ownership, it is weaponizing ownership as leverage to force surrender of other property and contractual rights and interests. The statute thus functions as a compelled divestiture regime, demanding some of Plaintiffs' rights in exchange for not having its continued ownership of its property rendered unlawful.

132. There is no legitimate essential nexus between forced perpetual membership in ISO-NE and Maine's purported policy objectives, nor is there even a rough proportionality between Maine's demand—comply or shut down—and its policy goals.

133. The Maine RTO Requirement thus extends beyond regulating the use of property or contracts, and instead conditions the right to own that property on the surrender of constitutionally and statutorily protected rights—in other words, a taking through the imposition of an unconstitutional condition. Such coercion is the hallmark of an unconstitutional condition and independently renders the statute invalid.

Accordingly, Plaintiffs seek (a) a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Maine RTO Requirement is unconstitutional through its imposition of unconstitutional conditions on Plaintiffs, and (b) a permanent injunction pursuant to 28 U.S.C. § 1651(a) prohibiting Defendants from enforcing the Maine RTO Requirement.

**WHEREFORE**, in light of the foregoing, Plaintiffs seek:

A. a declaration that the Maine RTO Requirement is invalid;

B. a permanent injunction prohibiting Defendants from enforcing the Maine RTO Requirement; and

C. such costs and reasonable attorneys' fees to which Plaintiffs may be entitled by law, including under 42 U.S.C. § 1988; and

D. all such other relief to which they may be entitled.

Dated: October 9, 2026

Respectfully submitted,

*/s/ John A. Woodcock III*
John A. Woodcock III
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, Maine 04101
Telephone: (207) 791-1100
Email: jwoodcock@pierceatwood.com

Catherine P. McCarthy *(pro hac vice pending)*
Britt Cass Steckman *(pro hac vice pending)*
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
Telephone: (202) 828-5800
Email: catherine.mccarthy@bracewell.com
britt.steckman@bracewell.com

***Counsel to Plaintiffs***
***Central Maine Power Company and Maine Electric Power Company***