# EXHIBIT 2

ORIGINAL

ISO new england

FILED
OFFICE OF THE
SECRETARY

2006 NOV -9 P 2:02

FEDERAL ENERGY
REGULATORY COMMISSION

November 9, 2006

FILED
OFFICE OF THE
SECRETARY
2006 NOV -9 P 1:57
FEDERAL ENERGY
REGULATORY COMMISSION

**Via Courier**

The Honorable Magalie R. Salas, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

**Re: Informational Filing of Revisions to the MEPCO Transmission Operating Agreement; Docket No. ER07- 197 -000**

Dear Secretary Salas:

For informational purposes, ISO New England Inc. (the "ISO" or "ISO-NE") and Maine Electric Power Company, Inc. ("MEPCO") (collectively, the "Filing Parties") hereby submit an original and fourteen (14) copies[1] of this transmittal letter and revisions to the MEPCO Transmission Operating Agreement ("MEPCO TOA")[2] between the ISO and MEPCO to include the Chester Static VAR Compensator ("SVC") as a covered facility under the MEPCO TOA. Through the MEPCO TOA, MEPCO will grant operational authority to the ISO over the Chester SVC.

## I. BACKGROUND

On March 28, 2005, the ISO and MEPCO submitted the MEPCO TOA to the Federal Energy Regulatory Commission ("Commission") for filing. On May 27, 2005, the Commission issued an order accepting the MEPCO TOA effective April 1, 2005 ("Accepting Order").[3] The MEPCO TOA is the contract under which MEPCO transferred operational authority over its facilities to the ISO consistent with the initial regional transmission organization ("RTO") filing.[4] In the Accepting Order, the Commission found, among other things that: (1) the

---

1 *See* 18 C.F.R. § 385.2004 (2006).

2 Capitalized terms used but not otherwise defined in this filing have the meanings ascribed to them in the MEPCO TOA.

3 *See ISO New England Inc.*, 111 FERC ¶ 61,277 (2005).

4 *See* Request for Approval of a Regional Transmission Organization for New England, Docket No. RT04-2-000, October 31, 2003.

MEPCO TOA achieves a greater integration of the MEPCO Transmission System within the operations, administration, and planning of the New England Control Area; (2) the MEPCO Transmission System is operated, under the MEPCO TOA, in a similar fashion to the transmission facilities subject to the ISO's other Transmission Operating Agreements ("TOAs") and with a similar split of rights and responsibilities between ISO-NE and MEPCO as is contained in such other agreements; and (3) the MEPCO TOA ensures that the MEPCO Transmission System is operated and administered in a manner consistent with ISO-NE's long-range system planning process.[5]

The Commission also noted in the Accepting Order that the MEPCO TOA contains adequate and reasonable procedures for adding facilities in the future.[6] These procedures are set forth in Article 11.04 of the MEPCO TOA. Under Article 11.04, the Filing Parties may mutually agree to amend the MEPCO TOA. The instant filing reflects the Filing Parties' mutual agreement to amend the MEPCO TOA for the sole purpose of adding the Chester SVC to the list of facilities covered under the MEPCO TOA. Under Article 11.04(d), the Filing Parties must notify the stakeholders of proposed amendments to the MEPCO TOA by posting such amendments on the ISO website prior to the filing of such amendments with the Commission. Accordingly, the revisions described in this filing (the "Revisions") were posted on the ISO website on August 16, 2006 and were communicated to the New England Power Pool ("NEPOOL") Transmission Committee on August 22, 2006.[7]

Until the date of the Revisions, the Chester SVC was not included under any of the ISO's TOAs. However, because the Chester SVC is a facility that provides voltage support to the bulk power system in New England and is interconnected to the MEPCO transmission facilities, the ISO and MEPCO felt that the Chester SVC needed to be included within a TOA in order to formalize the ISO's operational control over the facility. The Chester SVC is not owned by MEPCO, nor is it a MEPCO transmission facility. However, under the Chester SVC Partnership Basic Operating Agreement,[8] MEPCO has authority on behalf of the Chester SVC Partnership, the owner of the Chester SVC, to operate the Chester SVC and to transfer operating authority over the Chester SVC to another party, as appropriate.

Given MEPCO's authority on behalf of the Chester SVC Partnership and the ISO's role under the RTO, the Filing Parties felt that the formalization of the ISO's operating authority over the Chester SVC should most appropriately be included within the MEPCO TOA. The Revisions bring the Chester SVC under the operational control of the ISO.

---

[5] Accepting Order at P 10.

[6] *Id.* at P 12.

[7] *Available at* http://www.iso-ne.com/committees/comm_wkgrps/trans_comm/tariff_comm/mtrls/2006/aug222006/a0_zip_1_tc_082206.zip.

[8] The terms of this agreement were extended until July 1, 2010 by letter order issued September 16, 2005 in Docket No. ER05-1278-000.

## II. DESCRIPTION OF THE FILING PARTIES

The ISO is the private, non-profit entity that serves as the RTO for New England. The ISO administers the New England energy markets and operates the New England bulk power system pursuant to the ISO Tariff[9] and its TOAs with the various New England transmission owners.

MEPCO is the signatory to the MEPCO TOA with the ISO. MEPCO is jointly owned and operated by three Maine utilities: Central Maine Power Company, Bangor Hydro-Electric Company, and Maine Public Service Company. MEPCO owns and operates a 345 kV transmission line connected to Central Maine Power Company at the Maine Yankee Substation in Wiscasset Maine, and at the Maxcy's Substation in Windsor, Maine to Bangor Hydro Electric Company at Orrington, Maine and at its northern end, at the Canadian border to a similar 345 kV transmission line owned by New Brunswick Power.

## III. DESCRIPTION OF THE REVISIONS

The main role of the Chester SVC is to support the bulk power system in New England. The Revisions amend the MEPCO TOA to provide the ISO with formal operational authority over the Chester SVC. The ISO's practices and responsibilities in directing the operation of the MEPCO Transmission Facilities under the MEPCO TOA will not be affected by the Revisions and will remain as accepted by the Commission. The amendments are therefore primarily administrative in nature and do not alter the substantive terms and conditions of the MEPCO TOA. This filing includes updated Schedules 1.01, 2.01(a) & (e), and 3.10 to the MEPCO TOA to reflect the inclusion of the Chester SVC in the ISO's control area.

- Schedules 1.01 and 2.01(a) set forth a definition of the Chester SVC, clarify the purpose for the inclusion of the Chester SVC, and describe the manner in which its costs have been and will be recovered.

- The definition of covered MEPCO Transmission Facilities in Article 2.01(e) has been amended to include the Chester SVC and modified to make clear that the Chester SVC is covered by the MEPCO TOA for the sole purpose of conveying operational authority to the ISO.

- Schedule 3.10 lists certain existing contracts involving the Chester SVC that would be afforded grandfathered treatment under the MEPCO TOA without modification.

A "Whereas" clause has been added to memorialize that MEPCO has the authority to act as agent for the Chester SVC Partnership and that it desires to include the Chester SVC as an entity over which the ISO has operating authority.

---

9 ISO New England Inc. Transmission, Markets and Services Tariff ("ISO Tariff") includes the ISO Open Access Transmission Tariff ("ISO OATT"), which is Section II of the ISO Tariff. The ISO Tariff is available at www.iso-ne.com/regulatory/tariff/index.html.

The Revisions also include certain ministerial and non-substantive changes, such as replacing the term "ISO Tariff" with "ISO OATT" and replacing the term "TOA" with "MEPCO TOA."[10]

The Revisions do not result in any changes to the Regional Network Service ("RNS") rates or the MEPCO transmission service rates. Chester SVC costs will continue to be recovered via a bilateral contract with New England Hydro Corporation. The Filing Parties note that the Revisions *only* bring the Chester SVC facility under the ISO's operational authority, and do not modify in any way existing filing rights under the TOAs or the cost recovery of the MEPCO Transmission Facilities or the Chester SVC.[11] MEPCO's and the ISO's rights and responsibilities associated with MEPCO transmission service as defined under the MEPCO TOA and the terms and conditions by which RNS and MEPCO transmission service are offered under Section II of the ISO Tariff will remain the same and there will be no adverse impact on transmission customers or the New England bulk power system generally as a result of this filing.

## IV. EFFECTIVE DATE

The Filing Parties have agreed that the Chester SVC will be under the operational control of the ISO effective as of December 1, 2006.

## V. ATTACHMENTS TO THE FILING LETTER

In addition to this transmittal letter, the Filing Parties provide the following materials:

- A clean version of the MEPCO TOA including the Revisions (Attachment 1); and
- A blacklined version of the MEPCO TOA showing the Revisions (Attachment 2).

10 Other ministerial changes include the correction of various clerical errors namely, the proper alphabetical ordering of definitions in Schedule 1.01, the insertion of a definition for "MEPCO TOA" in Schedule 1.01, and other such non-substantive corrections and clarifications.

11 Although the MEPCO TOA includes provisions relating to tariff filing rights, rate recovery issues, and operational authority functions, the Revisions expressly state that the provisions regarding tariff filing rights and rate recovery do not apply to the Chester SVC. *See, e.g.* Schedule 2.01(a) ("The inclusion of the Chester SVC on this Schedule 2.01(a) is for the sole purpose of granting Operating Authority of said facility to ISO"); and Article 2.01(e) ("The inclusion of the Chester SVC Facility in Schedule 2.01(a) of this agreement is for the sole purpose of granting Operating Authority, but specifically excludes those responsibilities under Article 3.03 of this Agreement, of said facility to ISO.")

All correspondence and communications to ISO-NE regarding this filing should be addressed to:

Monica Gonzalez
Regulatory Counsel
ISO New England Inc.
One Sullivan Road
Holyoke, MA 01040-2841
Tel: (413) 535-4178
Fax: (413) 535-4379
E-mail: mgonzalez@iso-ne.com

Perry D. Robinson
Ballard Spahr Andrews & Ingersoll, LLP
601 13th Street NW
Suite 1000 South
Washington, DC 20005-3807
Tel: (202) 661-7616
Fax: (202) 626-9044
E-mail: robinsonp@ballardspahr.com

All correspondence and communications to MEPCO regarding this filing should be addressed to:

Stephanie T. McNeal
Regulatory & Tariffs
Central Maine Power Company
83 Edison Drive
Augusta, ME 04336
Tel: (207) 621-3871
Facsimile: (207) 626-9577
e-mail: regulatoryservices@cmpco.com

R. Scott Mahoney
Vice President
Central Maine Power Company
83 Edison Drive
Augusta, ME 04336
Tel: (207) 621-3955
Facsimile: (207) 621-4714
e-mail: scott.mahoney@cmpco.com

Hariph M. Smith
Electric Transmission Services
Maine Electric Power Company
83 Edison Drive
Augusta, ME 04336
Tel: (207) 621-7800
Facsimile: (207) 621-7869
e-mail: hariph.smith@cmpco.com

## VI. CONCLUSION

Wherefore, the Filing Parties hereby provide formal notice to the Commission that the Chester SVC will be under the operational control of the ISO.

Please acknowledge receipt of the foregoing by date-stamping the enclosed extra copies of this filing and returning it to the courier delivering this filing.

Respectfully submitted,

Monica Gonzalez
Regulatory Counsel
ISO New England Inc.
One Sullivan Road
Holyoke, MA 01040
(413) 535-4178

Counsel for ISO New England Inc.

R. Scott Mahoney
Vice President
Central Maine Power Company
83 Edison Drive
Augusta, ME 04336
(207) 621-3955

Counsel for Central Maine Power Company
(on behalf of MEPCO)

Document Accession #: 20061114-0058 Filed Date: 11/09/2006

**Attachment 1**

# MEPCO TRANSMISSION OPERATING AGREEMENT

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS; INTERPRETATIONS ..... 5

1.01 Definitions; Interpretations ..... 5

ARTICLE II MEPCO TRANSMISSION FACILITIES ..... 6

2.01 MEPCO Transmission Facilities ..... 6

2.02 New MEPCO-TF ..... 7

2.03 Excluded Assets ..... 7

2.04 Connection with Non-Parties ..... 9

2.05 Review of Transmission Plans ..... 11

2.06 Condemnation ..... 11

ARTICLE III OPERATING AUTHORITY ..... 12

3.01 Grant of Operating Authority ..... 12

3.02 Definition of ISO Operating Authority ..... 12

3.03 Transmission Services and OATT Administration ..... 17

3.04 Application Authority ..... 18

3.05 ISO's Responsibilities ..... 22

3.06 MEPCO's Responsibilities ..... 23

3.07 Reserved Rights of MEPCO ..... 26

3.08 Repair and Maintenance of Transmission Facilities ..... 28

3.09 Invoicing, Collection and Disbursement of Customer Payments ..... 29

3.10 Grandfathered Transmission Agreements ..... 29

3.11 Subcontractors ..... 30

3.12 No Impairment of ISO's Other Legal Rights and Obligations ..... 30

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PARTIES ..... 30

4.01 Representations and Warranties of MEPCO ..... 30

4.02 **Representations and Warranties of ISO** ........ 31

ARTICLE V COVENANTS OF MEPCO ........ 31

5.01 **Covenants of MEPCO** ........ 31

5.02 **Financial Statements and Filings** ........ 32

5.03 **Expenses** ........ 32

5.04 **Consents and Approvals** ........ 32

5.05 **Notice and Cure** ........ 32

ARTICLE VI COVENANTS OF ISO ........ 33

6.01 **Covenants of ISO** ........ 33

6.02 **Financial Statements and Filings** ........ 33

6.03 **Expenses** ........ 33

6.04 **Consents and Approvals** ........ 33

6.05 **Notice and Cure** ........ 34

6.06 **Management Agreements** ........ 34

6.07 **ISO Line of Business; Non-Profit-Status** ........ 34

ARTICLE VII TAX MATTERS ........ 34

7.01 **Responsibility for MEPCO Taxes** ........ 34

7.02 **Responsibility for ISO Taxes** ........ 35

ARTICLE VIII RELIANCE; SURVIVAL OF AGREEMENTS ........ 35

8.01 **Reliance; Survival of Agreements** ........ 35

ARTICLE IX INDEMNIFICATION; INSURANCE; ASSUMPTION OF LIABILITIES ........ 35

9.01 **Indemnification** ........ 35

9.02 **Notice of Proceedings** ........ 36

9.03 **Defense of Claims** ........ 36

9.04 **Subrogation** ........ 37

9.05 **Insurance** ........ 38

9.06 Assumption of Liability ........ 39

ARTICLE X TERM; DEFAULT AND TERMINATION ........ 39

10.01 Term; Termination Date ........ 39

10.02 Release of Operating Authority ........ 42

10.03 Events of Default of ISO ........ 43

10.04 Events of Default of MEPCO ........ 44

ARTICLE XI MISCELLANEOUS ........ 45

11.01 Notices ........ 45

11.02 Supersession of Prior Agreements ........ 46

11.03 Waiver ........ 46

11.04 Amendment; Limitations on Modifications of Agreement ........ 46

11.05 No Third Party Beneficiaries ........ 47

11.06 No Assignment; Binding Effect ........ 47

11.07 Further Assurances; Information Policy; Access to Records. ........ 48

11.08 Business Day ........ 49

11.09 Governing Law ........ 49

11.10 Consent to Service of Process ........ 50

11.11 Specific Performance; Force Majeure ........ 50

11.12 Dispute Resolution ........ 50

11.13 Invalid Provisions ........ 51

11.14 Headings and Table of Contents ........ 51

11.15 Liabilities; No Joint Venture ........ 51

11.16 Counterparts ........ 52

11.17 Conditions Precedent ........ 52

11.18 Preserved Rights ........ 52

11.19 TOA and ISO Tariff Impact due to the NRI Project ........ 53

# MEPCO TRANSMISSION OPERATING AGREEMENT

This MEPCO Transmission Operating Agreement (this "MEPCO TOA" or this "Agreement"), dated as of March 28, 2005, is made and entered into by Maine Electric Power Company ("MEPCO") and ISO New England Inc. ("ISO"), the Regional Transmission Organization for New England and a Delaware corporation (MEPCO and ISO are collectively referred to herein as the "Parties").

WHEREAS, MEPCO owns and operates a 345 kV transmission line connected to Central Maine Power Company at the Maine Yankee Substation in Wiscasset Maine, and at the Maxcy's Substation in Windsor, Maine to Bangor Hydro Electric Company at Orrington, Maine and at its northern end, at the Canadian border to a similar 345 kV transmission line owned by New Brunswick Power ("MEPCO Transmission Facilities" or "MEPCO-TF");

WHEREAS, ISO is a regional transmission organization authorized by the Federal Energy Regulatory Commission ("FERC") to exercise the functions required of RTOs pursuant to FERC's Order No. 2000 ("Order 2000") and FERC's RTO regulations;

WHEREAS, MEPCO is willing to offer and provide transmission service under a Transmission Service Schedule ("Schedule 20B") under the ISO Open Access Transmission Tariff ("ISO OATT"), which is contained in Section II of the ISO-NE Transmission, Markets and Service Tariff, FERC Electric Tariff No. 3 ("ISO Tariff");

WHEREAS, in accordance with the terms set forth herein, MEPCO desires for ISO to exercise, and ISO desires to exercise, Operating Authority (as defined in Section 3.02 of this Agreement) over the MEPCO Transmission Facilities (as defined in this Agreement);

WHEREAS, in accordance with the terms set forth herein, MEPCO, as agent for the Chester SVC Partnership, desires for ISO to exercise, and ISO desires to exercise, Operating Authority (as defined in Section 3.02 of this Agreement) over the Chester SVC Facility; and

WHEREAS, MEPCO reserves the right to transfer certain rights and obligations to an Independent Transmission Company in accordance with the ISO OATT.

NOW, THEREFORE, in consideration of the promises, and the mutual representations, warranties, covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, MEPCO and ISO agree as follows:

# ARTICLE I

## DEFINITIONS; INTERPRETATIONS

### 1.01 Definitions; Interpretations.

Each of the capitalized terms and phrases used in this Agreement (including the foregoing recitals) and not otherwise defined herein shall have the meaning specified in Schedule 1.01. In this Agreement, unless otherwise provided herein:

(a) words denoting the singular include the plural and vice versa;

(b) words denoting a gender include all genders;

(c) references to a particular part, clause, section, paragraph, article, exhibit, schedule, appendix or other attachment shall be a reference to a part, clause, section, paragraph, or article of, or an exhibit, schedule, appendix or other attachment to, this Agreement;

(d) the exhibits, schedules and appendices attached hereto are incorporated herein by reference and shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein;

(e) a reference to any statute, regulation, proclamation, ordinance or law includes all statutes, regulations, proclamations, amendments, ordinances or laws varying, consolidating or replacing the same from time to time, and a reference to a statute includes all regulations, policies, protocols, codes, proclamations and ordinances issued or otherwise applicable under that statute unless, in any such case, otherwise expressly provided in any such statute or in this Agreement;

(f) a reference to a particular section, paragraph or other part of a particular statute shall be deemed to be a reference to any other section, paragraph or other part substituted therefore from time to time;

(g) a definition of or reference to any document, instrument or agreement includes any amendment or supplement to, or restatement, replacement, modification or novation of, any such document, instrument or agreement unless otherwise specified in such definition or in the context in which such reference is used;

(h) a reference to any Person (as hereinafter defined) includes such Person's successors and permitted assigns in that designated capacity;

(i) any reference to "days" shall mean calendar days unless "Business Days" (as hereinafter defined) are expressly specified;

(j) if the date as of which any right, option or election is exercisable, or the date upon which any amount is due and payable, is stated to be on a date or day that is not a Business Day, such right, option or election may be exercised, and such amount shall be deemed due and payable, on the next succeeding Business Day with the same effect as if the same was exercised or made on such date or day (without, in the case of any such payment, the payment or

accrual of any interest or other late payment or charge, provided such payment is made on such next succeeding Business Day);

(k) words such as "hereunder," "hereto," "hereof" and "herein" and other words of similar import shall, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular article, section, subsection, paragraph or clause hereof;

(l) a reference to "include" or "including" means including without limiting the generality of any description preceding such term, and for purposes hereof the rule of *ejusdem generis* shall not be applicable to limit a general statement, followed by or referable to an enumeration of specific matters, to matters similar to those specifically mentioned; and

(m) neither this Agreement nor any other agreement, document or instrument referred to herein or executed and delivered in connection herewith shall be construed against any Person as the principal draftsperson hereof or thereof.

## ARTICLE II

## MEPCO TRANSMISSION FACILITIES

### 2.01 <u>MEPCO Transmission Facilities.</u>

The MEPCO-TF over which ISO shall exercise Operating Authority in accordance with the terms set forth herein shall be:

(a) those facilities of MEPCO listed in Schedule 2.01(a), the Chester SVC Facility, and such list of facilities may be added to or deleted from in accordance with Sections 2.01(b) and 2.02 below.

(b) the MEPCO-TF included in Schedule 2.01(a) as of the Effective Date, may be added to or deleted from Schedule 2.01(a) without the necessity of an amendment to this Agreement, but only in the following manner:

(i) at the direction of a Governmental Authority with jurisdiction over the MEPCO-TF in question, provided that ISO shall be provided prior written notice of such changes; or

(ii) as agreed between ISO and MEPCO.

(c) Nothing in this Agreement is intended to address the rate treatment of MEPCO-TF or any other MEPCO assets.

(d) The MEPCO-TF listed in Schedule 2.01(a) shall not include Excluded Assets as defined in Section 2.03.

(e) The inclusion of the Chester SVC Facility in Schedule 2.01(a) of this agreement is for the sole purpose of granting Operating Authority, but specifically excludes

those responsibilities under Article 3.03 of this Agreement, of said facility to ISO. Nothing in this Agreement shall be construed to (1) create an association, joint venture, trust or partnership or to impose a partnership duty, obligation or liability between MEPCO and the Chester SVC Partnership, or (2) designate the Chester SVC Partnership as being a public utility subject to regulation under the Federal Power Act, as amended. Chester SVC Facility is treated the same as MEPCO-TF for purposes of Articles IV through XI of this Agreement.

**2.02 New MEPCO-TF.**

Any new facilities, and/or portions of facilities owned by MEPCO that are connected with or associated with those facilities listed in Schedule 2.01(a) and are not Excluded Assets and are placed in service after the Effective Date of this Agreement shall be subject to the Operating Authority of the ISO by including said facilities in Schedule 2.01(a) as set forth in Section 2.01 (b).

**2.03 Excluded Assets.**

The "Excluded Assets" of MEPCO shall consist of those assets and/or facilities set forth in this Section 2.03. Such Excluded Assets are expressly excluded from the definition of MEPCO-TF under this MEPCO TOA, and ISO shall not have Operating Authority over MEPCO's Excluded Assets:

(a) Any assets, facilities, and/or portions of facilities owned by MEPCO that are connected with or associated with those facilities listed in Schedule 2.01(a) to the extent specifically excluded pursuant to the following items (i) through (vii) of this Section 2.03(a):

(i) proceeds from the use or disposition of MEPCO-TF;

(ii) any payment, deposit, refund or credit (1) relating to MEPCO Taxes , (2) arising under any contracts or tariffs of MEPCO, (3) arising under any contract or tariff subject to regulation by an agency other than FERC, or not subject to regulation, or (4) relating to a Grandfathered Transmission Agreement;

(iii) any rights, ownership, title or interest MEPCO may have with respect to telecommunications assets and equipment, provided that ISO shall continue to have the right to use such telecommunication assets and equipment attached to or associated with MEPCO-TF solely to the extent needed for the exercise of ISO's Operating Authority in accordance with practice prior to the Effective Date and further provided that such use right shall not be assignable by ISO;

(iv) any existing contracts or contract rights of MEPCO related in any manner to MEPCO-TF unless MEPCO assigns or transfers such contracts to ISO, provided that MEPCO shall exercise its rights and responsibilities under Grandfathered Transmission Agreements in accordance with Section 3.10 and the applicable provisions of this Agreement;

(v) any assets, property rights, licenses, permits or facilities that are used for or in (1) the distribution, generation, trading or marketing of electricity,

(2) gas transportation, gas, water, petroleum, chemical, real estate development, or cable business, (3) the use of MEPCO's right-of-ways by others, or (4) any other activity unrelated to providing transmission service over the MEPCO-TF;

(vi) any causes of action or claims related to MEPCO-TF, provided, that upon the written agreement of MEPCO and ISO to the assumption by ISO of the management of such claims under mutually agreed terms and conditions, ISO may manage MEPCO's causes of action or claims against a third party relating to the MEPCO-TF, and provided further that ISO shall have the right to pursue causes of action or claims against third parties to the extent necessary for ISO to fulfill its responsibilities; and

(vii) any asset or facility for which Operating Authority may not be lawfully transferred or assigned.

(b) Any assets or facilities of MEPCO that are not specifically defined as MEPCO-TF, including without limitation the facilities or portions of facilities described in items (i) through (xii) of this Section 2.03(b):

(i) all cash, cash equivalents, bank deposits, accounts receivable, and any income, sales, payroll, property or other Tax receivables;

(ii) proceeds from the use or disposition of any facilities or assets owned by MEPCO;

(iii) certificates of deposit, shares of stock, securities, bonds, debentures, and evidences of indebtedness;

(iv) any rights or interest in trade names, trademarks, service marks, patents, copyrights, domain names or logos;

(v) any payment, refund or credit (1) relating to Taxes, (2) arising under any contracts or tariffs of MEPCO and relating to services provided prior to the beginning of the Term, or (3) arising under any contract or tariff that provides for rates that are subject to regulation by an agency other than FERC;

(vi) any facilities, including transmission facilities, located outside the New England Transmission System;

(vii) any rights, ownership, title or interest MEPCO may have with respect to telecommunications assets and equipment;

(viii) any existing contracts or contract rights of MEPCO unless MEPCO agrees to assign or transfer such contracts to ISO;

(ix) any assets, property rights, licenses, permits or facilities that are used for or in (1) the distribution, generation, trading or marketing of electricity or (2) gas transportation, gas, water, petroleum, chemical, real estate development,

or cable business, or (3) any other activity unrelated to the transmission of electricity whether or not located on, or making use of, the MEPCO-TF;

(x) any causes of action or claims;

(xi) any asset or facility for which Operating Authority may not be lawfully transferred or assigned; and

(xii) any interests of any kind in MEPCO's real property, provided that nothing in this Section 2.03 shall restrict MEPCO from conveying interests in real property in any future written agreement into which ISO and MEPCO may, in their sole discretion, enter.

**2.04 <u>Connection with Non-Parties.</u>**

(a) On or after the Effective Date, MEPCO shall connect its MEPCO-TF with the facilities of a current or proposed Transmission Customer, and shall install (or cause to be installed) and construct (or cause to be constructed) any transmission facilities required to connect the facilities of a current or proposed Transmission Customer to the MEPCO-TF to the extent such connection or construction is required by applicable law, including the Federal Power Act and any applicable regulations issued by FERC. Any such interconnection shall be subject further to: (1) the receipt of any necessary regulatory approvals, (2) compliance with the procedures set forth in the ISO OATT for review of the reliability and operational impacts of a proposed interconnection (including the procedures for interconnection of a Generating Unit under the Interconnection Standard); and (3) execution of an Interconnection Agreement with any Interconnection Customer containing provisions for the safe and reliable operation of each interconnection with respect to such entity's generating facilities in accordance with Good Utility Practice, applicable NERC/NPCC Requirements, and applicable Law (including the Federal Power Act); provided that:

(i) Except as provided in 2.04(a)(ii) below, MEPCO shall engage in good faith negotiations as to the terms and conditions of such Interconnection Agreement with any such Interconnection Customer, but, except as may be required pursuant to regulations issued by FERC, MEPCO shall not be required to enter into any Interconnection Agreement containing terms and conditions unacceptable to MEPCO and shall reserve the right to resolve any disputes, and/or make any filings with FERC, with respect thereto.

(ii) With respect to the interconnection of a Large Generating Facility or a Small Generating Facility to any MEPCO-TF, the Interconnection Agreement shall be a three-party agreement among MEPCO, the ISO, and the Interconnection Customer based on the Schedule 22 Large Generator Interconnection Agreement or the Schedule 23 Small Generator Interconnection Agreement, respectively, in the ISO OATT. With respect to the interconnection of other Generating Units to any MEPCO-TF, the ISO shall be a party to Interconnection Agreements if and to the extent that FERC regulations require the ISO to be a party. Either the ISO or MEPCO, acting in cooperation with the Participating Transmission Owners ("PTO") who are signatories to the Transmission Operating Agreement ("TOA"), may initiate a filing to amend the

Schedule 22 Large Generator Interconnection Agreement or the Schedule 23 Small Generator Interconnection Agreement under Section 205 of the Federal Power Act and shall include in such filing the views of the ISO, MEPCO and the PTOs, as applicable, provided that the standard applicable under Section 205 of the Fedcral Power Act shall apply only to MEPCO's and the PTOs' position on any financial obligations of the interconnecting non-Party, and any provisions related to physical impacts of the interconnection on the MEPCO-TF or the PTOs' Transmission Facilities or other assets. If MEPCO, the ISO and the Interconnection Customer agree to the terms and conditions of a specific Large Generator Interconnection Agreement or Small Generator Interconnection Agreement, as applicable, or any amendments to such an Interconnection Agreement, then MEPCO and the ISO shall jointly file the executed Interconnection Agreement, or amendment thereto, with FERC under Section 205 of the Federal Power Act. To the extent MEPCO, the ISO and such Interconnection Customer cannot agree to proposed variations from the Schedule 22 or 23 Interconnection Agreement applicable to a Large Generating Facility or Small Generating Facility, respectively, or cannot otherwise agree to the terms and conditions of the Interconnection Agreement, or any amendments to such an Interconnection Agreement, then MEPCO and the ISO shall jointly file an unexecuted Interconnection Agreement, or amendment thereto, with FERC under Section 205 of the Federal Power Act and shall identify the areas of disagreement in such filing, provided that, in the event of disagreement on terms and conditions of the Interconnection Agreement related to the costs of upgrades to the MEPCO-TF, the anticipated schedule for the construction of such upgrades, any financial obligations of MEPCO, and any provisions related to physical impacts of the interconnection on the MEPCO-TF, then the standard applicable under Section 205 of the Federal Power Act shall apply only to MEPCO's position on such terms and conditions.

The costs of interconnection facilities shall be allocated in the manner specified in the ISO OATT.

(b) MEPCO shall also connect its MEPCO-TF with the facilities of any entity that is not a PTO who is a signatory to the TOA upon satisfaction of the "Elective Transmission Upgrade" provisions of the ISO OATT, provided that MEPCO shall only connect the facilities of such entity (the "Elective Transmission Upgrade Applicant ") upon satisfaction of the following conditions:

(i) The Elective Transmission Upgrade Applicant shall enter into an Interconnection Agreement with MEPCO and, to the extent necessary and appropriate, enter into support agreements with MEPCO, provided that the Elective Transmission Upgrade Applicant may request, upon providing the security, credit assurances, and/or deposits required by MEPCO, the filing with the Commission by MEPCO of unexecuted Interconnection Agreements and support agreements.

(ii) The Elective Transmission Upgrade Applicant shall obtain all necessary legal rights and approvals for the construction and maintenance of the

upgrade and shall cooperate with MEPCO in obtaining all necessary legal rights and approvals for the construction and maintenance of additions or modifications, if any, required in conjunction with the upgrade.

(iii) The Elective Transmission Upgrade Applicant shall be responsible for 100% of all of the costs of said upgrade and of any additions to or modifications of MEPCO-TF that are required to accommodate the Elective Transmission Upgrade.

**2.05 <u>Review of Transmission Plans.</u>**

MEPCO shall submit to ISO in such form, manner and detail as ISO may reasonably prescribe: (i) any new or materially changed plans for retirements of or changes in the capacity of such MEPCO-TF rated 69 kV or above or plans for construction of new transmission facilities rated 69 kV or above to be interconnected to or part of the New England Transmission System; and (ii) any new or materially changed plan for any other action to be taken by MEPCO which may have a significant effect on the stability, reliability or operating characteristics of the MEPCO-TF, the facilities of any Transmission Owner or the system of a Participant. Unless prior to the expiration of ninety (90) days from receipt of MEPCO's submittal, ISO notifies MEPCO in writing that it has determined that implementation of the plan will have a significant adverse effect upon the reliability or operating characteristics of the MEPCO-TF, the facilities of any Transmission Owner, or the system of a Participant, MEPCO shall be free to proceed. If ISO notifies MEPCO that implementation of such plan has been determined to have a significant adverse effect upon the reliability or operating characteristics of the MEPCO-TF, the facilities of any Transmission Owner or the system of a Participant, MEPCO shall not proceed to implement such plan unless MEPCO takes such action or constructs such facilities as ISO determines to be reasonably necessary to avoid such adverse effect.

**2.06 <u>Condemnation.</u>**

If, at any time, any Governmental Authority commences any process to acquire any MEPCO-TF or any other interest in MEPCO-TF then held by MEPCO through condemnation or otherwise through the power of eminent domain, (i) MEPCO shall provide ISO with written notice of such process, (ii) MEPCO shall, at its cost, direct any litigation or proceeding regarding such condemnation or eminent domain matter, (iii) MEPCO shall have the right to settle any such proceeding without the consent of ISO, and (iv) any award in condemnation or eminent domain shall be paid to MEPCO without any claim to such award by ISO.

## ARTICLE III

## OPERATING AUTHORITY

**3.01 Grant of Operating Authority.**

(a) Subject to the terms set forth in this Agreement, including Article III and Article X hereof, and effective as of the Effective Date, MEPCO hereby authorizes ISO, through its officers, employees, consultants, independent contractors and other personnel, to exercise Operating Authority over the MEPCO-TF and ISO hereby agrees to assume and exercise Operating Authority over the MEPCO-TF in accordance with this Agreement.

(b) The grant by MEPCO to ISO and the assumption by ISO of Operating Authority over the MEPCO-TF are solely for the purposes of allowing ISO to fulfill the functions of an RTO as specified herein and do not constitute an assumption by ISO of any liabilities with respect to the MEPCO-TF except as otherwise specifically provided herein (including as provided in Article IX of the Agreement).

(c) Nothing herein or elsewhere contained shall be construed as requiring or effecting a transfer of MEPCO's responsibility (or the assumption thereof by ISO) for the physical control of the MEPCO-TF, including the physical operation, repair, maintenance and replacement of such MEPCO-TF, or as conveying to ISO: (i) any right, ownership, title or interest in or to MEPCO or any of its assets including any transmission facilities; (ii) any right of access to MEPCO's real property, except as specified in Section 3.02(j); or (iii) any rights or authority with respect to MEPCO's Excluded Assets, except as specifically provided herein.

**3.02 Defiuition of ISO Operatiug Authority.**

Consistent with the provisions of this Agreement, including Section 3.02(a) below, "Operating Authority" shall mean those functions set forth in Sections 3.02, 3.03, and 3.08, those responsibilities set forth in Section 3.05, and shall not include those rights, responsibilities and functions set forth in Sections 3.06 and 3.07. Subject to the first sentence of this Section 3.02, ISO shall exercise such Operating Authority in accordance with applicable Operating Procedures and Additional MEPCO-TF Procedures as specified in Sections 3.02(g) and (h) below.

(a) ISO shall perform the following functions with respect to the MEPCO-TF, consistent with applicable NERC/NPCC Requirements and other applicable regulatory standards, including (as needed) issuing instructions to, or coordinating with the Maine Local Control Center:

(i) centrally dispatch generation, (and dispatchable and interruptible load) and implement real-time balancing, including meeting NERC control performance criteria;

(ii) determine Operating Limits based on forecasted or real-time system conditions and in accordance with the facility ratings established by MEPCO in accordance with Section 3.06;

(iii) take such actions as may be necessary to plan and maintain short-term (including real-time) reliability and system security (including curtailment of External Transactions in accordance with FERC -accepted or approved-Tariff, including Schedule 20B of the ISO OATT;

(iv) consistent with the ISO Information Policy, exchange security information with MEPCO, the Maine Local Control Centers, transmission operators and other neighboring systems and regional entities;

(v) provide for an ISO Control Center and an independent Back-up Control Center, as ISO deems necessary to comply with applicable NERC/NPCC Requirements and any applicable regulatory requirement; and

(vi) dispatch MEPCO-TF via Maine Local Control Center in accordance with applicable Operating Procedures and Additional MEPCO-TF Procedures. ISO will coordinate directly with MEPCO for the purpose of scheduling power transfers with external Control Areas including the notification of ramp time, duration, and magnitude.

(b) Pursuant to the requirements of Section 3.03, ISO shall receive, confirm, schedule and curtail External Transactions using MEPCO-TF for the New England Transmission System.

(c) ISO shall enter into Coordination Agreements and operating arrangements with the operators of neighboring Control Areas; coordinate system operation and emergency procedures with neighboring Control Areas; and administer scheduling provisions of the Tariff applicable to External Transactions using MEPCO-TF, in accordance with the terms of those agreements and the Tariff; provided that as of the Effective Date, the applicable agreements and the Tariff shall be set forth in Schedule 3.02(c).

(d) The ISO shall direct the implementation of emergency procedures, including the utilization of the MEPCO-TF for the transfer of Pool-to-Pool emergency energy transactions, in coordination with the Maine Local Control Center and in accordance with applicable NERC/NPCC Requirements.

(e) The ISO shall track inadvertent energy and administer inadvertent energy payback/accounting with neighboring Control Areas in accordance with the terms and conditions of the interconnection or coordination agreements with neighboring Control Areas and applicable tariff provisions.

(f) ISO shall act as the Reliability Authority for MEPCO-TF. ISO may intercede and direct appropriate near-term operational actions in order to protect reliability, provided that nothing in this Section 3.02(f) shall require MEPCO to undertake an action contrary to applicable Law or shall limit the right of MEPCO pursuant to Section 3.07 to take any action(s) that it deems necessary to prevent loss of human life, injury to persons and/or damage to property.

(g) ISO shall utilize Operating Procedures relating to the exercise of Operating Authority over the MEPCO-TF. The Operating Procedures shall initially consist of

the Operating Procedures in existence on the Operations Date (hereinafter "Existing Operating Procedures"). Such Existing Operating Procedures shall consist of those Operating Procedures listed in Schedule 3.02(g). ISO shall develop any modifications to Operating Procedures (including Existing Operating Procedures) and any new Operating Procedures that it may deem necessary or appropriate: (i) in coordination with MEPCO so as to ensure that that MEPCO's knowledge of the MEPCO-TF is given due consideration in the development or modification of the transmission related portions of such Operating Procedures and (ii) in consultation with other stakeholders. ISO shall have the authority to modify Operating Procedures or develop new Operating Procedures without such coordination or consultation when ISO does not have sufficient time to undertake such coordination or consultation due to emergent and unanticipated circumstances. In the event that ISO and MEPCO disagree about modifications to the transmission related portions of the Operating Procedures or any new Operating Procedures related to the operation of the MEPCO-TF, MEPCO will have the opportunity to submit the dispute for resolution in accordance with the dispute resolution provisions set forth in Section 11.12 herein. Pending such resolution, ISO shall have the authority, as the system operator with ultimate authority for the real-time operation of MEPCO-TF, to implement any such new Operating Procedures or modified Operating Procedures.

Notwithstanding anything in the foregoing, Operating Procedures and operating documents related to the establishment of ratings for MEPCO-TF (Rating Procedures) shall be developed and placed into effect pursuant to Section 3.06(a)(v) and (vi).

To the extent MEPCO will be required to physically operate its MEPCO-TF in accordance with any operational documents in effect as of the Effective Date or as subsequently developed or amended by ISO (other than Operating Procedures), ISO shall develop or amend such operational documents in coordination with MEPCO (or the Maine Local Control Center, as applicable), subject to the right of ISO to place such operating documents into effect in the event of a dispute concerning such documents and the right of MEPCO to submit the dispute for resolution in accordance with the dispute resolution provisions set forth in Section 11.12 herein. Any such coordination and stakeholder consultation shall be conducted in accordance with the regulations implementing FERC's standards of conduct.

(h) In addition to the procedures listed in Schedule 3.02(g), MEPCO and the ISO may negotiate in good faith to include Additional MEPCO-TF Procedures for the operation of the MEPCO-TF in Schedule 3.02(h) to this MEPCO TOA. These procedures may include, but are not limited to, common operating instructions established between the ISO and MEPCO including those that address the functions and responsibilities of a MEPCO Control Station. If the functions and responsibilities of the MEPCO Control Station as stipulated in this Agreement are performed by a Local Control Center as of the Effective Date, then MEPCO may satisfy the MEPCO Control Station functions and responsibilities pursuant to this Agreement through its Local Control Center, and the Additional MEPCO-TF Procedures shall so specify. Such Additional MEPCO-TF Procedures shall be consistent with MEPCO's responsibilities set forth in Section 3.06, and shall be listed in Schedule 3.02(h). Following the Effective Date, this list may be added to or deleted from without the necessity of an amendment to this Agreement, but only in the following manner:

(i) at the direction of a Governmental Authority, provided that ISO and MEPCO shall be provided prior written notice of such changes; or

(ii) as agreed between ISO and MEPCO.

(i) ISO shall seek agreement with MEPCO, where time limitations do not make it impracticable to do so, on real-time operational decisions affecting the MEPCO-TF not otherwise specified in the Operating Procedures developed in accordance with Section 3.02(g) and the Additional MEPCO-TF Procedures developed in accordance with Section 3.02(h). In the absence of such agreement, or if time limitations do not permit reaching agreement, ISO shall implement its operational decision. If such ISO decision is disputed, ISO's position shall control pending resolution of the dispute.

(j) ISO shall develop, maintain, and, if needed, implement the System Restoration Plan for the New England Transmission System, which shall include (if needed) MEPCO's existing Local Restoration Plans. ISO shall develop any modifications to the System Restoration Plan in consultation with MEPCO and shall incorporate into the System Restoration Plan any modifications developed by MEPCO to its Local Restoration Plan, provided that any modifications to the MEPCO Local Restoration Plan are subject to ISO's approval in order to coordinate and promote the reliability of the Restoration Plans. The extent to which the MEPCO-TF is subject to the requirements for participation in the ISO's System Restoration Plan will be determined on a facility-by-facility basis and such requirements will be included in the applicable Operating Procedures to which the MEPCO-TF must comply.

(k) ISO shall coordinate voltage and reactive dispatch of facilities to the extent normal schedules are unable to be maintained by the Maine Local Control Center.

(l) ISO shall direct the implementation of emergency procedures, including inter-Control Area emergency energy transactions, in coordination with the Maine Local Control Centers in accordance with applicable NERC/NPCC Requirements.

(m) ISO shall have the authority to perform the following tasks in relation to compliance with current or future MEPCO responsibilities:

(i) perform all compliance and monitoring responsibilities of ISO, including the issuance of sanction letters, with respect to existing or successor NERC or NPCC compliance programs associated with standards, criteria and measurements for which MEPCO is responsible and accountable to ISO. To the extent that ISO receives a sanction letter from NERC or NPCC that is substantially related to the actions of MEPCO, ISO may issue a sanction letter to MEPCO;

(ii) perform all compliance and monitoring responsibilities of ISO associated with Operating Procedures and Additional MEPCO-TF Procedures relating to standards, criteria and measurements that MEPCO is responsible for and accountable to ISO. Such responsibilities shall include audits of MEPCO for compliance with Operating Procedures and Additional MEPCO-TF Procedures to the extent ISO determines such audits are necessary and the issuance of sanction letters;

(iii) perform periodic audits of the Maine Local Control Center's and MEPCO's performance of the functions listed in Sections 3.06 (a)(i), (ii), (iii),

(vii), (viii), (ix) and (x) in accordance with applicable Operating Procedures and applicable reliability standards, including audits to monitor compliance with the ISO Information Policy and applicable standards of conduct consistent with FERC Order No. 2004 in performing these functions. Such Maine Local Control Station audits addressing MEPCO-TF shall generally be conducted no more frequently than once every three years, provided that ISO shall have the authority to conduct an audit more frequently if it determines that circumstances so require. The ISO will make every attempt to schedule such audits at the same time as the audit of the Maine Local Control Center scheduled to address similar issues under Section 3.02 (i)(iii) of the Transmission Operating Agreement with PTOs.

All audits conducted pursuant to this Section 3.02(m) shall be conducted by ISO or by an independent third party, in a manner consistent with generally accepted auditing standards, with expenses of ISO (or the third-party auditor) borne by ISO and recovered through its administrative tariff. MEPCO shall bear its own expenses in complying with the audit. Such audits shall be conducted during normal business or operational hours and with reasonable notice. The scope of each audit and the process for conducting the audit will be discussed with and agreed to by MEPCO in advance.

Nothing in this Section 3.02(m) shall imply that a sanction letter shall include any financial or other penalties. Nothing in this Section 3.02(m) shall limit the right of ISO to separately file proposals at FERC to assess financial or other penalties against any entity or shall limit the right of MEPCO to comment on or protest any such proposals.

In the event that any Governmental Authority is established as the successor to NERC or NPCC or that a Governmental Authority assumes responsibility for performing the audit functions contemplated by this Section 3.02(m), the Parties shall negotiate in good faith over modifications to this Section 3.02(m) that are appropriate to address such changes in circumstances.

(n) The ISO shall monitor and control, in accordance with the facility ratings established by MEPCO in accordance with Section 3.06, on a real-time basis, power flows on the system, voltage and system frequency; and

(o) The ISO shall coordinate with the Maine Local Control Center or MEPCO on the settings for MEPCO owned dynamic reactive resources, FACTS controllers, special protection systems, PARS, and other similar dynamic equipment that affects power flows over MEPCO-TF, and approve or direct changes to such settings.

(p) If at any time, a Party provides notice to the other Party that it believes NERC and NPCC documents that are not NERC/NPCC Requirements have been modified so as to expand the scope of the functions to be performed by ISO or MEPCO, the Parties shall consider in good faith changes to this Agreement that will allow the Parties to follow such guidelines; provided, however, that, the Parties shall have no obligation to agree to such changes. If the Parties cannot agree to such changes, the dispute resolution procedures of Section 11.12 shall be utilized. Nothing in this Section 3.02(p) shall be construed to excuse any Party from complying with applicable NERC/NPCC Requirements.

**3.03 Transmission Services and OATT Admiuistration.**

(a) ISO shall administer Schedule 20B of the ISO OATT in the manner specified in this Section 3.03. ISO's OATT administration responsibilities shall include those enumerated below:

(i) ISO shall receive, confirm, schedule, curtail and interrupt real-time External Transactions over the MEPCO-TF in accordance with the ISO Tariff, including Schedule 20B of the ISO OATT. The ISO shall develop and publish any necessary or appropriate procedures consistent with the ISO Tariff, including Schedule 20B of the ISO OATT, to describe how it will receive, confirm, schedule, curtail and interrupt real-time External Transactions over the MEPCO-TF.

(ii) ISO shall calculate TTC for the New Brunswick/MEPCO interface and total MEPCO/Pool Transmission Facility interface and determine the associated TTC calculation methodology (consistent with applicable NERC/NPCC Requirements and applicable regulatory standards), provided that modifications to the calculation methodology as it exists on the Effective Date shall be developed by ISO in consultation with MEPCO. The TTC for the New Brunswick/MEPCO interface and total MEPCO/Pool Transmission Facility interface shall be posted by the ISO on the MEPCO Transmission Provider Page on the ISO OASIS.

(iii) ISO shall operate and maintain the ISO OASIS (or a successor system) as required by FERC; provided, however, that such system shall conform to the requirements for such systems as specified by FERC;

(iv) Except for MEPCO provided Ancillary Service No. 1, Scheduling, System Control and Dispatch Service, ISO shall procure and act as supplier of last resort of Ancillary Services, including arranging for the sale and purchase of emergency capacity and energy with neighboring Control Areas, in accordancc with a FERC -accepted or approved-Tariff.

(b) MEPCO shall administer Schedule 20B of the ISO OATT in the manner specified in this Section 3.03. MEPCO's OATT administration responsibilities shall include those enumerated below:

(i) On or after the Effective Date, MEPCO shall continue to have the right, in accordance Schedule 20B of the ISO OATT, to enter into service agreements or other contractual arrangements whereby it can make available transmission service over the MEPCO-TF. MEPCO's administration of such service agreements shall include the posting of service offerings, responding to requests for service and ensuring that any resulting transmission reservations are posted on its Transmission Provider Page on the ISO OASIS.

(ii) Upon receipt of a Completed Application for transmission service from ISO, MEPCO shall respond to Customers and administer transmission service as set forth in Schedule 20B.

(iii) MEPCO shall file with or report to FERC all new, modified or terminated Transmission Service Agreements.

(iv) MEPCO shall supply and customers must take Ancillary Service No. 1, Scheduling, System Control and Dispatch Service;

(v) For the sole purpose of offering transmission service over internal points on the MEPCO-TF MEPCO shall calculate the individual TTCs for the Orrington, Maxcy's and Maine Yankee points on the MEPCO-TF, and determine the associated TTC calculation methodology (consistent with applicable NERC/NPCC Requirements and applicable regulatory standards). The TTC for the for Orrington, Maxcy's and Maine Yankee points on the MEPCO-TF shall be posted by MEPCO on the MEPCO Transmission Provider Page on the ISO OASIS.

(vi) MEPCO shall calculate ATC for the MEPCO-TF and determination of the ATC calculation methodology consistent with applicable NERC/NPCC Requirements and other applicable regulatory standards. Modifications to the calculation methodology as it exists on the Effective Date shall be developed by MEPCO in consultation with ISO.

(vii) The ATC for the MEPCO-TF shall be posted by MEPCO on the MEPCO Transmission Provider Page on the ISO OASIS. MEPCO may enter into contracts with other entities, including ISO, to calculate and post ATC on the MEPCO Transmission Provider Page on the ISO OASIS. If ISO is performing such services for other Transmission Providers, ISO shall do so for MEPCO, if so requested by MEPCO, at nondiscriminatory fees equivalent to fees charged others for the same services.

(viii) MEPCO shall administer the MEPCO-TF Transmission Provider Page on the ISO OASIS (or a successor system) as required by FERC.

(c) The ISO and MEPCO as applicable, shall receive and respond to requests by Large Generating Facilities and Small Generating Facilities to be interconnected to the MEPCO-TF and shall perform system impact and facilities studies (and execute and administer agreements for such studies) in accordance with Schedule 22 and Schedule 23 of the ISO OATT.

**3.04 <u>Application Authority.</u>**

(a) Except as set forth in 3.04(e), MEPCO shall have the sole authority to submit filings under Section 205 of the Federal Power Act for any changes to Schedule 20B of the ISO OATT and any accompanying schedules and attachments. These rights include but are not limited to:

(i) establishing or revising MEPCO's revenue requirements for MEPCO-TF used for the provision of transmission service;

(ii) establishing or revising rates or charges for transmission services over the MEPCO-TF;

(iii) setting the recovery of MEPCO's investment in an Interconnection or Elective Transmission Upgrade that enters commercial service after the effective date of this Agreement; and

(iv) establishing or revising charges for the recovery of any MEPCO stranded costs;

(v) establishing or revising charges for unauthorized use;

(vi) establishing or revising charges for parallel flows resulting from new transmission interconnections between Maine and eastern Canada;

(vii) any terms and conditions of Interconnection Service with any entities connecting with the MEPCO-TF, subject to Section 2.04 and Schedule 20B, provided that Interconnection Agreements associated with Interconnection Service shall not include any operating arrangements and Coordination Agreements that ISO may enter into with operators of neighboring Control Areas in accordance with Section 3.02(c);

(viii) establishing or revising any terms and conditions of transmission service over MEPCO-TF.

MEPCO shall not have the authority to revise rates, terms and conditions in a manner that would abridge the rights granted to ISO in Section 3.04(b).

MEPCO shall provide written notification to ISO and MEPCO customers of any filing described in sub-paragraphs (i), (ii), and (v) through (viii) above, which notification shall include a detailed description of the filing, at least thirty (30) days in advance of a filing. MEPCO shall retain the right to modify aspects of any filing authorized by this Section 3.04(a) after it provides written notification to ISO and MEPCO customers, and shall provide notification to ISO and MEPCO Customers of any material modification to such filings.

With respect to any filing described in sub-paragraphs (i), (ii), and (v) through (viii) above, MEPCO shall include in any filing a statement that, in the good faith judgment of MEPCO, the proposal will not be inconsistent with the design of the ISO Markets, as accepted or approved by FERC. In the event ISO believes that a proposed filing described in sub-paragraphs (i), (ii), and (v) through (viii) above, would have such an inconsistency, it shall so advise MEPCO and MEPCO and ISO shall consult in good faith to resolve any ISO concerns, but, if such disagreement cannot be resolved, MEPCO may submit a filing under Section 205, provided that MEPCO's filing (including the transmittal letter for such filing) to FERC shall include any written statement provided by ISO setting forth the basis for ISO's concerns. With respect to any transmission rates of MEPCO that are not subject to FERC jurisdiction under Section 205 or otherwise, MEPCO shall have the right to establish rates and charges, in accordance with applicable law and submit such rates and charges, if required, to the appropriate agency for a determination that the rates and charges satisfy the applicable standards.

MEPCO shall consult with ISO to determine whether ISO will need to make any software modifications in order to implement any filing authorized by subparagraphs (i), (ii), and (v) through (vii) of this Section 3.04(a) and when any needed software modifications could reasonably be expected to be implemented. MEPCO's filing to FERC (and the transmittal letter for such a filing) shall include any written statement provided by ISO setting forth the basis for any software-related implementation concerns raised by ISO. ISO shall make Commercially Reasonable Efforts to implement any needed software modifications by the effective date accepted by the FERC for a filing authorized by this Section 3.04(a), provided that, if ISO has exercised such Commercially Reasonable Efforts, a failure to implement needed software modifications by the FERC-accepted effective date shall not constitute an event of default by ISO under this Agreement or subject ISO to financial damages.

(b) The ISO shall have the authority to submit filings under Section 205 of the Federal Power Act to establish and to revise any terms and conditions of the ISO Tariff, and any separate ISO tariffs, relating to the New England Transmission System (including those provisions under the ISO Tariff that relate to the scheduling, curtailment and interruption of External Transactions over the MEPCO-TF) and/or the New England Markets. Notwithstanding any other provisions of this agreement: (A) the ISO shall not have the authority to revise such terms and conditions in a manner that would abridge the rights granted to MEPCO in Section 3.04(a); (B) the ISO shall not have the authority to eliminate Point-to-Point Transmission Service provided under Schedule 20B; (C) the ISO shall not file to change the terms and conditions of Schedule 20B in a way that eliminates advanced reservations or any rates and other mechanisms for the recovery of wholesale stranded costs; (D) the ISO shall not have the authority to modify such terms and conditions in a manner that would eliminate the Schedule 20B distinction between firm and non-firm transmission service; (E) the ISO shall not have the authority to transfer to any third party the ISO's Section 205 rights to revise the terms and conditions of Transmission Service or the authority to enter into agreements with any group of stakeholders to submit filings under Section 205 of the Federal Power Act to change the terms and conditions of Transmission Service where such proposed changes are not supported by the ISO but are approved by a vote of the stakeholder group.

(c) ISO shall provide written notification of any proposed filing under this subsection to MEPCO and stakeholders, which notice shall include a detailed description of the proposed filing, at least 30 days prior to the filing. ISO shall consult with MEPCO and stakeholders and will consider any comments MEPCO or any stakeholder provides in developing its filing. ISO shall retain the right to modify aspects of any filing authorized by this subsection after it provides written notification to MEPCO and stakeholders and shall provide notification to MEPCO and stakeholders of any material modification to such filings. In addition, ISO shall consult with MEPCO to determine whether the filing will have any adverse impact on MEPCO's service charges, or on the ability of MEPCO to recover its charges. If MEPCO concludes in its good faith judgment that the filing will have any such effects, ISO and MEPCO will make every reasonable effort to resolve the concerns of MEPCO. In the event that MEPCO's concerns cannot be resolved, ISO may, nevertheless, make a filing under Section 205 provided that, except as provided in the next sentence, such a filing will not become effective until such time as the Commission issues an order determining the proposal set forth in the filing to be consistent with the standard applicable under Section 205 of the Federal Power Act. ISO may request that FERC permit a filing authorized by this subsection to go into effect on an interim basis, notwithstanding the conclusion of MEPCO, provided that ISO shall include in such filing (and

the transmittal letter for such a filing) any written statement provided by MEPCO setting forth the basis for MEPCO's concerns. If FERC grants ISO's request to permit the filing to go into effect on an interim basis, the filing will become effective, subject to refund, on the date specified in FERC's order.

(d) ISO shall have no authority to submit a filing under Section 205 of the Federal Power Act to modify any provision of the Schedule 20B for which MEPCO retains authority to make a Section 205 filing pursuant to subsection (a). MEPCO shall have no authority to submit a filing under Section 205 of the Federal Power Act to modify any provision of the ISO Tariff for which ISO retains responsibility for pursuant to subsection (b). ISO reserves its rights to intervene in, comment on or protest any filing made by MEPCO, and to submit proposals for the consideration of MEPCO and MEPCO reserve its rights to intervene in, comment on or protest any filing made by ISO, and to submit proposals for the consideration of ISO.

(e) In the event ISO determines that a change in the design of any provision of the ISO Tariff which is the subject of retained Section 205 rights by MEPCO pursuant to subsection (a) is required because such provision is inconsistent with the design of the ISO Markets, and such inconsistency will, if not remedied before relief would be available in a proceeding under Section 206 of the Federal Power Act, will either: (i) substantially and adversely affect the efficiency or competitiveness of the New England Markets, or (ii) substantially and adversely affect the reliability of the New England Bulk Power System, a senior officer of ISO shall notify MEPCO of its determination. Upon receipt of such notification, MEPCO and the ISO shall diligently work together to arrive at appropriate changes in the rates to alleviate the conditions that led to this notification being given, while protecting the rights of MEPCO to fully recover its revenue requirements and the amount of incentive payments associated with FERC-accepted or approved incentive arrangements. If MEPCO and the ISO agree on a solution to this issue, MEPCO shall make a filing at FERC under Section 205 consistent with such agreement.

If MEPCO and the ISO cannot agree on a mutually acceptable Section 205 filing to address this issue within a period of thirty (30) days, and MEPCO does not make a Section 205 filing within the thirty (30) day period, then the ISO shall have the authority to submit a filing under Section 205 of the Federal Power Act as permitted herein provided that such a Section 205 filing shall not be submitted until MEPCO has an opportunity to meet with representatives of the ISO Board of Directors, if so requested with reasonable notice. Any such ISO filing permitted herein: (1) shall not abrogate any existing firm rights for transmission service over the MEPCO transmission facilities, (2) shall not eliminate advanced reservation requirements or (3) shall not modify the rates that MEPCO charges for services provided under Schedule 20B of the ISO OATT; and ISO may, with the approval of FERC, place its proposal into effect, while the proceeding on ISO's filing is pending before FERC, for a period no longer than fifteen (15) months, provided that the replacement charge proposal of ISO is subject to refund and surcharge, as necessary to restore the status quo ante if FERC does not ultimately approve that proposal. To place its replacement rate design proposal into effect, ISO shall bear the burden of persuading FERC that: (i) ISO's replacement proposal is consistent with the standard applicable under Section 205 of the Federal Power Act; (ii) ISO's determination regarding the inconsistency of the existing design of the ISO Markets and the impact of that inconsistency as set forth in the first sentence of this subsection, is correct; and (iii) ISO's proposal will not adversely affect the rights

of MEPCO to fully recover its rates or charges or that would result in any costs previously approved or accepted for recovery under either a federal or state-jurisdictional rate thereafter becoming unrecoverable under either a federal or state-jurisdictional rate. If ISO concludes that the delay in filing required by the notice provisions of this subsection would result in a material adverse effect on the efficiency or competitiveness of the markets administered by the ISO or the reliability of the New England Bulk Power System in the circumstances, ISO shall (i) provide such notice to MEPCO as is possible under the circumstances; and (ii) may make a filing under Section 206.

(f) In the event ISO concludes that a filing to establish or to revise the terms and conditions listed in subsection (b) is required and that providing the notification or consultation required under subsection (b) for such filing would result in an unanticipated material adverse effect on the efficiency or competitiveness of the New England Markets or the reliability of the New England Bulk Power System in the circumstances, ISO: (i) shall provide such notification to MEPCO and stakeholders or undertake such consultation with MEPCO and stakeholders as is possible under the circumstances; and (ii) may submit a filing under Section 205 to establish or to revise the terms and conditions listed in Section 3.04 (b) upon issuance of a written statement setting forth the circumstances that do not permit such notification or consultation.

(g) In the event MEPCO concludes that a filing to establish or to revise the charges as stipulated under subsection (a) is required and that providing the notification or consultation required under subsection (a) for such filing would result in a material adverse financial effect on MEPCO, MEPCO: (i) shall provide such notification to the ISO and MEPCO Customers or undertake such consultation with ISO as is possible under the circumstances; and (ii) may make a Section 205 filing to establish or to revise the charges as stipulated under subsection (a) upon issuance of a written statement setting forth the circumstances that do not permit such notification or consultation.

(h) ISO shall have sole authority to submit Section 205 filings to recover its administrative, capital and other costs (including the collection of funds from Transmission Customers to support payment of FERC annual charges with respect to transmission service for which ISO is the transmission provider as defined in FERC rules and orders) including the design of any charges therefore (the "ISO Administrative Charge").

(i) Nothing in this Agreement shall restrict in any way the rights of ISO or of MEPCO to submit an application under Section 206 of the Federal Power Act for revisions to the rates, terms and conditions of service under the ISO Tariff.

(j) Nothing in this Agreement shall restrict in any way the rights of MEPCO to submit a proposal under Section 205 of the Federal Power Act to participate in, join, or become an ITC pursuant to Attachment M of the ISO OATT and, upon approval of such proposal, to withdraw from this Agreement in accordance with Section 10 of this Agreement.

**3.05 <u>ISO's Responsibilities.</u>**

(a) In addition to its other obligations under this Agreement, in performing its obligations and responsibilities hereunder, and in accordance with Good Utility Practice, ISO shall:

(i) maintain system reliability;

(ii) in all material respects, act in accordance with applicable Laws and conform to, and implement, all applicable reliability criteria, policies, standards, rules, regulations, orders, license requirements and all other applicable NERC/NPCC Requirements, and other applicable reliability organizations' reliability rules, and all applicable requirements of federal or state laws or regulatory authorities; and

(iii) act without undue preference to any Party.

(b) ISO shall obtain and retain all necessary authorizations of FERC and other regulatory authorities to function as the New England RTO and shall possess the characteristics and perform the functions required for that purpose.

**3.06 <u>MEPCO's Responsibilities.</u>**

The functions and responsibilities of the MEPCO Control Station shall be performed by the Maine Local Control Center.

(a) From and after the Effective Date, MEPCO shall, in accordance with Good Utility Practice:

(i) direct, physically operate, repair, and maintain its MEPCO-TF in accordance with this Agreement, applicable Law, applicable Operating Procedures and Additional MEPCO-TF Procedures in a manner that will not have an adverse impact on the New England Transmission System;

(ii) the Maine Local Control Center will carry out the orders of the ISO for the purpose of scheduling power transfers, over MEPCO-TF, with external Control Areas, including the notification of ramp time, duration, and magnitude;

(iii) MEPCO shall provide ISO with reasonable notice of any change to the facility or the Maine Local Control Center and shall coordinate with ISO to ensure that such a change will not adversely affect the reliable operation of the New England Transmission System. MEPCO shall have the responsibility to ensure that the Maine Local Control Center will: operate the MEPCO-TF on a 24 hour basis, implement the instructions, orders and directions received from ISO in the exercise of its Operating Authority in accordance with Section 3.02, and perform the following functions in accordance with applicable Operating Procedures and/or Additional MEPCO-TF Procedures:

(A) switching and tagging;

(B) real-time monitoring of the MEPCO-TF;

(C) security analysis;

(D) dispatch voltage and reactive power (within the capability of the MEPCO-TF equipment provided that ISO shall dispatch voltage and reactive power to the extent the Maine Local Control Center is unable to maintain normal voltage schedules;

(E) coordinate with ISO the development of settings for MEPCO owned dynamic reactive resources, FACTS controllers, special protection systems, PARS, and other similar dynamic equipment that affects power flows;

(F) implementation of MEPCO Local Restoration Plan and development of modifications to MEPCO Local Restoration Plans, subject to the approval of ISO in order to coordinate and promote the reliability of the Restoration Plans (the extent to which MEPCO-TF is subject to the requirements for participation in the ISO or a Local Restoration Plan will be determined on a facility-by-facility basis and such requirements will be included in the applicable Operating Procedures to which the MEPCO-TF must comply);

(G) operation and maintenance of communication systems and software;

(H) implementation of voltage reduction measures (only as applicable under the Operating Procedures for MEPCO-TF);

(I) implementation of Load Shedding (only as applicable under the Operating Procedures for MEPCO-TF);

(J) coordinate with ISO with respect to congestion management efforts and, to the extent applicable, demand-side management and distributed generation efforts; and

(K) coordinate with other entities interconnected with the New England Transmission System and the MEPCO-TF.

(iv) cooperate with ISO's performance of the monitoring and audits in connection with all monitoring and compliance provisions detailed in Sections 3.02(m) of this Agreement;

(v) establish ratings and rating procedures for MEPCO-TF;

(vi) collaborate with the ISO with respect to:

(A) the development of Rating Procedures for MEPCO Transmission Facilities;

(B) the establishment of ratings for upgrades to the MEPCO Transmission Facilities; and

(C) the establishment of any changes to existing ratings for the MEPCO Transmission Facilities in effect as of the Effective Date.

To the extent there is any disagreement between the ISO and MEPCO concerning Rating Procedures or the rating of the MEPCO-TF, such disagreement shall be the subject of good faith negotiations between MEPCO and the ISO, provided that; (x) MEPCO's position concerning such Rating Procedures or Transmission Facility ratings shall govern until MEPCO and the ISO agree on a resolution to such disagreement; and (y) nothing in this Section 3.06(a)(vi) shall limit the rights of the ISO or MEPCO to submit a filing under Section 206 of the Federal Power Act with respect to MEPCO Transmission Facility ratings or Rating Procedures. During any collaboration or discussions concerning Transmission Facility ratings, MEPCO shall continue to provide the ISO with up-to-date ratings information in accordance with the applicable Rating Procedures.

(vii) undertake operating actions in accordance with any tariffs or rate schedules approved or accepted by FERC;

(viii) provide ISO with the right to use a level of communications capacity (and maintain the equipment associated with this capacity in accordance with Good Utility Practice) on its telecommunication assets and equipment attached to or associated with MEPCO-TF consistent with practice prior to the Effective Date in order to supply reliability-related data including meter, voice and data communications; continue to receive and send telemetry to and from MEPCO-TF ; provide for the receipt of such information and MEPCO-TF substations, and provide metering data and/or telemetry to ISO as reasonably necessary for ISO to perform its obligations under this Agreement and the ISO Tariff; provided that MEPCO shall have the unfettered right to use communications capacity on its telecommunication assets and equipment attached to or associated with MEPCO-TF for other business purposes to the extent such capacity is not being used by ISO as of the Effective Date; and provided further that as required by the Schedule 22 Large Generator Interconnection Agreement and Schedule 23 Small Generator Interconnection Agreement in the ISO OATT, MEPCO shall include provisions in its Interconnection Agreements with generators after the Effective Date providing for the installation and maintenance of sufficient communications capability to allow ISO to exercise its Operating Authority with respect to such generators;

(ix) notify ISO prior to making changes to the operational status of MEPCO's MEPCO-TF and provide information on the operational status of MEPCO-TF consistent with practice prior to the Effective Date;

(x) provide for or arrange to provide ISO with revenue metering data;

(xi) in all material respects, comply with all applicable laws, regulations, orders, permits, license requirements, and with all applicable NERC/NPCC Requirements, other applicable reliability organizations' local reliability rules, and all applicable requirements of federal or state laws or regulatory authorities; and

(xii) Nothing in this Agreement shall modify or alter the obligations of MEPCO under Grandfathered Transmission Agreements.

(b) <u>Operation of MEPCO-TF During A System Failure</u>. Existing Operating Procedures for use during a System Failure shall be utilized by ISO and MEPCO. Any modifications to the Existing Operating Procedures for use during a System Failure or new Operating Procedures for use during a System Failure shall be developed by ISO in the manner specified in Section 3.02(g). The procedures for use during a System Failure shall provide that, in situations where immediate action is required, the Maine Local Control Center shall have the authority to take the following reliability actions at a minimum, provided that MEPCO or the Maine Local Control Center shall coordinate with ISO as soon as practicable upon taking such action:

(i) Undertake those operational functions with respect to MEPCO-TF undertaken by ISO under non-System Failure conditions;

(ii) Re-energize MEPCO-TF following breaker trips;

(iii) Implement emergency Load Shedding and voltage reduction measures and subsequent restoration;

(iv) Implement Voltage/VAR control;

(v) Adjust PARS settings;

(vi) Take such other measures necessary, consistent with Good Utility Practice, to respond to a System Failure.

Nothing in this Section 3.06(b) shall limit the right of MEPCO pursuant to Section 3.07 to take any action(s) that it deems necessary to prevent loss of human life, injury to persons and/or damage to property.

**3.07 <u>Reserved Rights of MEPCO.</u>**

(a) Notwithstanding any other provision of this Agreement to the contrary, MEPCO shall retain all of the rights set forth in this Section 3.07; provided, however, that such rights shall be exercised in a manner consistent with applicable NERC/NPCC Requirements and applicable regulatory standards. This Section 3.07 is not intended to reduce or limit any other rights of MEPCO as a signatory to this Agreement or under the ISO Tariff.

(i) Nothing in this Agreement shall restrict any rights: (A) of MEPCO that is a party to a merger, acquisition or other restructuring transaction to make filings under Section 205 of the Federal Power Act with respect to MEPCO's

reallocation or redistribution of revenues or the assignment of MEPCO's rights or obligations, to the extent the Federal Power Act requires such filings; or (B) of MEPCO to terminate its participation in this Agreement pursuant to Article X of this Agreement.

(ii) Except as expressly provided in the grant of Operating Authority to ISO, MEPCO retains all rights that it otherwise has incident to its ownership of, and legal and equitable title to, its assets, including its MEPCO-TF and all land and land rights, including the right to build, acquire, sell, lease, merge, dispose of, retire, use as security, or otherwise transfer or convey all or any part of its assets, subject to MEPCO's compliance with Section 2.05 of this Agreement. Subject to Article X, MEPCO may, directly or indirectly, by merger, sale, conveyance, consolidation, recapitalization, operation of law, or otherwise, transfer all or any portion of MEPCO's MEPCO-TF subject to this Agreement but only if such transferee or successors shall agree in writing to be bound by terms of this Agreement to the extent that, upon such event, the MEPCO Transmission Facilities remain within the New England Transmission System and service over the MEPCO Transmission Facilities will continue to be provided under the ISO Tariff.

(iii) Any expansion or modification by MEPCO of its MEPCO-TF, any facilities constructed by MEPCO to connect the facilities of a current or proposed Transmission Customer to such MEPCO-TF, and/or any new transmission facilities constructed by MEPCO shall be subject to MEPCO's right to recover, pursuant to appropriate financial arrangements and tariffs or contracts, all costs prudently incurred or prudently committed to be incurred, plus a return on invested equity and other capital, associated with constructing and owning or financing such facilities, expansions or modifications to its Transmission Facilities.

(iv) The responsibilities granted to ISO under this Agreement shall not affect the rights of MEPCO to modify or expand its MEPCO-TF, nor confer upon ISO any authority to direct MEPCO to modify or expand its MEPCO-TF.

(v) MEPCO shall have the right to adopt and implement, consistent with Good Utility Practice, procedures and to take such actions it deems necessary to protect its facilities from physical damage or to prevent injury or damage to persons or property.

(vi) MEPCO retains the right to take whatever actions, consistent with Good Utility Practice, it deems necessary to fulfill its obligations under applicable Law.

(vii) Nothing in this Agreement shall be construed as limiting in any way the rights of MEPCO to make any filing with any applicable state or local or federal regulatory authority other than FERC.

(viii) Subject to Section 2.04, MEPCO shall retain the right to enter into Interconnection Agreements with transmission owners, generators and other

entities connecting with the MEPCO-TF and to file such agreements for approval or acceptance with FERC.

(ix) MEPCO shall have the right to retain one or more subcontractors to perform any or all of its obligations under this Agreement. The retention of a subcontractor pursuant to the terms of this Section 3.07 shall not relieve MEPCO of its primary liability for the performance of any of its obligations under this Agreement.

(b) Any and all other rights and responsibilities of MEPCO related to the ownership or operation of its MEPCO-TF not expressly assigned to ISO under this Agreement will remain with MEPCO.

(c) Nothing in this Agreement shall be deemed to impair or infringe on any rights or obligations of MEPCO under the Federal Power Act and FERC's rules and regulations thereunder, provided that any such rights are not inconsistent with the express terms of this Agreement. Nothing contained in this Agreement shall be construed to limit in any way the right of MEPCO to take any position, including opposing positions, in any administrative or judicial proceeding or filing by the ISO or other parties, notwithstanding that such proceeding or filing may be undertaken or made, explicitly or implicitly, pursuant to this Agreement.

**3.08 Repair and Maintenance of Transmission Facilities.**

(a) Planning, Scheduling, and Approval of Transmission Facility Outages.

(i) MEPCO shall submit to the ISO long-term plans for Transmission Facility outages, shall submit to the ISO schedules for Transmission Facility outages, and shall obtain ISO approval for Transmission Facility outages in accordance with, and to the extent required by Market Rule 1.

(ii) Notwithstanding any of the foregoing, nothing in this Section 3.08 shall be construed to require MEPCO to reschedule an outage of a Transmission Facility or to require MEPCO to refrain from initiating switching and tagging procedures to take a Transmission Facility out of service or place it back into service to the extent MEPCO determines that such outage or actions are necessary to prevent injury or damage to persons or property or to protect its facilities from physical damage, in accordance with Section 3.07(a)(v) of this Agreement.

(b) Recovery of Transmission Outage Rescheduling Costs. MEPCO shall have the right to file a schedule to the Schedule 20B under the ISO OATT that will provide for reimbursement to MEPCO for any direct costs incurred by MEPCO due to ISO's rescheduling or revocation of a previously Scheduled or Approved Outage.

(c) Annual Assessment of Outage Coordination Efforts. ISO shall prepare and issue annual public reports on the scheduling and coordination of transmission outages. Each such annual report shall: (i) assess the accuracy of the ISO's estimation of congestion and RMR cost impacts and the accuracy of MEPCO and other inputs used in such estimation (ii) assess any long term impacts of ISO's exercise of its authority to require the rescheduling of transmission maintenance outages in accordance with Section 3.08(a) and; (iii) include analyses

and data which could allow MEPCO to identify potential opportunities for incentives based on efficient coordination of outages and other operational measures that will reduce congestion costs or increase operational flexibility. ISO shall provide a draft of each such annual report to MEPCO and interested stakeholders prior to issuing a final report and shall consider the input of MEPCO and interested stakeholders in preparing such reports, subject to any applicable restrictions set forth in the ISO Information Policy on file with FERC.

(d) Development of Incentive Proposals. Notwithstanding any other provision in this Agreement, the ISO will apply reasonable efforts to work actively with MEPCO to analyze alternatives including incentives adopted in other markets and to provide input for use by MEPCO in developing the design of incentive rates or mechanisms for regional congestion cost reduction. The ISO will work with other stakeholders in a similar fashion if so requested. Any such incentive proposal shall be filed by MEPCO with FERC in accordance with Section 3.04(a). Such incentive mechanisms shall be designed to further improve coordination of outages or operational measures in a manner that will reduce overall congestion or RMR costs. Any MEPCO incentive must be approved or accepted by FERC. MEPCO shall attempt to reach agreement with the ISO before filing an incentive proposal with FERC. The ISO may submit filings to the FERC (including a protest or a complaint under Section 206 of the Federal Power Act) raising any questions or concerns that it may have concerning MEPCO's specific incentive proposal, provided that the ISO shall not contend that an incentive proposal is inappropriate or oppose the proposal on the ground that MEPCO has agreed to the provisions of Section 3.08 of this Agreement.

(e) Market Monitoring of Outage Scheduling. The Market Monitoring Unit of the ISO shall monitor the outage scheduling activities of MEPCO. The Market Monitoring Unit of the ISO shall have the right to request that MEPCO provide information to the Market Monitoring Unit concerning MEPCO's scheduling of MEPCO-TF outages, including the rescheduling or cancellation of any Planned, Scheduled or Approved Outage, and MEPCO shall provide such information to the Market Monitoring Unit in accordance with Section 11.07(c) of this Agreement.

(f) Damage or Destruction of MEPCO-TF. If, at any time during the Term, any of MEPCO's MEPCO-TF are damaged or destroyed, then, MEPCO shall determine, in its sole discretion, consistent with Good Utility Practice and applicable Law, whether or not (and if so, in what manner) to restore or cause the restoration of such damaged or destroyed MEPCO-TF to substantially the same condition, character or use as existed before the damage or destruction, if at all, provided that MEPCO shall consult with ISO prior to making such determination and shall comply with the requirements specified in Section 2.05.

**3.09 Invoicing, Collection and Disbursement of Customer Payments.**

MEPCO shall be responsible for invoicing, collection and disbursement of customer payments, provided that MEPCO may enter into a separate agreement with another entity to perform such services.

**3.10 Grandfathered Transmission Agreements.**

Notwithstanding any other provision of this Agreement, Grandfathered Transmission Service Agreements, Grandfathered Intertie Agreements and Grandfathered Interconnection Agreements (hereinafter collectively referred to as "Grandfathered Transmission Agreements"), as listed in Schedule 3.10, will continue to be effective for the terms of such agreements.

**3.11 Subcontractors.**

MEPCO acknowledges and agrees that, subject to the terms set forth herein, including Section 6.06, ISO has the right to retain one or more subcontractors to perform any or all of its obligations under this Agreement. The retention of a subcontractor pursuant to the terms of this Section 3.11 shall not relieve ISO of its primary liability for the performance of any of its obligations under this Agreement.

**3.12 No Impairment of ISO's Other Legal Rights and Obligations.**

Nothing in this MEPCO TOA shall be deemed to impair or infringe on any other rights or obligations of ISO under the Federal Power Act and FERC's rules and regulations thereunder, including ISO's rights and obligations to submit filings to recover its administrative, capital, and other costs, provided that any such rights are not inconsistent with the express terms of this Agreement. During the Term of this MEPCO TOA, ISO shall:

(a) have the rights and obligations to design, develop, operate, maintain and administer the New England Markets and congestion pricing mechanisms (including the exclusive right to make Section 205 filings relating to the Market Rules in accordance with Section 3.04), and

(b) have the right to undertake actions relating to congestion pricing and management in accordance with this Agreement, ISO Market Rules, and applicable FERC orders.

Nothing in this MEPCO TOA shall be deemed to impair or infringe on such rights and obligations.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

**4.01 Representations and Warranties of MEPCO.**

As of the time of execution of this Agreement, MEPCO represents and warrants to ISO as follows:

(a) Organization. It is duly organized, validly existing and in good standing under the laws of the state of its organization.

(b) Authorization. It has all requisite power and authority to execute, deliver and perform this Agreement; the execution, delivery and performance by MEPCO of this

Agreement have been duly authorized by all necessary and appropriate action on the part of MEPCO; and this Agreement has been duly and validly executed and delivered by MEPCO and constitutes the legal, valid and binding obligations of MEPCO, enforceable against MEPCO in accordance with its terms.

(c) No Breach. The execution, delivery and performance by MEPCO of this Agreement will not result in a breach of any terms, provisions or conditions of any agreement to which MEPCO is a party which breach has a reasonable likelihood of materially and adversely affecting MEPCO's performance under this Agreement.

(d) MEPCO Transmission Facilities. The MEPCO-TF listed by MEPCO in Schedule 2.01(a) constitute all MEPCO-TF owned by MEPCO in New England that are subject to this Agreement.

(e) No Warranty Regarding MEPCO's MEPCO-TF. In connection with MEPCO's grant of operating authority to ISO over the MEPCO-TF pursuant to the terms of this agreement, such MEPCO-TF are being made available pursuant to this agreement to ISO "AS IS, WHERE IS," and MEPCO is not making any representations or warranties, written or oral, statutory, express or implied, concerning such MEPCO-TF, including, in particular, any warranty of merchantability or fitness for a particular purpose, all of which are hereby expressly excluded and disclaimed. The foregoing provision is not intended to limit or condition any obligation of MEPCO expressly provided for elsewhere in this Agreement.

**4.02 Representations and Warranties of ISO.**

As of the time of execution of this Agreement, ISO represents and warrants to MEPCO as follows:

(a) Organization. It is duly organized, validly existing and in good standing under the laws of the state of its organization.

(b) Authorization. It has all requisite power and authority to execute, deliver and perform this Agreement; the execution, delivery and performance by ISO of this Agreement have been duly authorized by all necessary and appropriate action on the part of ISO; and this Agreement has been duly and validly executed and delivered by ISO and constitutes the legal, valid and binding obligation of ISO, enforceable against ISO in accordance with its terms.

(c) No Breach. The execution, delivery and performance by ISO of this Agreement will not result in a breach of any of the terms, provisions or conditions of any agreement to which ISO is a party which breach has a reasonable likelihood of materially and adversely affecting ISO's performance under this Agreement.

## ARTICLE V

## COVENANTS OF MEPCO

**5.01 Covenants of MEPCO.**

MEPCO covenants and agrees that during (i) the Term, or (ii) the period expressly specified herein, as applicable, MEPCO shall comply with all covenants and provisions of this Article V, except to the extent ISO and MEPCO consent in writing to waive such covenants or performance is excused pursuant to Section 11.11(b).

**5.02 Financial Statements and Filings.**

If MEPCO's financial statements, permit applications or any other filing with any Governmental Authority are publicly available, MEPCO shall, upon request by ISO, provide ISO information sufficient to allow ISO to locate such financial statements, permit applications or other filings, including the date and place of the filing of the relevant documents.

**5.03 Expenses.**

Except to the extent specifically provided herein, all costs and expenses incurred by MEPCO in connection with the negotiation of this Agreement shall be borne by MEPCO; provided that nothing herein shall prevent MEPCO from recovering such expenses in accordance with applicable law.

**5.04 Consents and Approvals.**

(a) MEPCO shall exercise Commercially Reasonable Efforts to promptly prepare and file all necessary documentation to effect all necessary applications, notices, petitions, filings and other documents, and shall exercise Commercially Reasonable Efforts to obtain (and will cooperate with ISO in obtaining) any consent, acquiescence, authorization, order or approval of, or any exemption or nonopposition by, any Governmental Authority required to be obtained or made by MEPCO in connection with this Agreement or the taking of any action contemplated by this Agreement.

(b) MEPCO shall exercise Commercially Reasonable Efforts to obtain consents of all other third parties necessary to the performance of this Agreement by MEPCO. MEPCO shall promptly notify ISO of any failure to obtain any such consents and, if requested by ISO, shall provide copies of all such consents obtained by MEPCO.

(c) Nothing in this Section 5.04 shall require MEPCO to pay any sums to a third party, including any Governmental Authority, excluding filing fees paid to any Governmental Authority in connection with a filing necessary or appropriate to further action.

**5.05 Notice and Cure.**

MEPCO shall notify ISO in writing of, and contemporaneously provide ISO with true and complete copies of any and all information or documents relating to, any event, transaction or circumstance, as soon as practicable after it becomes Known to MEPCO, that causes or shall cause any covenant or agreement of MEPCO under this Agreement to be breached or that renders or shall render untrue any representation or warranty of MEPCO contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance. MEPCO shall use all Commercially Reasonable Efforts to cure such event, transaction or circumstance as soon as practicable after it becomes known to MEPCO. No notice given pursuant to this Section 5.05 shall have any effect on the representations, warranties,

covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit ISO's right to seek indemnity under Article IX.

## ARTICLE VI

## COVENANTS OF ISO

**6.01 Covenants of ISO.**

ISO covenants and agrees that during (i) the Term, or (ii) the period expressly specified herein, as applicable, ISO shall comply with all covenants and provisions of this Article VI, except to the extent the Parties consent in writing to a waiver of such covenants or performance is excused pursuant to Section 11.11(b).

**6.02 Financial Statements and Filings.**

(a) To the extent not provided to stakeholders generally or made publicly available by ISO, ISO shall make available to MEPCO: (i) quarterly unaudited financial statements within sixty (60) days after each quarter end and (ii) annual audited financial statements within one hundred twenty (120) days after each fiscal year end. In each instance, the financial statements made available by ISO pursuant to (i) and (ii) above shall be prepared in accordance with Generally Accepted Accounting Principles and shall be true and correct in all material respects.

(b) If financial statements, permit applications or any other filing with any Governmental Authority are publicly available, ISO shall, upon request by MEPCO, provide MEPCO information sufficient to allow MEPCO to locate such financial statements, permit applications or other filings including the date and place of the filing of the relevant documents.

**6.03 Expenses.**

Except to the extent specifically provided herein, all costs and expenses incurred by ISO in connection with the negotiation of this Agreement shall be borne by ISO; provided that nothing herein shall prevent ISO from recovering such expenses in accordance with applicable law.

**6.04 Consents and Approvals.**

(a) ISO shall exercise Commercially Reasonable Efforts to promptly prepare and file all necessary documentation to effect all necessary applications, notices, petitions, filings and other documents, and shall exercise Commercially Reasonable Efforts to obtain (and will cooperate with MEPCO in obtaining) any consent, acquiescence, authorization, order or approval of, or any exemption or nonopposition by, any Governmental Authority required to be obtained or made by ISO in connection with this Agreement or the taking of any action contemplated by this Agreement.

(b) ISO shall exercise Commercially Reasonable Efforts to obtain consents of all other third parties necessary to performance of this Agreement by ISO. ISO shall promptly notify MEPCO of any failure or anticipated failure to obtain any such consents and, if requested by MEPCO, shall provide copies of all such consents obtained by ISO.

(c) Nothing in this Section 6.04 shall require ISO to pay any sums to a third party, including any Governmental Authority, excluding filing fees paid to any Governmental Authority in connection with a filing necessary or appropriate to discharge its obligations hereunder.

**6.05 <u>Notice and Cure.</u>**

ISO shall notify MEPCO in writing of, and contemporaneously shall provide MEPCO with true and complete copies of any and all information or documents relating to, any event, transaction or circumstance, as soon as practicable after it becomes Known to ISO, that causes or shall cause any covenant or agreement of ISO under this Agreement to be breached or that renders or shall render untrue any representation or warranty of ISO contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance. ISO shall use all Commercially Reasonable Efforts to cure such event, transaction or circumstance as soon as practicable after it becomes Known to ISO. No notice given pursuant to this Section 6.05 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit any right of MEPCO to seek indemnity under Article IX.

**6.06 <u>Management Agreements.</u>**

ISO shall not enter into any management agreement relating to the provision of transmission services with any Person, including MEPCO, unless such agreement: (a) has been approved by FERC; (b) does not violate ISO's Code of Conduct and is on an arms-length basis; or (c) if for an aggregate amount of $1,000,000 or more for a contract with any Participant in the ISO Markets, including MEPCO, is the result of a competitive solicitation process, the outcome of which is based on factors that include, among others, skill, qualifications, costs, reputation and associated risks.

**6.07 <u>ISO Line of Business; Non-Profit-Status.</u>**

ISO shall not be operated on a for-profit basis. This provision is not intended to require ISO to maintain its status as an entity not subject to federal or state taxes, to require ISO to remain a Delaware not-for-profit corporation or to assure that in any particular year that ISO's revenues do not exceed its expenses. ISO shall not pay dividends or use its net earnings other than to offset RTO operating and capital expenses and maintain reasonable reserves.

## ARTICLE VII

## TAX MATTERS

**7.01 <u>Responsibility for MEPCO Taxes.</u>**

MEPCO shall prepare and file all Tax Returns and other filings related to its Transmission Business and MEPCO-TF and pay any Tax liabilities related to its Transmission Business and MEPCO-TF. ISO shall not be responsible for, or required to file, any Tax Returns or other tax related reports for MEPCO and shall have no liability for any Taxes related to MEPCO's Transmission Business or MEPCO-TF. ISO and MEPCO hereby agree that, for tax purposes, MEPCO-TF shall be deemed to be owned by MEPCO.

**7.02 Responsibility for ISO Taxes.**

ISO shall prepare and file all Tax Returns and other filings related to its operations and pay any Tax liabilities related to its operations. MEPCO shall not be responsible for, or required to, file any Tax Returns or other reports for ISO and shall have no liability for any Taxes related to ISO's operations.

## ARTICLE VIII

## RELIANCE; SURVIVAL OF AGREEMENTS

**8.01 Reliance; Survival of Agreements.**

Notwithstanding any right of any Party (whether or not exercised) to investigate the accuracy of any of the matters subject to indemnification by any other Party contained in this Agreement, each of the Parties has the right to rely fully upon the representations, warranties, covenants and agreements of each other Party contained in this Agreement. The provisions of Sections 11.01, 11.07, 11.11 and 11.15 and Articles VII and IX shall survive the termination of this Agreement.

## ARTICLE IX

## INDEMNIFICATION; INSURANCE; ASSUMPTION OF LIABILITIES

**9.01 Indemnification.**

(a) Subject to Section 9.06(b) through 9.06(d), (i) MEPCO shall release, indemnify, and hold harmless the ISO from and against any and all damages, losses, liabilities, obligations, claims, demands, suits, proceedings, recoveries, judgments, settlements, costs and expenses, court costs, attorney fees, and all other obligations (each, an "Indemnifiable Loss") asserted against the ISO by a Person that is not a Party to this Agreement (a "Third Party") including but not limited to any action by a MEPCO employee, to the extent alleged to result from, arise out of or be related to MEPCO's acts or omissions that give rise to such Indemnifiable Loss; and (ii) the ISO shall release, indemnify, and hold harmless MEPCO from and against any Indemnifiable Loss asserted against MEPCO by a Third Party, including but not limited to any action by an ISO employee, to the extent alleged to result from, arise out of or be related to the ISO's acts or omissions that give rise to such Indemnifiable Loss, including an ISO directive and/or instructions to a Party.

(b) The indemnification by the ISO set forth in Section 9.01(a)(ii) above shall be limited to the extent that MEPCO's liability would be limited by any applicable Law and arises from a claim by (i) MEPCO in its role as a Transmission Customer or (ii) a customer of MEPCO.

(c) MEPCO shall release, indemnify, and hold harmless the ISO from and against any Environmental Damages that the ISO becomes subject to as a result of its exercise of Operational Authority over MEPCO-TF, to the extent such Environmental Damages arose prior to the Effective Date or did not result from the ISO's acts or omissions.

(d) MEPCO and/or the ISO each hereby (i) waives any defense or immunity it might otherwise have under applicable workers' compensation laws or any other statute, or judicial decision, disallowing or limiting such indemnification and (ii) consents to a cause of action for indemnity and/or contribution in connection with such indemnification.

**9.02 Notice of Proceedings.**

Each party entitled to receive indemnification under this Agreement (each, an "Indemnitee") shall promptly notify the party who holds an indemnification obligation hereunder (in each case, the "Indemnifying Party") of any Indemnifiable Loss in respect of which such Indemnitee is or may be entitled to indemnification pursuant to Section 9.01. Such notice shall be given as soon as reasonably practicable after the Indemnitee becomes aware of the Indemnifiable Loss and that any such claim or proceeding may give rise to an indemnification obligation hereunder. Such notice shall describe the nature of the loss or proceeding in reasonable detail and shall indicate, if practicable, the estimated amount of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The delay or failure of such Indemnitee to provide the notice required pursuant to this Section 9.02 shall not release the Indemnifying Party from any indemnification obligation which it may have to such Indemnitee except (a) to the extent that such failure or delay materially and adversely affects the Indemnifying Party's ability to defend such action or increases the amount of the Indemnifiable Loss, and (b) that the Indemnifying Party shall not be liable for any costs or expenses of the Indemnitee in the defense of the claim, suit, action or proceeding during such period of failure or delay.

**9.03 Defense of Claims.**

(a) Unless and until the Indemnifying Party (i) acknowledges in writing its obligation within ten (10) calendar days of the Indemnitee's notice of a claim, suit, action or proceeding, and (ii) assumes control of the defense of such claim, suit, action or proceeding in accordance with Section 9.03(b), the Indemnitee shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, action, suit or proceeding by any third party alleged or asserted against such Indemnitee in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the Indemnifying Party hereunder.

(b) Upon acknowledging in writing its obligation to indemnify an Indemnitee to the extent required pursuant to this Article IX and paying all reasonable costs incurred by such Indemnitee in its defense, including reasonable attorney's fees, the Indemnifying Party shall be entitled, at its option (subject to Section 9.03(d)), to assume and control the defense of such claim, action, suit or proceeding at its expense with counsel of its selection, subject to the prior reasonable approval of the Indemnitee.

(c) Neither the Indemnifying Party nor the Indemnitee shall be entitled to settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other; provided, however, that such consent shall not be unreasonably withheld.

(d) Following the acknowledgment of the indemnification and the assumption of the defense by the Indemnifying Party pursuant to Section 9.03(b), the Indemnitee shall have the right to employ its own counsel and such counsel may participate in such action, but the fees and expenses of such counsel shall be at the expense of such Indemnitee, when and as incurred, unless: (i) the employment of counsel by such Indemnitee has been authorized in writing by the Indemnifying Party; (ii) the Indemnitee shall have reasonably concluded and specifically notified the Indemnifying Party that there may be a conflict of interest between the Indemnifying Party and the Indemnitee in the conduct of the defense of such action; (iii) the Indemnifying Party shall not in fact have employed independent counsel reasonably satisfactory to the Indemnitee to assume the defense of such action and shall have been so notified by the Indemnitee; (iv) the Indemnitee shall have reasonably concluded and specifically notified the Indemnifying Party that there may be specific defenses available to it which are different from or additional to those available to the Indemnifying Party or that such claim, action, suit or proceeding involves or could have a material adverse effect upon the Indemnitee beyond the scope of this Agreement; or (v) the Indemnifying Party shall not have taken reasonable steps necessary to defend diligently such action within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps. If clause (ii), (iii), (iv) or (v) of the preceding sentence shall be applicable, then counsel for the Indemnitee shall have the right to direct the defense of such claim, action, suit or proceeding on behalf of the Indemnitee and the reasonable fees and disbursements of such counsel shall constitute indemnifiable legal or other expenses hereunder.

(e) If the amount of any Indemnifiable Loss incurred by an Indemnitee, at any time subsequent to the making of an indemnity payment by an Indemnifying Party in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the Prime Rate) shall promptly be repaid by the Indemnitee to the Indemnifying Party. In the event that the claim, demand or suit giving rise to an Indemnifiable Loss is ultimately adjudicated, if a Final Order confirms that the Indemnitee was not entitled to indemnification hereunder, then the amount advanced by the Indemnifying Party in respect of such Indemnifiable Loss (together with interest thereon from the date of payment thereof at the Prime Rate) shall promptly be paid by the Indemnitee to the Indemnifying Party.

**9.04 Subrogation.**

Upon payment of any indemnification by a party pursuant to this Article IX, the Indemnifying Party, without any further action, shall be subrogated to any and all claims that the Indemnitee may have relating thereto, and such Indemnitee shall at the request and expense of the Indemnifying Party cooperate with the Indemnifying Party and give at the request and expense of the Indemnifying Party such further assurances as are necessary or advisable to enable the Indemnifying Party vigorously to pursue such claims.

**9.05 Insurance.**

(a) The ISO shall at all times, at its own cost and expense, carry and maintain or cause to be carried and maintained throughout the Term: (i) liability and errors and omissions insurance (including blanket coverage for contractual liability), insuring the ISO against liability for injury or death to persons, damage to property and environmental restoration, (ii) worker's compensation insurance, (iii) property insurance and (iv) directors' and officers' insurance. The amount of the insurance coverages and deductibles shall generally be comparable to other independent system operators or RTOs, taking into consideration the relative size of the ISO and its contractual and tariff liabilities as compared to the other system operators or RTOs administering similar market structures. In assessing the comparable coverages and deductibles, the ISO may rely on the advice of its insurance consultants.

(b) MEPCO will maintain property insurance on its Transmission Facilities and liability insurance in accordance with good utility practice. MEPCO may self insure such amount to the extent it currently self insures similar policies and amounts.

(c) All insurance required under this Section 9.05 by outside insurers shall be maintained with insurers qualified to insure the obligations or liabilities under this Agreement and having a Best's rating of at least B+ VIII (or an equivalent Best's rating from time to time of B+ VIII), or in the event that from time to time Best's ratings are no longer issued with respect to insurers, a comparable rating by a nationally recognized rating service or such other insurers as may be agreed upon by the Parties.

(d) MEPCO shall be listed as additional insured parties on the liability and errors and omissions insurance required to be maintained by the ISO and the ISO shall be listed as an additional insured party on the liability insurance maintained by MEPCO. Upon execution of this Agreement, and when requested thereafter, each Party shall furnish each other Party with certificates of all such insurance policies setting forth the amounts of coverage, policy numbers, and date of expiration for such insurance in conformity with the requirements of this Agreement.

(e) The insurance policies maintained by the ISO hereunder shall not be canceled, terminated or the terms thereof modified or amended without at least thirty (30) days' prior notice to MEPCO.

(f) If any insurance policy required to be maintained by the ISO hereunder shall not be available to the ISO on a commercially reasonable basis (taking into account both terms and premiums), the ISO shall obtain a written report of an independent insurance advisor of recognized national standing, chosen by MEPCO and reasonably acceptable to the ISO, confirming in reasonable detail that such insurance policy, in respect of amount or scope of coverage, is not available on a commercially reasonable basis from insurers of recognized

standing. During any period with respect to which any insurance policy required by this Agreement is not commercially available, the ISO shall nevertheless maintain insurance that approximates such required insurance policy as closely as commercially practical, to the extent it is available on a commercially reasonable basis from insurers of recognized standing. If any insurance policy which was previously not held or discontinued because of its commercial unavailability later becomes available on a commercially reasonable basis, the ISO shall obtain or reinstate such insurance.

**9.06 Assumption of Liability.**

(a) MEPCO shall be liable to the ISO, and the ISO shall be liable to MEPCO, for losses, liabilities, damages, diminution in value, obligations, claims, proceedings, fines, deficiencies and expenses (collectively, "Losses") caused by such Party's grossly negligent acts or omissions or willful misconduct (including the grossly negligent acts or omissions or willful misconduct of such Party's directors, Affiliates, members, officers, employees, agents, and contractors) in connection with the performance of such Party of its obligations under this Agreement; and no Party shall be liable to another Party for any incidental, indirect, special, exemplary, punitive or consequential damages, including lost revenues or profits, even if such damages are foreseeable or the damaged Party has advised such Party of the possibility of such damages and regardless of whether any such damages are deemed to result from the failure or inadequacy of any exclusive or other remedy. The foregoing limitations shall not apply to the right of the Parties to seek indemnification under this Agreement in accordance with Section 9.01.

(b) Nothing in this Agreement shall be deemed to affect the right of the ISO to recover its costs due to liability under this Article IX through the ISO Participants Agreement or the ISO Administrative Tariff.

(c) The ISO shall not be liable to MEPCO with respect to any damages incurred by MEPCO that are directly attributable to the ISO's reliance on facility ratings established by MEPCO.

(d) MEPCO shall not be liable to any other transmission owner, any other party and/or the ISO by reason of this Agreement (whether based on contract, indemnification, warranty, tort, strict liability or otherwise) for: (i) any acts or omissions taken or done in compliance with, or good faith attempts to comply with, the directives and/or instructions of the ISO, except in cases of the gross negligence or willful misconduct MEPCO; and/or (ii) any costs and expenses relating to the operation, repair, maintenance or improvement of any Transmission Facility of the ISO or any other transmission owner.

## ARTICLE X

## TERM; DEFAULT AND TERMINATION

**10.01 Term; Termination Date.**

(a) Term and Effective Date.

(i) Term. Subject to the terms set forth in this Section 10.01, the initial term of this Agreement (the "Initial Term") shall commence on the Effective Date and shall continue until January 31, 2010. Subject to the terms set forth in this Section 10.01, the Initial Term shall be extended automatically for additional two-year periods (each, an "Additional Term"). MEPCO may withdraw from this Agreement effective at the end of the Initial Term or the end of any Additional Term by providing no less than 180 days' prior notice of such withdrawal to the other Party. Together, the Initial Term and the Additional Term(s), if any, shall constitute the term (the "Term") of this Agreement.

(ii) Effective Date. The "Effective Date" shall be the date on which ISO and MEPCO unanimously agree to place this Agreement and related agreements and documents into effect.

(iii) This Agreement shall terminate upon Commission approval or acceptance of (1) MEPCO becoming a PTO under the TOA between the PTOs and ISO, and (2) MEPCO including MEPCO-TF under the ISO Tariff in a manner such that MEPCO's revenue requirements are recovered thereunder and not from separate charges to MEPCO Transmission Customers under Schedule 20B to the ISO OATT.

(b) MEPCO Termination During The Term. Subject to Section 10.01(d), MEPCO may terminate this Agreement at any time during the Term if any of the following shall have occurred:

(i) upon a ISO event of default in accordance with Section 10.03(a), provided that MEPCO shall exercise this right in accordance with Section 10.03(b)(i).

(ii) if a Final Order of FERC, a Final Order of a Federal court or a Federal law sets forth a change in policy stating that (A) the federal government no longer encourages the participation of transmission owners in RTOs and such Final Order or law affirmatively states that transmission owners participating in an RTO may withdraw therefrom; or (B) that the recovery of costs for existing MEPCO-TF will be subject to any change in policy which would prevent MEPCO from recovering the costs of such MEPCO-TF on a regulated cost-of-service basis; provided that withdrawal pursuant to (A) or (B) of this provision shall require notice to the other Parties not less than 180 days prior to the Termination Date established pursuant to Section 10.01(d).

(iii) FERC issues an order putting into effect changes to the relative rights and responsibilities of MEPCO and ISO under this Agreement, including changing the scope and definition of Operating Authority, so as to materially adversely affect the interests of MEPCO, unless MEPCO has agreed to such changes in accordance with Section 11.04; provided that a withdrawal pursuant to this provision shall require notice to the other Party not less than 180 days prior to the Termination Date established pursuant to Section 10.01(d); and MEPCO providing a notice of termination pursuant to this provision shall be required to rescind such notice if FERC issues a subsequent order prior to the Termination

Date so as to eliminate the changes to the relative rights and responsibilities of MEPCO and ISO under this Agreement.

(iv) MEPCO has entered into an agreement to form or join an ITC in accordance with Attachment M of the ISO OATT which has been accepted for filing by the FERC, provided that termination pursuant to this provision shall be effective concurrent with the effective date of such agreement.

(v) MEPCO has obtained authorization from the FERC to join another control area, RTO or other similar organization in connection with a merger with or acquisition by another entity.

(c) Termination By ISO. ISO may terminate its obligations under this Agreement and surrender its Operating Authority over the MEPCO-TF if any of the following shall have occurred:

(i) the withdrawal of one or more transmission owners from ISO, and, as a result of such withdrawal, ISO cannot maintain system reliability or administer efficient and competitive markets.

(ii) FERC issues an order putting into effect material changes in the liability and indemnification protections afforded to ISO under this Agreement or the ISO Tariff, provided that: (A) withdrawal pursuant to this provision shall require notice to the other Party not less than 180 days prior to the Termination Date established pursuant to Section 10.01(d); and (B) ISO shall be required to rescind such notice if FERC issues a subsequent order prior to the Termination Date so as to eliminate the material changes to such liability and indemnification protections.

(iii) upon a MEPCO event of default in accordance with Section 10.04(a), provided that ISO shall exercise this right in accordance with Section 10.04(b)(i).

(iv) FERC issues an order putting into effect an amendment or modification of this Agreement that materially adversely affects ISO's ability to carry out its responsibilities under this Agreement, unless ISO has agreed to such changes in accordance with Section 11.04, provided that: (A) withdrawal pursuant to this provision shall require notice to MEPCO not less than 180 days prior to the Termination Date established pursuant to Section 10.01(d); and (B) ISO shall be required to rescind such notice if FERC issues a subsequent order prior to the Termination Date so as to eliminate the material adverse effect to ISO's ability to carry out it responsibilities under this Agreement.

(v) upon a MEPCO event of default in accordance with Section 10.04(a), provided that ISO shall exercise this right in accordance with Section 10.04(b)(i).

(d) Actions Prior To Termination. Upon submission of a written notice of termination by MEPCO, MEPCO submitting such notice shall commence the development of a

plan under which Operating Authority shall be transferred from ISO to another entity. The Termination Date with respect to MEPCO or ISO shall not occur until both: (a) ISO and MEPCO have agreed upon a plan addressing the technical, operational and market issues associated with the transfer of Operating Authority in connection with such termination and such plan has been implemented, provided that: (i) if the Parties are unable to reach agreement on such plan, any affected Party shall not have the right to submit the matter to FERC for resolution without additional negotiation under Section 11.12; (ii) with respect to a termination pursuant to Section 10.01(a), MEPCO shall not be required to remain a Party to this Agreement for longer than one year after providing notice of termination; and (iii) in the event of a default by ISO, MEPCO may require that ISO immediately make arrangements for the orderly transfer of ISO's invoicing and collection functions with respect to MEPCO, if applicable, prior to the Termination Date in accordance with Section 10.03(b); and (b) all required regulatory approvals, if any, have been obtained for such termination.

(e) Approvals. Notwithstanding any other provision contained herein or in any other document to the contrary, any termination requested under this Section 10.01 shall be effective: (1) unless a party to this Agreement seeking to challenge the request demonstrates that the requested termination is contrary to the public interest under the Mobile-Sierra Doctrine and (ii) subject to the FERC's determination under Section 205 of the Federal Power Act that the termination is just, reasonable and not unduly discriminatory or preferential. If MEPCO is exercising its right to terminate in accordance with this Section 10.01, MEPCO shall file with the FERC, pursuant to Section 205 of the FPA, the tariffs and rate schedules applicable to transmission service over its Transmission Facilities to become effective upon such termination.

(f) Continuing Obligations. The terminating Party shall have the following continuing obligations following termination of this Agreement:

(i) All financial obligations incurred and payments applicable to the time period prior to the Termination Date shall be honored by the terminating Party in accordance with the terms of this Agreement, and each Party shall remain liable for all obligations arising hereunder prior to the Termination Date.

(ii) MEPCO, if terminating, shall file a replacement transmission tariff to replace the affected portion of the ISO Tariff, unless FERC rules no longer require the filing of such a tariff or no longer has jurisdiction over MEPCO's Tariff.

## 10.02 Release of Operating Authority.

(a) Upon the Termination Date, ISO's right and obligation to exercise Operating Authority over the MEPCO-TF shall promptly cease, and, in accordance with Section 10.01, ISO shall be deemed to have released and returned, and MEPCO (or its designee) shall have assumed, Operating Authority over the MEPCO-TF on the Termination Date.

(b) After the Termination Date, ISO shall take Commercially Reasonable Efforts to assist MEPCO or MEPCO's designee in resuming performance of the functions comprising Operating Authority.

(c) The expenses associated with any termination under Section 10.01 shall be at MEPCO's expense unless (1) the termination is by ISO pursuant to Section 10.01(c)(ii) or (iii), or (2) pursuant to Section 10.03 in the event of a ISO default.

**10.03 Events of Default of ISO.**

(a) Events of Default of ISO. Subject to the terms and conditions of this Section 10.03, the occurrence of any of the following events shall constitute an event of default of ISO under this Agreement:

(i) Failure by ISO to perform any material obligation set forth in this Agreement and continuation of such failure for longer than thirty (30) days after the receipt by ISO of written notice of such failure from MEPCO; provided, however, that if ISO is diligently pursuing a remedy during such thirty day (30) period, said cure period shall be extended for an additional thirty (30) days or as otherwise agreed by MEPCO;

(ii) If there is a dispute between ISO and MEPCO as to whether ISO has failed to perform a material obligation, the cure period(s) provided in Section 10.03(a)(i) above shall run from the point at which a finding of failure to perform has been made by a Governmental Authority;

(iii) Failure of ISO to pay when due any other amounts payable to MEPCO by ISO pursuant to this MEPCO TOA within thirty (30) days of the due date; or

(iv) Any attempt (not including consideration of strategic options or entering into exploratory discussions) by ISO to transfer an interest in, or assign its obligations under, this Agreement, except as otherwise permitted hereunder;

(v) The exercise of Operating Authority or other responsibilities under this Agreement in a manner that results in a material amount of damage to or the destruction of MEPCO's MEPCO-TF due to the willful misconduct or gross negligence of ISO or the repeated and persistent exercise by ISO of its Operating Authority in a manner that subjects the MEPCO-TF to the significant risk of a material amount of damage, provided that exercise by ISO of its Operating Authority over the MEPCO-TF both in accordance with the Operating Procedures and within the ratings established by MEPCO for the MEPCO-TF shall not be considered to subject the MEPCO-TF to risk of damage and further provided that nothing in this Section 10.03(a)(v) shall be deemed to excuse ISO from complying with its obligations under this MEPCO TOA or to limit the other events of default specified in this Section 10.03(a);

(vi) With respect to ISO, (A) the filing of any petition in bankruptcy or insolvency, or for reorganization or arrangement under any bankruptcy or

insolvency laws, or voluntarily taking advantage of any such laws by answer or otherwise or the commencement of involuntary proceedings under any such laws, (B) assignment by ISO for the benefit of creditors; or (C) allowance by ISO of the appointment of a receiver or trustee of all or a material part of its property if such receiver or trustee is not discharged within thirty (30) days after such appointment.

(b) Remedies for Default. If an event of default by ISO occurs and is continuing, MEPCO shall have the right to avail itself of any or all of the following remedies, all of which shall be cumulative and not exclusive:

(i) To terminate this Agreement in accordance with Section 10.01(d); provided that if ISO contests such allegation of an ISO event of default, this Agreement shall remain in effect pending resolution of the dispute, but any applicable notice period shall run during the pendency of the dispute;

(ii) To demand that ISO shall immediately make arrangements for the orderly transfer of Operating Authority over MEPCO's MEPCO-TF and assist MEPCO or MEPCO's designee in resuming performance of the functions comprising Operating Authority, provided that: (A) MEPCO shall not be liable for the reimbursement of ISO for any costs and expenses incurred by ISO in connection therewith; (B) ISO and MEPCO shall agree upon a plan addressing the technical and operational issues associated with such transfer of Operating Authority, as such plan has been implemented; and (C) if the Parties are unable to reach agreement on such plan, any affected Party shall have the right to submit the matter to FERC for resolution without additional negotiation under Section 11.12;

(iii) To make any payment or perform or comply with any agreement that ISO shall be obligated to pay, perform or comply with under this Agreement and the amount of reasonable expenses (including attorneys' fees and any other reasonable professionals' fees and expenses) of MEPCO incurred in connection with such payment or the performance of or compliance with any such agreement shall be payable by ISO upon demand;

(iv) To obtain such specific performance and/or an injunction to prevent breaches of this Agreement and to enforce specifically the terms and conditions hereof; and/or

(v) To obtain damages pursuant to the indemnity provisions of Sections 9.01 and 9.06 of this Agreement.

**10.04 Events of Default of MEPCO.**

(a) Events of Default of MEPCO. Subject to the terms and conditions of this Section 10.04, the occurrence of any of the events listed below shall constitute an event of default of MEPCO under this Agreement (in each instance, a "MEPCO Default"):

(i) Failure by MEPCO to perform any material obligation set forth in this Agreement and continuation of such failure for longer than thirty (30) days after the receipt by MEPCO of written notice of such failure from ISO, provided, however, that if MEPCO is diligently pursuing a remedy during such thirty day (30) period, said cure period shall be extended for an additional thirty (30) days or as otherwise agreed by ISO;

(ii) If there is a disputc between ISO and MEPCO as to whether MEPCO has failed to perform a material obligation, the cure period(s) provided in Section 10.04(a)(i) above shall run from the point at which a finding of failure to perform has been made by a Governmental Authority;

(iii) With respect to MEPCO, (A) the filing of any petition in bankruptcy or insolvency, or for reorganization or arrangement under any bankruptcy or insolvency laws, or voluntarily taking advantage of any such laws by answer or otherwise or the commencement of involuntary proceedings under any such laws, (B) assignment by MEPCO for the benefit of creditors; or (C) allowance by MEPCO of the appointment of a receiver or trustee of all or a material part of its property if such receiver or trustee is not discharged within thirty (30) days after such appointment; or

(b) Remedies for Default. If an event of default by MEPCO occurs and is continuing, ISO shall have the following remedies, all of which shall be cumulative and not exclusive:

(i) terminate this Agreement in accordance with Section 10.01(d); provided that if MEPCO contests such allegation of MEPCO event of default, this Agreement shall remain in effect pending resolution of the dispute, but any applicable notice period shall run during the pendency of the dispute;

(ii) such specific performance and/or an injunction to prevent breaches of this Agreement and to enforce specifically the terms and conditions hereof; or

(iii) obtain damages pursuant to the indemnity provisions of Sections 9.01 and 9.06.

(c) Notwithstanding anything to the contrary herein, nothing in this Section 10.04 shall be deemed to give ISO or any ISO agent or designee the right to exercise any functions other than those enumerated as Operating Authority in Section 3.02 or the right to take physical control of MEPCO-TF.

## ARTICLE XI

## MISCELLANEOUS

**11.01 Notices.**

Unless otherwise expressly specified or permitted by the terms hereof, all communications and notices provided for herein shall be in writing and any such communication or notice shall become effective (a) upon personal delivery thereof, including by overnight mail or courier service, (b) in the case of notice by United States mail, certified or registered, postage prepaid, return receipt requested, upon receipt thereof, or (c) in the case of notice by facsimile, upon receipt thereof; *provided that* such transmission is promptly confirmed by either of the methods set forth in clauses (a) or (b) above, in each case addressed to each party and copy party hereto at its address set forth in Schedule 11.01 or, in the case of any such party or copy party hereto, at such other address as such party or copy party may from time to time designate by written notice to the other party hereto; *further provided* that a notice given in connection with this Section 11.01 but received on a day other than a Business Day, or after business hours in the situs of receipt, will be deemed to be received on the next Business Day.

**11.02 Supersession of Prior Agreements.**

With respect to the subject matter hereof, this Agreement (together with all schedules and exhibits attached hereto) constitutes the entire agreement and understanding among the Parties with respect to all subjects covered by this Agreement and supersedes all prior discussions, agreements and understandings among the Parties with respect to such matters, including those agreements set forth on Schedule 11.02 attached hereto. To the extent that such other agreements address subjects addressed in this Agreement, this Agreement shall govern.

**11.03 Waiver.**

Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by Law or otherwise afforded, shall be cumulative and not alternative.

**11.04 Amendment; Limitations on Modifications of Agreement.**

Except as otherwise specifically provided herein, this Agreement shall only be subject to modification or amendment by mutual agreement of MEPCO and ISO.

(a) In light of the foregoing, the Parties agree that they shall not rely to their detriment on any purported amendment, waiver or other modification of any rights under this Agreement unless the requirements of this Section 11.04 are satisfied and further agree not to assert equitable estoppel or any other equitable theory to prevent enforcement of this provision in any court of law or equity, arbitration or other proceeding.

(b) Absent the agreement of the Parties to any proposed change hereof or an amendment hereof pursuant to Section 11.04(a), the standard of review for changes to the following sections of this Agreement (or changes to any schedules associated with such sections) proposed by a Party, a non-party or the Federal Energy Regulatory Commission acting sua sponte shall be the "public interest" standard of review under the Mobile-Sierra Doctrine: 2.01, 2.03, 3.01, 3.02, 3.03, 3.04, 3.05, 3.06, 3.07, 3.09, 3.10, 3.12, 4.01(e), 6.06, 6.07, 9.01, 9.06,

10.02, 10.03, 10.04, 11.04(a)-(d), 11.06, 11.15, 11.17(d) and Article I, as it applies to the foregoing sections. Absent the agreement of the Parties to any proposed change hereof or an amendment hereof pursuant to Section 11.04(a), with respect to changes to the remaining provisions of this Agreement proposed by a Party, a non-party or the Federal Energy Regulatory Commission acting sua sponte, the standard of review shall be that provided under Section 206 of the Federal Power Act.

(c) Notwithstanding the Parties' rights under Section 3.04 hereof, neither ISO nor MEPCO shall propose to modify or amend the ISO Tariff (including Schedule 20B) nor any other tariff, rate schedule, procedure (including Operating Procedures), protocol, or agreement applicable to ISO or MEPCO in any manner that would limit, alter, or adversely affect the rights and responsibilities of the non-proposing Party under this Agreement or that would otherwise be inconsistent with the provisions of this Agreement unless: (i) MEPCO and ISO have entered into a prior written agreement to make corresponding modifications to this Agreement in accordance with this Section 11.04, or (ii) if the corresponding modifications to the provisions of this Agreement enumerated in Section 11.04(c) above are required, the proposing Party also requests FERC to find (or FERC has already so found) that the corresponding modifications are required under the "public interest" standard of review under the Mobile-Sierra Doctrine or (iii) if corresponding modifications to the remainder of the Agreement are required, the proposing Party also requests FERC to find (or FERC has already so found) that the corresponding modifications are required under the standard of review under Section 206 of the Federal Power Act.

(d) The parties shall notify stakeholders of proposed amendments to this Agreement by posting such amendments on the ISO website prior to the filing of such amendments with FERC.

**11.05 <u>No Third Party Beneficiaries.</u>**

Except as provided in Article IX, it is not the intention of this Agreement or of the Parties to confer a third party beneficiary status or rights of action upon any Person or entity whatsoever other than the Parties and nothing contained herein, either express or implied, shall be construed to confer upon any Person or entity other than the Parties any rights of action or remedies either under this Agreement or in any manner whatsoever.

**11.06 <u>No Assignment; Binding Effect.</u>**

Neither this Agreement nor any right, interest or obligation hereunder may be assigned by a Party (including by operation of law) without the prior written consent of the other Party in its sole discretion and any attempt at assignment in contravention of this Section 11.06 shall be void. MEPCO may assign or transfer any or all of its rights, interests and obligations hereunder upon the transfer of its assets through sale, reorganization, or other transfer, provided that:

(a) MEPCO's successors and assigns shall agree to be bound by the terms of this Agreement except that MEPCO's successors and assigns shall not be required to be bound by any obligations hereunder to the extent that MEPCO has agreed to retain such obligations; and

(b) notwithstanding (a), MEPCO shall assign or transfer to any new owner of the MEPCO-TF subject to this Agreement all of the rights, responsibilities and obligations associated with the physical operation of the MEPCO-TF as well as all of the rights, responsibilities and obligations associated with the ISO's Operating Authority with respect to the MEPCO-TF, further provided that the new owner shall have the right to retain one or more subcontractors to perform any or all of its responsibilities or obligations under this Agreement.

Subject to the foregoing, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective permitted successors and assigns. No assignment shall be effective until MEPCO receives all required regulatory approvals for such assignment.

**11.07 <u>Further Assurances; Information Policy; Access to Records</u>.**

(a) Each Party agrees, upon another Party's request, to make Commercially Reasonable Efforts to execute and deliver such additional documents and instruments, provide information, and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and of the transactions contemplated hereby.

(b) ISO shall, upon MEPCO's request, make available to MEPCO any and all information within ISO's custody or control that is necessary for MEPCO to perform its responsibilities and obligations or enforce its rights under this Agreement, provided that such information shall be made available to MEPCO only to the extent permitted under the ISO Information Policy and subject to any applicable restrictions in the ISO Information Policy, including provisions of the ISO Information Policy governing the confidential treatment of non-public information, and provided further that any MEPCO employee or employee of the Maine Local Control Center shall comply with such ISO Information Policy and any applicable standards of conduct to prevent the disclosure of such information to any unauthorized Person. Any dispute concerning what information is necessary for MEPCO to perform its responsibilities and obligations or enforce its right under this Agreement shall be subject to dispute resolution under Section 11.12 of this Agreement.

(c) MEPCO shall, upon ISO's request,

(i) make available to ISO any and all information within MEPCO's custody or control that is necessary for ISO to perform its responsibilities and obligations or enforce its rights under this Agreement, provided that such information shall be shall be made available to ISO only to the extent permitted under the ISO Information Policy and subject to any applicable restrictions in the ISO Information Policy, including provisions of the ISO Information Policy governing the confidential treatment of non-public information, and provided further that any ISO employee shall comply with such ISO Information Policy and any applicable standards of conduct to prevent the disclosure of such information to any unauthorized Person. Any dispute concerning what information is necessary for ISO to perform its responsibilities and obligations or enforce its right under this Agreement shall be subject to dispute resolution under Section 11.12 of this Agreement, and

(ii) make reasonable efforts to provide information and support in response to ISO's requests within ISO's requested time frames and shall comply with all deadlines set forth in the ISO Planning Process, as specified in the ISO Tariff.

(d) If, in order to properly prepare its Tax Returns, other documents or reports required to be filed with Governmental Authorities or its financial statements or to fulfill its obligations hereunder, it is necessary that ISO or MEPCO be furnished with additional information, documents or records not referred to specifically in this Agreement, and such information, documents or records are in the possession or control of ISO or MEPCO, ISO or MEPCO shall use its best efforts to furnish or make available such information, documents or records (or copies thereof) at ISO's or MEPCO's request, cost and expense. Any information obtained by ISO or MEPCO in accordance with this paragraph shall be subject to any applicable provisions of the ISO Information Policy.

(e) Notwithstanding anything to the contrary contained in this Section 11.07:

(i) no Party shall be obligated by this Section 11.07 to undertake studies or analyses that such Party would not otherwise be required to undertake or to incur costs outside the normal course of business to obtain information that is not in such Party's custody or control at the time a request for information is made pursuant to this Section 11.07;

(ii) if MEPCO and ISO are in an adversarial relationship in litigation or arbitration (other than with respect to litigation or arbitration to enforce this Section 11.07), the furnishing of information, documents or records by ISO or MEPCO in accordance with this Section 11.07 shall be subject to applicable rules relating to discovery;

(iii) no Party shall be compelled to provide any privileged and/or confidential documents or information that are attorney work product or subject to the attorney/client privilege; and

(iv) no Party shall be required to take any action that impairs or diminishes its rights under this Agreement, diminishes any other Party's obligations under this Agreement or otherwise lessens the value of this Agreement to such Party.

**11.08 Business Day.**

Notwithstanding anything herein to the contrary, if the date on which any payment is to be made pursuant to this Agreement is not a Business Day, the payment otherwise payable on such date shall be payable on the next succeeding Business Day with the same force and effect as if made on such scheduled date and, provided such payment is made on such succeeding Business Day, no interest shall accrue on the amount of such payment from and after such scheduled date to the time of such payment on such next succeeding Business Day.

**11.09 Governing Law.**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware including all matters of construction, validity and performance without regard to the conflicts-of-laws provisions thereof.

**11.10 <u>Consent to Service of Process.</u>**

Each of the Parties hereby consents to service of process by registered mail, Federal Express or similar courier at the address to which notices to it are to be given, it being agreed that service in such manner shall constitute valid service upon such party or its respective successors or assigns in connection with any such action or proceeding; provided, however, that nothing in this Section *11.10* shall affect the right of any such Parties or their respective successors and permitted assigns to serve legal process in any other manner permitted by applicable Law or affect the right of any such Parties or their respective successors and assigns to bring any action or proceeding against any other one of such Parties or its respective property in the courts of other jurisdictions.

**11.11 <u>Specific Performance; Force Majeure.</u>**

(a) <u>Specific Performance</u>. The Parties specifically acknowledge that a breach of this Agreement, whether or not an Event of Default, and notwithstanding any cure period in Section 10.03(b), would cause each of the non-breaching Parties to suffer immediate and irreparable harm due to the unique relationship among the Parties. The Parties hereto shall be entitled to seek specific performance and/or an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and conditions hereof in any court of competent jurisdiction, such remedy being in addition to any other remedy to which any Party may be entitled at law or in equity.

(b) <u>Force Majeure</u>. A Party shall not be considered to be in default or breach under this Agreement, and shall be excused from performance or liability for damages to any other party, if and to the extent it shall be delayed in or prevented from performing or carrying out any of the provisions of this Agreement, except the obligation to pay any amount when due, in consequence of any act of God, labor disturbance, failure of contractors or suppliers of materials (not including as a result of non-payment), act of the public enemy or terrorists, war, invasion, insurrection, riot, fire, storm, flood, ice, explosion, breakage or accident to machinery or equipment or by any other cause or causes (not including a lack of funds or other financial causes) beyond such Party's reasonable control, including any order, regulation, or restriction imposed by governmental, military or lawfully established civilian authorities. Any Party claiming a force majeure event shall use reasonable diligence to remove the condition that prevents performance, except that the settlement of any labor disturbance shall be in the sole judgement of the affected Party.

**11.12 <u>Dispute Resolution.</u>**

The Parties agree that any dispute arising under this Agreement shall be the subject of good-faith negotiations between the affected Parties and that each Party shall designate one or

more representatives with the authority to negotiate the matter in dispute to participate in such negotiations. The Parties shall engage in such good-faith negotiations for a period of not less than 60 calendar days, unless: (a) a Party identifies exigent circumstances reasonably requiring expedited resolution of the dispute by FERC or a court or agency with jurisdiction over the dispute; or (b) the provisions of this Agreement otherwise provide a Party the right to submit a dispute directly to FERC for resolution. Any other dispute that is not resolved through good-faith negotiations may, by any party, be submitted for resolution by FERC or a court or agency with jurisdiction over the dispute upon the conclusion of such negotiations. Any Party may request that any dispute submitted to FERC for resolution be subject to FERC settlement procedures. Notwithstanding the foregoing, any dispute arising under this Agreement may be submitted to arbitration or any other form of alternative dispute resolution upon the agreement of all affected Parties to participate in such an alternative dispute resolution process.

**11.13 Invalid Provisions.**

If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any Party under this Agreement shall not be materially and adversely affected thereby, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) the court holding such provision to be illegal, invalid or unenforceable may in lieu of such provision add as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as it deems appropriate; provided that nothing in this Section 11.13 shall limit a Party's right to appeal conditions to regulatory approval in accordance with Section 11.17(d).

**11.14 Headings and Table of Contents.**

The headings of the sections of this Agreement and the Table of Contents are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

**11.15 Liabilities; No Joint Venture.**

(a) The obligations and liabilities of ISO and MEPCO arising out of or in connection with this Agreement shall be several, and not joint, and each Party shall be responsible for its own debts, including Taxes. No Party shall have the right or power to bind any other Party to any agreement without the prior written consent of such other Party. The Parties do not intend by this Agreement to create nor does this Agreement constitute a joint venture, association, partnership, corporation or an entity taxable as a corporation or otherwise. No express or implied term, provision or condition of this Agreement shall be deemed to constitute the parties as partners or joint venturers.

(b) To the extent any Party has claims against any other Party, such Party may only look to the assets of the other Party for the enforcement of such claims and may not seek to enforce any claims against the directors, members, officers, employees, affiliates or agents of such other Party who, each Party acknowledges and agrees, have no liability, personal or

otherwise, by reason of their status as directors, members, officers, employees, affiliates or agents of that Party, with the exception of fraud or willful misconduct.

**11.16 Counterparts.**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. The parties hereto agree that any document or signature delivered by facsimile transmission shall be deemed an original executed document for all purposes hereof.

**11.17 Conditions Precedent.**

Notwithstanding anything to the contrary in this Agreement, this Agreement shall not be effective with respect to any Party unless all of the conditions precedent set forth in this Section 11.17 shall have been satisfied or waived.

(a) Required Regulatory Approvals. All final required regulatory approvals shall have been obtained and be in full force and effect and shall not be subject to the satisfaction of any condition or conditions that, if accepted, would: (i) in the case of MEPCO, in the reasonable judgment of MEPCO, in the aggregate have a material adverse effect on the value of MEPCO's MEPCO-TF, its expected level of transmission revenues, or its electric utility business, revenues, or financial condition, unless MEPCO waives said condition, provided however, that with respect to any required regulatory approval obtained from a Governmental Authority of a State, the condition set forth in this clause shall apply only if MEPCO operates its Transmission Business within such State; and (ii) in the case of ISO, in its reasonable judgment, have a material adverse effect on ISO's ability to perform its obligations under this or any other agreement to which it is subject, unless ISO waives such condition.

(b) Board Consent. The board of directors of each Party, in its sole discretion, shall have authorized and approved such Party's executing, delivering and performing this Agreement.

(c) Additional Conditions Precedent. Additional conditions precedent are listed on Schedule 11.17(c).

(d) Right to Appeal Conditions to Regulatory Approval. In the event that a Governmental Authority conditions its regulatory approval of this Agreement on acceptance of a contractual provision, contractual modification, or any other condition or ruling related to formation of ISO that is not acceptable to any Party, such Party shall have the option of agreeing to permit this Agreement to become effective with the condition or ruling to which it objects and appeal the propriety of the condition or ruling to courts of competent jurisdiction; provided that, in the event a Final Order requires a vacation or modification of such objectionable condition or ruling, this Agreement shall thereupon be modified consistent with that Final Order; provided, however, that the other Party may exercise their rights to withdraw from or terminate this Agreement pursuant to Section 10.01(b) or Section 10.01(d), as applicable.

**11.18 Preserved Rights.**

No Party, by executing this Agreement, shall waive any rights to seek rehearing of a Commission order or to appeal a Commission order, including Commission orders concerning the terms and conditions of the NEPOOL tariff and market rules in effect prior to the Operations Date to the extent such terms and conditions have been incorporated into the ISO Tariff. The Parties expressly reserve the rights to pursue all pending requests for rehearing or appeals of such orders, and to file pleadings relating to such requests for rehearing or appeals, to the same extent as if the NEPOOL tariff were still in effect. Changes to the ISO Tariff shall be made to the extent necessary to comply with the results of a Commission rehearing order or judicial appeal concerning the terms and conditions of the NEPOOL tariff and market rules in effect prior to the Operations Date to the extent such terms and conditions have been incorporated into the ISO Tariff. The foregoing sentence shall not be deemed to prevent a Party from expressing its views to the Commission or a court regarding the foregoing compliance filing.

**11.19 <u>MEPCO TOA and ISO Tariff Impact due to the NRI Project.</u>**

Subject to Section 11.04, the Parties agree to review and, as necessary modify, their authorities and responsibilities under this MEPCO TOA ("Review/Negotiation Process") at least 12 months prior to the operational date of the North East Reliability Interconnection Project (otherwise referred to as the NRI Project or the Second New Brunswick Tie). Such operational date shall be determined based on the NRI Project projected schedule as reported in the ISO Regional System Planning process. This review shall be limited to assuring that the authorities and responsibilities under this MEPCO TOA and the ISO Tariff remain consistent with the Parties' intent herein.

(a) The Review/Negotiation Process shall consist of the following steps:

(i) Within a period of no greater than 90 days, MEPCO, in consultation with the ISO, shall develop a proposal for presentation to the PTOs that addresses the inclusion of the MEPCO-TF under Regional Network Service ("roll-in") within the ISO OATT;

(ii) From the date of the initial presentation to the PTOs (and other stakeholders, as appropriate), but in no event greater than 120 days, MEPCO shall attempt negotiate with the PTOs a final, mutually agreed upon proposal for roll in of the MEPCO-TF; and

(iii) Following the agreement of a final roll-in proposal by the PTOs and support by the stakeholders, MEPCO shall, at least 60 days prior to the operational date of the NRI Project and in conjunction with the PTOs and the ISO, shall prepare and file the proposal with FERC.

(b) If within the time frames established above, a consensus roll-in proposal is not achieved or the FERC rejects or substantially modifies a proposal on file with it, MEPCO agrees to work with the ISO to develop an alternative proposal.

(c) If at any time during the Review/Negotiation Process one or both Parties to this Agreement conclude that negotiations are at am impasse, the matter may be addressed pursuant to Section 11.04. Until such time as the matter in dispute is resolved or is under

consideration before the FERC, the terms and conditions of this MEPCO TOA shall remain in effect.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officer of each party as of the date first above written.

[INSERT NAMES OF MEPCO]

[INSERT NAMES OF ISO]

**Schedule 1.01**
**Schedule of Definitions**

Additional Term. "Additional Term" shall have the meaning ascribed thereto in Section 10.01(a) of this Agreement.

Additional MEPCO-TF Procedures. "Additional MEPCO-TF Procedures" shall have the meaning ascribed thereto in Section 3.02(h).

Agreement. This MEPCO Transmission Operating Agreement, as it may be amended from time to time.

Ancillary Service. Those services that are necessary to support the transmission of electric capacity and energy from resources to loads while maintaining reliable operation of the transmission system in accordance with Good Utility Practice.

ATC. Available Transfer Capability.

Back-up Control Center. The control center established by ISO as a back-up to the ISO Control Center.

Business Day. Any day other than a Saturday or Sunday or an ISO Holiday, as posted by the ISO on its website.

Chester SVC Facility: The Chester SVC Facility is a generator/sink of VARS interconnected to MEPCO-TF. It is not owned by MEPCO nor is it a transmission facility. The Chester SVC Facility was constructed to maximize imports from eastern Canada as part of the construction of the HQ HVDC Phase II Project. Its costs are recovered via a bilateral contract with New England Hydro Corporation (NH Hydro). NH Hydro pays Chester a monthly support fee that covers the construction cost and ongoing O&M costs of the SVC. NH Hydro bills all Phase II Participants to recover its payments to Chester. Most Phase II Participants recover their support payments via regional rates as originally allowed by the Restated NEPOOL Agreement and now by the ISO-NE Tariff No. 3. Section II 49.

Commercially Reasonable Efforts. A level of effort which in the exercise of prudent judgment in the light of facts or circumstances known, or which should reasonably be known, at the time a decision is made, can be expected by a reasonable person to accomplish the desired result in a manner consistent with Good Utility Practice and which takes the performing party's interests into consideration. "Commercially Reasonable Efforts" will not be deemed to require a Person to undertake unreasonable measures or measures that have a significant adverse economic affect on such Person, including the payment of sums in excess of amounts that would be expended in the ordinary course of business for the accomplishment of the stated purpose.

Commission. The Federal Energy Regulatory Commission.

Control Area. An electric power system or combination of electric power systems, bounded by metering, to which a common automatic generation control scheme is applied in order to:

(a) match, at all times, the power output of the generators within the electric power system(s) and capacity and energy purchased from entities outside the electric power system(s), with the load within the electric power system(s);

(b) maintain scheduled interchange with other Control Areas, within the limits of Good Utility Practice;

(c) maintain the frequency of the electric power system(s) within reasonable limits in accordance with Good Utility Practice and applicable NERC/NPCC Requirements; and

(d) provide sufficient generating capacity to maintain operating reserves in accordance with Good Utility Practice.

Coordination Agreement. An agreement between ISO and the operator(s) of one or more neighboring Control Areas addressing issues including interchange scheduling, operational arrangements, emergency procedures, energy for emergency and reliability needs, the exchange of information among Control Areas, and other aspects of the coordinated operation of the Control Areas.

Effective Date. "Effective Date" shall have the meaning ascribed thereto in Section 10.01(a)(ii) of this Agreement.

Elective Transmission Upgrade. A Transmission Upgrade that is participant funded (i.e., voluntarily funded by an entity or entities that have agreed to pay for all of the costs of such Transmission Upgrade), and is not: (i) a Generator Interconnection Related Upgrade; (ii) a Reliability Transmission Upgrade (including a NEMA Upgrade, as appropriate); (iii) an Market Efficiency Transmission Upgrade (including a NEMA Upgrade, as appropriate); or (iv) initially proposed in an Elective Transmission Upgrade Application filed with the ISO in accordance with Section II.47.2 of the ISO Tariff on a date after the addition or modification already has been otherwise identified in the current ISO Transmission Plan (other than as an Elective Transmission Upgrade) in publication as of the date of that application.

Environmental Damages. Any cost, damages, expense, liability, obligation or other responsibility arising from or under Environmental Law consisting of or relating to:

(a) any environmental matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products);

(b) fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and response, investigative, remedial or inspection costs and expenses arising under Environmental Law;

(c) financial responsibility under Environmental Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment or other remediation or response actions ("Cleanup") required by applicable Environmental Law

(whether or not such Cleanup has been required or requested by any Governmental Authority or any other Person) and for any natural resource damages; or

(d) any other compliance, corrective, investigative, or remedial measures required under Environmental Law.

Environmental Laws. Any Law now or hereafter in effect and as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to pollution or protection of the Environment, health or safety or to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

Excluded Assets. "Excluded Assets" shall have the meaning ascribed thereto in Section 2.03 of this Agreement.

Exigent Circumstances. Circumstances such that the ISO determines in good faith that (i) failure to immediately implement a proposed Tariff filing authorized under Sections 3.04(c) and 3.04(e) of this Agreement would substantially and adversely affect (A) System reliability or security, or (B) the competitiveness or efficiency of the New England Markets, and (ii) invoking the procedures set forth in Sections 3.04(c) and 3.04(e) of this Agreement would not allow for timely redress of the ISO's concerns.

Existing Operating Procedures. "Existing Operating Procedures" shall have the meaning ascribed thereto in Section 3.02(g) of this Agreement.

External Transactions. Interchange transactions between the ISO Transmission System and neighboring Control Areas.

FACTS. Flexible AC Transmission Systems.

FERC. The Federal Energy Regulatory Commission.

Final Order. An order issued by a Governmental Authority in a proceeding after all opportunities for rehearing are exhausted (whether or not any appeal thereof is pending) that has not been revised, stayed, enjoined, set aside, annulled or suspended, with respect to which any required waiting period has expired, and as to which all conditions to effectiveness prescribed therein or otherwise by law, regulation or order have been satisfied.

FPA. The Federal Power Act.

Generally Accepted Accounting Principles. The widely accepted set of rules, conventions, standards, and procedures for reporting financial information, as established by the Financial Accounting Standards Board.

Good Utility Practice. Any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method,

or act to the exclusion of all others, but rather includes all acceptable practices, methods, or acts generally accepted in the region.

Governmental Authority. The government of any nation, state or other political subdivision thereof, including any entity exercising executive, military, legislative, judicial, regulatory, or administrative functions of or pertaining to a government, not including MEPCO or ISO.

Grandfathered Interconnection Agreement. An agreement or agreements for the interconnection of any party to the MEPCO-TF that has been executed or approved by an applicable Governmental Authority prior to the Effective Date and that is set forth in Schedule 3.10 to this Agreement.

Grandfathered Intertie Agreement. An agreement or agreements for the provision of transmission service over a Control Area intertie or for the interconnection of the MEPCO-TF with facilities outside the New England Control Area that has been executed or approved by an applicable Governmental Authority prior to the Effective Date and that is set forth in Schedule 3.10 of this Agreement.

Grandfathered Transmission Service Agreements. An agreement or agreements that sets forth the terms and conditions for transmission service between MEPCO and its customer(s) on the MEPCO-TF that has been executed or approved by an applicable Governmental Authority prior to the Effective Date and that is set forth in Schedule 3.10.

Grandfathered Transmission Agreements. "Grandfathered Transmission Agreements" shall consist of all Grandfathered Transmission Service Agreements, Grandfathered Interconnection Agreements and Grandfathered Intertie Agreements.

Independent Transmission Company or ITC. A transmission entity that assumes certain responsibilities in accordance with Attachment M of the ISO OATT, subject to the acceptance or approval of the FERC and a finding of the FERC that the transmission entity satisfies applicable independence requirements.

Initial Term. "Initial Term" shall have the meaning ascribed thereto in Section 10.01(a) of this Agreement.

Interconnection Agreement. An agreement or agreements for the interconnection of any entity to the MEPCO-TF.

Interconnection Standard. The applicable interconnection standards set forth in the ISO OATT.

ISO Administrative Charge. "ISO Administrative Charge" shall have the meaning ascribed thereto in Section 3.04(h) of this Agreement.

ISO Control Center. The primary control center established by ISO for the exercise of its Operating Authority and the performance of functions as an RTO.

ISO Default. "ISO Default" shall have the meaning ascribed thereto in Section 10.03(a) of this Agreement.

ISO Information Policy. The information policy set forth in the ISO Tariff.

ISO OATT. The ISO Open Access Transmission Tariff, Section II of the ISO Tariff, as in effect from time to time.

ISO Tariff. The ISO Transmission, Markets and Services Tariff, FERC Electric Tariff No. 3, as in effect from time to time.

ISO-NE (or ISO). ISO New England Inc, the RTO for New England authorized by FERC to perform the functions required pursuant to FERC's Order 2000 and FERC's corresponding regulations.

Knowledge. With respect to a Party, the collective actual knowledge of the directors and members of management of such Party, after reasonable inquiry by them of selected employees of such Party whom they believe, in good faith, to be the persons generally responsible for the subject matters to which the knowledge is pertinent. "Known" shall have the meaning correlative to "Knowledge."

Law. Any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, other requirement or rule of law.

Large Generating Unit. A Large Generating Facility as defined in Schedule 22 of the OATT.

Load Shedding. The systematic reduction of system demand by temporarily decreasing load.

Local Control Center. Those control centers now in existence (including the CONVEX, REMVEC, Maine and New Hampshire control centers) or established by MEPCO in accordance with Section 3.06 of this Agreement that are separate from the ISO Control Center and perform certain functions in accordance with this Agreement.

Market Rules. The rules describing how the ISO Markets are administered.

Market Monitoring Unit. Any market monitoring unit established by the ISO, including any internal market monitoring unit of the ISO and any independent market monitoring unit of the ISO.

MEPCO Transmission Facility. The a 345 kV transmission line, which is owned and operated by MEPCO, connected to Central Maine Power Company at the Maine Yankee Substation in Wiscasset Maine, and at the Maxcy's Substation in Windsor, Maine to Bangor Hydro Electric Company at Orrington, Maine and at its northern end, at the Canadian border to a similar 345 kV transmission line owned by New Brunswick Power ("MEPCO Transmission Facilities" or "MEPCO-TF").

Mobile-Sierra Doctrine. The "Mobile-Sierra Doctrine" shall mean the public interest standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956).

MEPCO Default. "MEPCO Default" shall have the meaning ascribed thereto in Section 10.04(a) of this Agreement.

MEPCO Local Restoration Plan. The restoration plan developed by MEPCO with respect to MEPCO's MEPCO-TF.

MEPCO-TF. "MEPCO-TF" shall have the meaning ascribed thereto in Section 2.01 of this Agreement.

MEPCO TOA. This Transmission Operating Agreement, as it may be amended from time to time.

NERC. The North American Electric Reliability Council.

NERC/NPCC Requirements. NPCC criteria, guides, and procedures, NERC reliability standards, and NERC operating policies and planning standards (until such time as they are replaced by NERC reliability standards) and any successor documents.

New England Control Area. The Control Area consisting of the interconnected electric power system or combination of electric power systems in the geographic region consisting of Vermont, New Hampshire, Maine, Massachusetts, Connecticut and Rhode Island.

New England Markets. Markets or programs (including congestion pricing and design and implementation of FTRs) for the purchase of energy, capacity, ancillary services, demand response services or other related products or services that are offered in the New England Control Area and that are administered by the ISO pursuant to rules, rates, or agreements on file from time to time with the Commission.

New England Transmission System. The system comprised of the transmission facilities over which the ISO has operational jurisdiction, including the Transmission Facilities of the PTOs and the transmission system of any ITC formed pursuant to Attachment M to the ISO OATT.

NPCC. The Northeast Power Coordinating Council.

OASIS. The Open Access Same-Time Information System of ISO.

Operating Authority. "Operating Authority" shall have the meaning ascribed thereto in Section 3.02 of this Agreement and shall include the responsibilities set forth in Section 3.05.

Operating Limits. The transfer limits for a transmission interface or generation facility.

Operating Procedures. The operating manuals, procedures, and protocols relating to the exercise of Operating Authority over the MEPCO-TF, as such guides, manuals, procedures, and protocols may be modified from time to time in accordance with Section 3.02(g) of this Agreement.

Order 2000. FERC's Order No. 2000, *i.e., Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 809 (January 6, 2000), FERC Stats. & Regs. ¶31,089 (1999), *order on reh'g*, Order No. 2000-A, 65 Fed. Reg. 12,088 (March 8, 2000), FERC Stats. & Regs. ¶31,092 (2000), *petitions for review pending sub nom.*, Public Utility District No. 1 of Snohomish County, Washington v. FERC, Nos. 00-1174, *et al.* (D.C. Cir).

PARS. Phase angle regulators.

Party or Parties. A "Party" shall mean ISO or MEPCO, as the context requires. "Parties" shall mean MEPCO and ISO.

Person. An individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, government or any department or agency thereof, or any other entity.

Pool Transmission Facility ("PTF"). The transmission facilities owned by a transmission owner that meet the criteria specified in Section II.49 of the ISO Tariff.

Rating Procedures. Procedures related to the establishment of ratings for MEPCO-TF or related to changes to existing ratings of MEPCO-TF (collectively "Rating Procedures").

Reliability Authority. "Reliability Authority" shall have the meaning established by NERC, as such definition may change from time to time, provided such definition of Reliability Authority shall not be inconsistent with the specific rights and responsibilities of ISO and MEPCO under this Agreement.

Restoration Plans. The System Restoration Plan and all MEPCO Local Restoration Plans.

RMR. Reliability must run resources.

RTO. An independent entity that complies with Order No. 2000 and FERC's corresponding regulations (or an entity that complies with all such requirements except for the scope and regional configuration requirements), as determined by the FERC.

System Failure. Widespread telecommunication, hardware or software failure or systemic ISO hardware or software failures that makes it impossible to receive or process bid information, dispatch resources, or exercise Operating Authority over the MEPCO-TF.

Tax or Taxes. All taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, including interest, penalties or additions attributable thereto.

Tax Return. Any return, report, information return, or other document (including any related or supporting information) required to be supplied to any authority with respect to Taxes.

Term. "Term" shall have the meaning ascribed thereto in Section 10.01(a) of this Agreement.

Termination Date. "Termination Date" shall mean the date of termination established in accordance with Section 10.01(e) of this Agreement.

TOA. The Transmission Operating Agreement between the Participating Transmission Owners (PTOs) and the ISO, as it may be amended from time to time.

Transmission Business. The business activities of MEPCO related to the ownership, operation and maintenance of its MEPCO-TF.

Transmission Customer. Any entity taking Transmission Service under the ISO Tariff.

Transmission Owner. "Transmission Owner" shall have the meaning ascribed thereto in the ISO Tariff.

Transmission Service. The non-discriminatory, open access transmission services provided to customers by MEPCO in accordance with Schedule 20B of the ISO OATT.

TTC. Total Transfer Capability.

VAR. Volt-Amps Reactive.

**Schedule 2.01(a)**

**List of MEPCO Transmission Facilities**

| Circuit # | Stations | Voltage (kV) |
|---|---|---|
| 388 | Orrington-Maxcy's | 345 |
| 392 | Maxcy's-Maine Yankee | 345 |
| 396 | Keswick-Chester-Orrington | 345 |

| Transformer # | Station | Voltage (kV) |
|---|---|---|
| T1 | Orrington | 345/115 |

| Interconnected Facility | Interconnection Point | Operating Range (MVAR) |
|---|---|---|
| The Chester SVC Facility located in Chester, Maine* | Circuit #396 in Chester, Maine | +450 Capacitive<br>-125 Inductive |

* The inclusion of the Chester SVC on this Schedule 2.01(a) is for the sole purpose of granting Operating Authority of said facility to ISO. The Chester SVC is not a MEPCO Transmission Facility.

Case 1:26-cv-00518-KFW Document 1-2 Filed 10/09/26 Page 73 of 155 PageID #: 263

**Schedule 3.02(c)**

**List of Interconnection Agreements and Tariffs Applicable to External Transactions**

1. ISO NEW ENGLAND INC., TRANSMISSION, MARKETS AND SERVICES TARIFF, FERC ELECTRIC TARIFF NO. 3, Effective February 1, 2005

**Schedule 3.02(g)**

**List of Existing Operating Procedures**

1. ISO New England Manual 6 – Financial Transmission Rights
2. ISO New England Manual 11 – Market Operations
3. ISO New England Manual 20 – Installed Capacity
4. ISO New England Manual 27 – Tariff Accounting
5. ISO New England Manual 28 – Market Rule 1 Accounting
6. ISO New England Manual 29 – Billing
7. ISO New England Manual 35 – Definitions And Abbreviations
8. ISO New England Manual 36 – Forward Reserve
9. ISO New England Manual – ISO-NE Load Response Program
10. ISO New England Operating Procedure No. 1 "Central Dispatch Operating Responsibility and Authority of ISO New England, the Local Control Centers and Market Participants"
11. ISO New England Operating Procedure No. 2 "Maintenance Of Communications, Computers, Metering, and Computer Support Equipment"
12. ISO New England Operating Procedure No. 3 "Transmission Outage Scheduling"
13. ISO New England Operating Procedure No. 4 "Action During a Capacity Deficiency"
14. ISO New England Operating Procedure No. 5 "Generation Maintenance and Outage Scheduling"
15. ISO New England Operating Procedure No. 6 "System Restoration"
16. ISO New England Operating Procedure No. 7 "Action In An Emergency"
17. ISO New England Operating Procedure No. 8 "Operating Reserve and Regulation"
18. ISO New England Operating Procedure No. 9 "Scheduling and Dispatch of External Transactions"
19. ISO New England Operating Procedure No. 10 "Analysis and Reporting of Power System Emergencies"
20. ISO New England Operating Procedure No. 11 "Black Start Capability Testing Requirements"
21. ISO New England Operating Procedure No. 12 "Voltage and Reactive Control"
22. ISO New England Operating Procedure No. 13 "Standards For Voltage Reduction and Load Shedding Capability"
23. ISO New England Operating Procedure No. 14 "Technical Requirements for Generation, Dispatchable and Interruptible Loads"
24. ISO New England Operating Procedure No. 16 "Transmission System Data"
25. ISO New England Operating Procedure No. 17 "Load Power Factor Correction"
26. ISO New England Operating Procedure No. 18 "Metering and Telemetering Criteria"
27. ISO New England Operating Procedure No. 19 "Transmission Operations"
28. ISO New England Operating Procedure No. 20 "Cold Weather Event Operations"
29. ISO New England Compliance Procedure
30. ISO New England Compliance and Enforcement Process For Enhanced NPCC Reliability and NERC Standards
31. Master/Local Control Center Procedure #1 "Nuclear Plant Transmission Operations"

32. Master/Local Control Center Procedure #2 "Abnormal Conditions Alert"
33. Master/Local Control Center Procedure #3 "Test Procedure For Local Control Center Satellite Phone Communications"
34. Master/Local Control Center Procedure #4 "Rules for Generator Unit Control Modes, Limits and Dispatch Terminology"
35. Master/Local Control Center Procedure #5 "Procedure for Millstone Point Station Generation Reduction"
36. Master/Local Control Center Procedure #6 "Procedure for Evacuation of ISO New England Control Room"
37. Master/Local Control Center Procedure #7 "Processing Transmission Outage Applications"
38. Master/Local Control Center Procedure #8 "Coordination of Generator Voltage Regulator Outages"
39. Master/Local Control Center Procedure #9 "Operation of the Chester Static VAR Compensator (SVC)"
40. Master/Local Control Center Procedure #10 "Generator Governor Control and Operation"

**Schedule 3.02(h)**

**List of Existing Additional MEPCO-TF Procedures**

**[Intentionally left blank]**

**Schedule 3.10**

**List of Grandfathered Transmission Agreements**

1. Permit Authorizing Maine Electric Power Company, Inc. to Construct, Operate, Maintain and Connect Electric Transmission Facilities at the International Border between the United States and Canada. July 25, 1969 (FPC Docket No. E-7486).

2. Order Authorizing Transmission of Electricity to Canada, July 21, 1970 (FPC Docket No. E-7534)

3. Order Amending Prior Order Authorizing Exportation of Electric Energy to a Foreign Country, February 25, 1977, Effective date November 1, 1976 (FPC Docket No. 7534)

4. Chester SVC Partnership Agreement, dated as of July 1, 1990

5. The Chester SVC Partnership Basic Operating Agreement, originally dated as of July 1, 1990 and recently extended through July 1, 2010. (FERC ER05-1278-000)

6. The Phase II Maine Electric Power SVC Facilities Support Agreement, dated as of October 1, 1988.

7. The Assignment and Purchase and Sale Agreement (between MEPCO and Chester SVC Partnership), dated as of July 1, 1990.

8. The Ground Lease Agreement (between MEPCO and Chester SVC Partnership), dated as of July 1, 1990.

9. The Chester SVC Partnership, Limited Recourse Senior Notes, Note Agreement, Dated as of December 20, 1990.

**Schedule 11.01**

**Notices**

<u>Maine Electric Power Company</u>

R. Scott Mahoney
Secretary and Clerk
83 Edison Drive
Augusta, Maine 04336

207-621-3955 (tel)
207-621-4714 (fax)

Hariph Smith
Director
83 Edison Drive
Augusta, Maine 04336

207-621-7800 (tel)
207-621-7869 (fax)

<u>ISO New England</u>

<u>Kathleen A. Carrigan</u>
SVP & General Counsel
ISO-NE
330 Whitney Ave.
Holyoke, MA 01040
413-540-4260 (tel)
413-535-4379(fax)

## Schedule 11.02

**Superseded Agreements**

1. Letter Agreement between NEPEX and MEPCO dated October 12, 1970.

2. Interconnection Agreement between thc New Brunswick Electric Power Commission and Central Maine Power and its subsequent assignment to MEPCO, both dated July 31, 1969.

**Schedule 11.17(c)**

**Additional Conditions Precedent**

**[Intentionally left blank]**

**Attachment 2**

# MEPCO TRANSMISSION OPERATING AGREEMENT

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; INTERPRETATIONS .......... 554

1.01 Definitions; Interpretations .......... 554

ARTICLE II MEPCO TRANSMISSION FACILITIES .......... 6

2.01 MEPCO Transmission Facilities .......... 6

2.02 New MEPCO-TF .......... 776

2.03 Excluded Assets .......... 776

2.04 Connection with Non-Parties .......... 998

2.05 Review of Transmission Plans .......... 11

2.06 Condemnation .......... 121211

ARTICLE III OPERATING AUTHORITY .......... 121211

3.01 Grant of Operating Authority .......... 121211

3.02 Definition of ISO Operating Authority .......... 131312

3.03 Transmission Services and OATT Administration .......... 171716

3.04 Application Authority .......... 191918

3.05 ISO's Responsibilities .......... 232322

3.06 MEPCO's Responsibilities .......... 23

3.07 Reserved Rights of MEPCO .......... 272726

3.08 Repair and Maintenance of Transmission Facilities .......... 28

3.09 Invoicing, Collection and Disbursement of Customer Payments .......... 303029

3.10 Grandfathered Transmission Agreements .......... 303029

3.11 Subcontractors .......... 303029

3.12 No Impairment of ISO's Other Legal Rights and Obligations .......... 30

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PARTIES .......... 313130

4.01 Representations and Warranties of MEPCO .......... 313130

4.02 **Representations and Warranties of ISO** ........ 323231

ARTICLE V COVENANTS OF MEPCO ........ 323231

5.01 **Covenants of MEPCO** ........ 323231

5.02 **Financial Statements and Filings** ........ 323231

5.03 **Expenses** ........ 32

5.04 **Consents and Approvals** ........ 32

5.05 **Notice and Cure** ........ 333332

ARTICLE VI COVENANTS OF ISO ........ 33

6.01 **Covenants of ISO** ........ 33

6.02 **Financial Statements and Filings** ........ 33

6.03 **Expenses** ........ 343433

6.04 **Consents and Approvals** ........ 343433

6.05 **Notice and Cure** ........ 34

6.06 **Management Agreements** ........ 353534

6.07 **ISO Line of Business; Non-Profit-Status** ........ 353534

ARTICLE VII TAX MATTERS ........ 353534

7.01 **Responsibility for MEPCO Taxes** ........ 353534

7.02 **Responsibility for ISO Taxes** ........ 35

ARTICLE VIII RELIANCE; SURVIVAL OF AGREEMENTS ........ 36

8.01 **Reliance; Survival of Agreements** ........ 36

ARTICLE IX INDEMNIFICATION; INSURANCE; ASSUMPTION OF LIABILITIES ........ 36

9.01 **Indemnification** ........ 36

9.02 **Notice of Proceedings** ........ 37

9.03 **Defense of Claims** ........ 37

9.04 **Subrogation** ........ 38

9.05 **Insurance** ........ 38

9.06 Assumption of Liability ........ 39

ARTICLE X TERM; DEFAULT AND TERMINATION ........ 40

10.01 Term; Termination Date ........ 40

10.02 Release of Operating Authority ........ 43

10.03 Events of Default of ISO ........ 43

10.04 Events of Default of MEPCO ........ 45

ARTICLE XI MISCELLANEOUS ........ 46

11.01 Notices ........ 46

11.02 Supersession of Prior Agreements ........ 474746

11.03 Waiver ........ 47

11.04 Amendment; Limitations on Modifications of Agreement ........ 47

11.05 No Third Party Beneficiaries ........ 48

11.06 No Assignment; Binding Effect ........ 48

11.07 Further Assurances; Information Policy; Access to Records. ........ 48

11.08 Business Day ........ 50

11.09 Governing Law ........ 50

11.10 Consent to Service of Process ........ 50

11.11 Specific Performance; Force Majeure ........ 51

11.12 Dispute Resolution ........ 51

11.13 Invalid Provisions ........ 525251

11.14 Headings and Table of Contents ........ 52

11.15 Liabilities; No Joint Venture ........ 52

11.16 Counterparts ........ 52

11.17 Conditions Precedent ........ 535352

11.18 Preserved Rights ........ 53

11.19 TOA and ISO Tariff Impact due to the NRI Project ........ 545453

## MEPCO TRANSMISSION OPERATING AGREEMENT

This MEPCO Transmission Operating Agreement (this "MEPCO TOA" or this "Agreement"), dated as of March 28, 2005, is made and entered into by Maine Electric Power Company ("MEPCO") and ISO New England Inc. ("ISO"), the Regional Transmission Organization for New England and a Delaware corporation (MEPCO and ISO are collectively referred to herein as the "Parties").

WHEREAS, MEPCO owns and operates a 345 kV transmission line connected to Central Maine Power Company at the Maine Yankee Substation in Wiscasset Maine, and at the Maxcy's Substation in Windsor, Maine to Bangor Hydro Electric Company at Orrington, Maine and at its northern end, at the Canadian border to a similar 345 kV transmission line owned by New Brunswick Power ("MEPCO Transmission Facilities" or "MEPCO-TF");

WHEREAS, ISO is a regional transmission organization authorized by the Federal Energy Regulatory Commission ("FERC") to exercise the functions required of RTOs pursuant to FERC's Order No. 2000 ("Order 2000") and FERC's RTO regulations;

WHEREAS, MEPCO is willing to offer and provide transmission service under a Transmission Service Schedule ("Schedule 20B") under the ISO Open Access Transmission Tariff ("ISO OATT"), which is contained in Section II of the ISO-NE Transmission, Markets and Service Tariff, FERC Electric Tariff No. 3 ("ISO Tariff");

WHEREAS, in accordance with the terms set forth herein, MEPCO desires for ISO to exercise, and ISO desires to exercise, Operating Authority (as defined in Section 3.02 of this Agreement) over the MEPCO Transmission Facilities (as defined in this Agreement); ~~and~~

WHEREAS, in accordance with the terms set forth herein, MEPCO, as agent for the Chester SVC Partnership, desires for ISO to exercise, and ISO desires to exercise, Operating Authority (as defined in Section 3.02 of this Agreement) over the Chester SVC Facility; and

WHEREAS, MEPCO reserves the right to transfer certain rights and obligations to an Independent Transmission Company in accordance with the ISO ~~Tariff~~OATT.

NOW, THEREFORE, in consideration of the promises, and the mutual representations, warranties, covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, MEPCO and ISO agree as follows:

# ARTICLE I

## DEFINITIONS; INTERPRETATIONS

**1.01 <u>Definitions; Interpretations.</u>**

Each of the capitalized terms and phrases used in this Agreement (including the foregoing recitals) and not otherwise defined herein shall have the meaning specified in Schedule 1.01. In this Agreement, unless otherwise provided herein:

(a) words denoting the singular include the plural and vice versa;

(b) words denoting a gender include all genders;

(c) references to a particular part, clause, section, paragraph, article, exhibit, schedule, appendix or other attachment shall be a reference to a part, clause, section, paragraph, or article of, or an exhibit, schedule, appendix or other attachment to, this Agreement;

(d) the exhibits, schedules and appendices attached hereto are incorporated herein by reference and shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein;

(e) a reference to any statute, regulation, proclamation, ordinance or law includes all statutes, regulations, proclamations, amendments, ordinances or laws varying, consolidating or replacing the same from time to time, and a reference to a statute includes all regulations, policies, protocols, codes, proclamations and ordinances issued or otherwise applicable under that statute unless, in any such case, otherwise expressly provided in any such statute or in this Agreement;

(f) a reference to a particular section, paragraph or other part of a particular statute shall be deemed to be a reference to any other section, paragraph or other part substituted therefore from time to time;

(g) a definition of or reference to any document, instrument or agreement includes any amendment or supplement to, or restatement, replacement, modification or novation of, any such document, instrument or agreement unless otherwise specified in such definition or in the context in which such reference is used;

(h) a reference to any Person (as hereinafter defined) includes such Person's successors and permitted assigns in that designated capacity;

(i) any reference to "days" shall mean calendar days unless "Business Days" (as hereinafter defined) are expressly specified;

(j) if the date as of which any right, option or election is exercisable, or the date upon which any amount is due and payable, is stated to be on a date or day that is not a Business Day, such right, option or election may be exercised, and such amount shall be deemed due and payable, on the next succeeding Business Day with the same effect as if the same was exercised or made on such date or day (without, in the case of any such payment, the payment or

accrual of any interest or other late payment or charge, provided such payment is made on such next succeeding Business Day);

(k) words such as "hereunder," "hereto," "hereof" and "herein" and other words of similar import shall, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular article, section, subsection, paragraph or clause hereof;

(l) a reference to "include" or "including" means including without limiting the generality of any description preceding such term, and for purposes hereof the rule of *ejusdem generis* shall not be applicable to limit a general statement, followed by or referable to an enumeration of specific matters, to matters similar to those specifically mentioned; and

(m) neither this Agreement nor any other agreement, document or instrument referred to herein or executed and delivered in connection herewith shall be construed against any Person as the principal draftsperson hereof or thereof.

## ARTICLE II

## MEPCO TRANSMISSION FACILITIES

### 2.01 MEPCO Transmission Facilities.

The MEPCO-TF over which ISO shall exercise Operating Authority in accordance with the terms set forth herein shall be:

(a) those facilities of MEPCO listed in Schedule 2.01(a), the Chester SVC Facility, and such list of facilities may be added to or deleted from in accordance with Sections 2.01(b) and 2.02 below.

(b) the MEPCO-TF included in Schedule 2.01(a) as of the Effective Date, may be added to or deleted from Schedule 2.01(a) without the necessity of an amendment to this Agreement, but only in the following manner:

(i) at the direction of a Governmental Authority with jurisdiction over the MEPCO-TF in question, provided that ISO shall be provided prior written notice of such changes; or

(ii) as agreed between ISO and MEPCO.

(c) Nothing in this Agreement is intended to address the rate treatment of MEPCO-TF or any other MEPCO assets.

(d) The MEPCO-TF listed in Schedule 2.01(a) shall not include Excluded Assets as defined in Section 2.03.

(e) The inclusion of the Chester SVC Facility in Schedule 2.01(a) of this agreement is for the sole purpose of granting Operating Authority, but specifically excludes

those responsibilities under Article 3.03 of this Agreement, of said facility to ISO. Nothing in this Agreement shall be construed to (1) create an association, joint venture, trust or partnership or to impose a partnership duty, obligation or liability between MEPCO and the Chester SVC Partnership, or (2) designate the Chester SVC Partnership as being a public utility subject to regulation under the Federal Power Act, as amended. Chester SVC Facility is treated the same as MEPCO-TF for purposes of Articles IV through XI of this Agreement.

**2.02 New MEPCO-TF.**

Any new facilities, and/or portions of facilities owned by MEPCO that are connected with or associated with those facilities listed in Schedule 2.01(a) and are not Excluded Assets and are placed in service after the Effective Date of this Agreement shall be subject to the Operating Authority of the ISO by including said facilities in Schedule 2.01(a) as set forth in Section 2.01 (b).

**2.03 Excluded Assets.**

The "Excluded Assets" of MEPCO shall consist of those assets and/or facilities set forth in this Section 2.03. Such Excluded Assets are expressly excluded from the definition of MEPCO-TF under this MEPCO TOA, and ISO shall not have Operating Authority over MEPCO's Excluded Assets:

(a) Any assets, facilities, and/or portions of facilities owned by MEPCO that are connected with or associated with those facilities listed in Schedule 2.01(a) to the extent specifically excluded pursuant to the following items (i) through (vii) of this Section 2.03(a):

(i) proceeds from the use or disposition of MEPCO-TF;

(ii) any payment, deposit, refund or credit (1) relating to MEPCO Taxes , (2) arising under any contracts or tariffs of MEPCO, (3) arising under any contract or tariff subject to regulation by an agency other than FERC, or not subject to regulation, or (4) relating to a Grandfathered Transmission Agreement;

(iii) any rights, ownership, title or interest MEPCO may have with respect to telecommunications assets and equipment, provided that ISO shall continue to have the right to use such telecommunication assets and equipment attached to or associated with MEPCO-TF solely to the extent needed for the exercise of ISO's Operating Authority in accordance with practice prior to the Effective Date and further provided that such use right shall not be assignable by ISO;

(iv) any existing contracts or contract rights of MEPCO related in any manner to MEPCO-TF unless MEPCO assigns or transfers such contracts to ISO, provided that MEPCO shall exercise its rights and responsibilities under Grandfathered Transmission Agreements in accordance with Section 3.10 and the applicable provisions of this Agreement;

(v) any assets, property rights, licenses, permits or facilities that are used for or in (1) the distribution, generation, trading or marketing of electricity,

(2) gas transportation, gas, water, petroleum, chemical, real estate development, or cable business, (3) the use of MEPCO's right-of-ways by others, or (4) any other activity unrelated to providing transmission service over the MEPCO-TF;

(vi) any causes of action or claims related to MEPCO-TF, provided, that upon the written agreement of MEPCO and ISO to the assumption by ISO of the management of such claims under mutually agreed terms and conditions, ISO may manage MEPCO's causes of action or claims against a third party relating to the MEPCO-TF, and provided further that ISO shall have the right to pursue causes of action or claims against third parties to the extent necessary for ISO to fulfill its responsibilities; and

(vii) any asset or facility for which Operating Authority may not be lawfully transferred or assigned.

(b) Any assets or facilities of MEPCO that are not specifically defined as MEPCO-TF, including without limitation the facilities or portions of facilities described in items (i) through (xii) of this Section 2.03(b):

(i) all cash, cash equivalents, bank deposits, accounts receivable, and any income, sales, payroll, property or other Tax receivables;

(ii) proceeds from the use or disposition of any facilities or assets owned by MEPCO;

(iii) certificates of deposit, shares of stock, securities, bonds, debentures, and evidences of indebtedness;

(iv) any rights or interest in trade names, trademarks, service marks, patents, copyrights, domain names or logos;

(v) any payment, refund or credit (1) relating to Taxes, (2) arising under any contracts or tariffs of MEPCO and relating to services provided prior to the beginning of the Term, or (3) arising under any contract or tariff that provides for rates that are subject to regulation by an agency other than FERC;

(vi) any facilities, including transmission facilities, located outside the New England Transmission System;

(vii) any rights, ownership, title or interest MEPCO may have with respect to telecommunications assets and equipment;

(viii) any existing contracts or contract rights of MEPCO unless MEPCO agrees to assign or transfer such contracts to ISO;

(ix) any assets, property rights, licenses, permits or facilities that are used for or in (1) the distribution, generation, trading or marketing of electricity or (2) gas transportation, gas, water, petroleum, chemical, real estate development,

or cable business, or (3) any other activity unrelated to the transmission of electricity whether or not located on, or making use of, the MEPCO-TF;

(x) any causes of action or claims;

(xi) any asset or facility for which Operating Authority may not be lawfully transferred or assigned; and

(xii) any interests of any kind in MEPCO's real property, provided that nothing in this Section 2.03 shall restrict MEPCO from conveying interests in real property in any future written agreement into which ISO and MEPCO may, in their sole discretion, enter.

**2.04 <u>Connection with Non-Parties.</u>**

(a) On or after the Effective Date, MEPCO shall connect its MEPCO-TF with the facilities of a current or proposed Transmission Customer, and shall install (or cause to be installed) and construct (or cause to be constructed) any transmission facilities required to connect the facilities of a current or proposed Transmission Customer to the MEPCO-TF to the extent such connection or construction is required by applicable law, including the Federal Power Act and any applicable regulations issued by FERC. Any such interconnection shall be subject further to: (1) the receipt of any necessary regulatory approvals, (2) compliance with the procedures set forth in the ISO ~~Tariff~~ <u>OATT</u> for review of the reliability and operational impacts of a proposed interconnection (including the procedures for interconnection of a Generating Unit under the Interconnection Standard); and (3) execution of an Interconnection Agreement with any Interconnection Customer containing provisions for the safe and reliable operation of each interconnection with respect to such entity's generating facilities in accordance with Good Utility Practice, applicable NERC/NPCC Requirements, and applicable Law (including the Federal Power Act); provided that:

(i) Except as provided in 2.04(a)(ii) below, MEPCO shall engage in good faith negotiations as to the terms and conditions of such Interconnection Agreement with any such Interconnection Customer, but, except as may be required pursuant to regulations issued by FERC, MEPCO shall not be required to enter into any Interconnection Agreement containing terms and conditions unacceptable to MEPCO and shall reserve the right to resolve any disputes, and/or make any filings with FERC, with respect thereto.

(ii) With respect to the interconnection of a Large Generating Facility or a Small Generating Facility to any MEPCO-TF, the Interconnection Agreement shall be a three-party agreement among MEPCO, the ISO, and the Interconnection Customer based on the Schedule 22 Large Generator Interconnection Agreement or the Schedule 23 Small Generator Interconnection Agreement, respectively, in the ISO ~~Tariff~~<u>OATT</u>. With respect to the interconnection of other Generating Units to any MEPCO-TF, the ISO shall be a party to Interconnection Agreements if and to the extent that FERC regulations require the ISO to be a party. Either the ISO or MEPCO, acting in cooperation with the Participating Transmission Owners ("PTO") who are signatories to the Transmission Operating Agreement ("TOA"), may initiate a filing to amend the

Schedule 22 Large Generator Interconnection Agreement or the Schedule 23 Small Generator Interconnection Agreement under Section 205 of the Federal Power Act and shall include in such filing the views of the ISO, MEPCO and the PTOs, as applicable, provided that the standard applicable under Section 205 of the Federal Power Act shall apply only to MEPCO's and the PTOs' position on any financial obligations of the interconnecting non-Party, and any provisions related to physical impacts of the interconnection on the MEPCO-TF or the PTOs' Transmission Facilities or other assets. If MEPCO, the ISO and the Interconnection Customer agree to the terms and conditions of a specific Large Generator Interconnection Agreement or Small Generator Interconnection Agreement, as applicable, or any amendments to such an Interconnection Agreement, then MEPCO and the ISO shall jointly file the executed Interconnection Agreement, or amendment thereto, with FERC under Section 205 of the Federal Power Act. To the extent MEPCO, the ISO and such Interconnection Customer cannot agree to proposed variations from the Schedule 22 or 23 Interconnection Agreement applicable to a Large Generating Facility or Small Generating Facility, respectively, or cannot otherwise agree to the terms and conditions of the Interconnection Agreement, or any amendments to such an Interconnection Agreement, then MEPCO and the ISO shall jointly file an unexecuted Interconnection Agreement, or amendment thereto, with FERC under Section 205 of the Federal Power Act and shall identify the areas of disagreement in such filing, provided that, in the event of

disagreement on terms and conditions of the Interconnection Agreement related to the costs of upgrades to the MEPCO-TF, the anticipated schedule for the construction of such upgrades, any financial obligations of MEPCO, and any provisions related to physical impacts of the interconnection on the MEPCO-TF, then the standard applicable under Section 205 of the Federal Power Act shall apply only to MEPCO's position on such terms and conditions.

The costs of interconnection facilities shall be allocated in the manner specified in the ISO ~~Tariff~~OATT.

(b) MEPCO shall also connect its MEPCO-TF with the facilities of any entity that is not a ~~Participating Transmission Owner ("PTO")~~ who is a signatory to the ~~Transmission Operating Agreement ("TOA")~~ upon satisfaction of the "Elective Transmission Upgrade" provisions of the ISO ~~Tariff~~OATT, provided that MEPCO shall only connect the facilities of such entity (the "Elective Transmission Upgrade Applicant ") upon satisfaction of the following conditions:

(i) The Elective Transmission Upgrade Applicant shall enter into an Interconnection Agreement with MEPCO and, to the extent necessary and appropriate, enter into support agreements with MEPCO, provided that the Elective Transmission Upgrade Applicant may request, upon providing the security, credit assurances, and/or deposits required by MEPCO, the filing with the Commission by MEPCO of unexecuted Interconnection Agreements and support agreements.

(ii) The Elective Transmission Upgrade Applicant shall obtain all necessary legal rights and approvals for the construction and maintenance of the upgrade and shall cooperate with MEPCO in obtaining all necessary legal rights and approvals for the construction and maintenance of additions or modifications, if any, required in conjunction with the upgrade.

(iii) The Elective Transmission Upgrade Applicant shall be responsible for 100% of all of the costs of said upgrade and of any additions to or modifications of MEPCO-TF that are required to accommodate the Elective Transmission Upgrade.

**2.05 Review of Transmission Plans.**

MEPCO shall submit to ISO in such form, manner and detail as ISO may reasonably prescribe: (i) any new or materially changed plans for retirements of or changes in the capacity of such MEPCO-TF rated 69 kV or above or plans for construction of new transmission facilities rated 69 kV or above to be interconnected to or part of the New England Transmission System; and (ii) any new or materially changed plan for any other action to be taken by MEPCO which may have a significant effect on the stability, reliability or operating characteristics of the MEPCO-TF, the facilities of any Transmission Owner or the system of a Participant. Unless prior to the expiration of ninety (90) days from receipt of MEPCO's submittal, ISO notifies MEPCO in writing that it has determined that implementation of the plan will have a significant adverse effect upon the reliability or operating characteristics of the MEPCO-TF, the facilities of any Transmission Owner, or the system of a Participant, MEPCO shall be free to proceed. If ISO notifies MEPCO that implementation of such plan has been determined to have a significant adverse effect upon the reliability or operating characteristics of the MEPCO-TF, the facilities of

any Transmission Owner or the system of a Participant, MEPCO shall not proceed to implement such plan unless MEPCO takes such action or constructs such facilities as ISO determines to be reasonably necessary to avoid such adverse effect.

**2.06 Condemnation.**

If, at any time, any Governmental Authority commences any process to acquire any MEPCO-TF or any other interest in MEPCO-TF then held by MEPCO through condemnation or otherwise through the power of eminent domain, (i) MEPCO shall provide ISO with written notice of such process, (ii) MEPCO shall, at its cost, direct any litigation or proceeding regarding such condemnation or eminent domain matter, (iii) MEPCO shall have the right to settle any such proceeding without the consent of ISO, and (iv) any award in condemnation or eminent domain shall be paid to MEPCO without any claim to such award by ISO.

## ARTICLE III

## OPERATING AUTHORITY

**3.01 Grant of Operating Authority.**

(a) Subject to the terms set forth in this Agreement, including Article III and Article X hereof, and effective as of the Effective Date, MEPCO hereby authorizes ISO, through its officers, employees, consultants, independent contractors and other personnel, to exercise Operating Authority over the MEPCO-TF and ISO hereby agrees to assume and exercise Operating Authority over the MEPCO-TF in accordance with this Agreement.

(b) The grant by MEPCO to ISO and the assumption by ISO of Operating Authority over the MEPCO-TF are solely for the purposes of allowing ISO to fulfill the functions of an RTO as specified herein and do not constitute an assumption by ISO of any liabilities with respect to the MEPCO-TF except as otherwise specifically provided herein (including as provided in Article IX of the Agreement).

(c) Nothing herein or elsewhere contained shall be construed as requiring or effecting a transfer of MEPCO's responsibility (or the assumption thereof by ISO) for the physical control of the MEPCO-TF, including the physical operation, repair, maintenance and replacement of such MEPCO-TF, or as conveying to ISO: (i) any right, ownership, title or interest in or to MEPCO or any of its assets including any transmission facilities; (ii) any right of access to MEPCO's real property, except as specified in Section 3.02(j); or (iii) any rights or authority with respect to MEPCO's Excluded Assets, except as specifically provided herein.

**3.02 Definition of ISO Operating Authority.**

Consistent with the provisions of this Agreement, including Section 3.02(a) below, "Operating Authority" shall mean those functions set forth in Sections 3.02, 3.03, and 3.08, those responsibilities set forth in Section 3.05, and shall not include those rights, responsibilities and functions set forth in Sections 3.06 and 3.07. Subject to the first sentence of this Section 3.02, ISO shall exercise such Operating Authority in accordance with applicable Operating Procedures and Additional MEPCO-TF Procedures as specified in Sections 3.02(g) and (h) below.

(a) ISO shall perform the following functions with respect to the MEPCO-TF, consistent with applicable NERC/NPCC Requirements and other applicable regulatory standards, including (as needed) issuing instructions to, or coordinating with the Maine Local Control Center:

(i) centrally dispatch generation, (and dispatchable and interruptible load) and implement real-time balancing, including meeting NERC control performance criteria;

(ii) determine Operating Limits based on forecasted or real-time system conditions and in accordance with the facility ratings established by MEPCO in accordance with Section 3.06;

(iii) take such actions as may be necessary to plan and maintain short-term (including real-time) reliability and system security (including curtailment of External Transactions in accordance with FERC -accepted or approved-Tariff, including– Schedule 20B of the ISO OATT;

(iv) consistent with the ISO Information Policy, exchange security information with MEPCO, the Maine Local Control Centers, transmission operators and other neighboring systems and regional entities-;

(v) provide for an ISO Control Center and an independent Back-up Control Center, as ISO deems necessary to comply with applicable NERC/NPCC Requirements and any applicable regulatory requirement; and

(vi) dispatch MEPCO-TF via Maine Local Control Center in accordance with applicable Operating Procedures and Additional MEPCO-TF Procedures. ISO will coordinate directly with MEPCO for the purpose of scheduling power transfers with external Control Areas including the notification of ramp time, duration, and magnitude.

(b) Pursuant to the requirements of Section 3.03, ISO shall receive, confirm, schedule and curtail External Transactions using MEPCO-TF for the New England Transmission System.

(c) ISO shall enter into Coordination Agreements and operating arrangements with the operators of neighboring Control Areas; coordinate system operation and emergency procedures with neighboring Control Areas; and administer scheduling provisions of the Tariff applicable to External Transactions using MEPCO-TF, in accordance with the terms of those

agreements and the Tariff; provided that as of the Effective Date, the applicable agreements and the Tariff shall be set forth in Schedule 3.02(c).

(d) The ISO shall direct the implementation of emergency procedures, including the utilization of the MEPCO-TF for the transfer of Pool-to-Pool emergency energy transactions, in coordination with the Maine Local Control Center and in accordance with applicable NERC/NPCC Requirements.

(e) The ISO shall track inadvertent energy and administer inadvertent energy payback/accounting with neighboring Control Areas in accordance with the terms and conditions of the interconnection or coordination agreements with neighboring Control Areas and applicable tariff provisions.

(f) ISO shall act as the Reliability Authority for MEPCO-TF. ISO may intercede and direct appropriate near-term operational actions in order to protect reliability, provided that nothing in this Section 3.02(f) shall require MEPCO to undertake an action contrary to applicable Law or shall limit the right of MEPCO pursuant to Section 3.07 to take any action(s) that it deems necessary to prevent loss of human life, injury to persons and/or damage to property.

(g) ISO shall utilize Operating Procedures relating to the exercise of Operating Authority over the MEPCO-TF. The Operating Procedures shall initially consist of the Operating Procedures in existence on the Operations Date (hereinafter "Existing Operating Procedures"). Such Existing Operating Procedures shall consist of those Operating Procedures listed in Schedule 3.02(g). ISO shall develop any modifications to Operating Procedures (including Existing Operating Procedures) and any new Operating Procedures that it may deem necessary or appropriate: (i) in coordination with MEPCO so as to ensure that that MEPCO's knowledge of the MEPCO-TF is given due consideration in the development or modification of the transmission related portions of such Operating Procedures and (ii) in consultation with other stakeholders. ISO shall have the authority to modify Operating Procedures or develop new Operating Procedures without such coordination or consultation when ISO does not have sufficient time to undertake such coordination or consultation due to emergent and unanticipated circumstances. In the event that ISO and MEPCO disagree about modifications to the transmission related portions of the Operating Procedures or any new Operating Procedures related to the operation of the MEPCO-TF, MEPCO will have the opportunity to submit the dispute for resolution in accordance with the dispute resolution provisions set forth in Section 11.12 herein. Pending such resolution, ISO shall have the authority, as the system operator with ultimate authority for the real-time operation of MEPCO-TF, to implement any such new Operating Procedures or modified Operating Procedures.

Notwithstanding anything in the foregoing, Operating Procedures and operating documents related to the establishment of ratings for MEPCO-TF (Rating Procedures) shall be developed and placed into effect pursuant to Section 3.06(a)(v) and (vi).

To the extent MEPCO will be required to physically operate its MEPCO-TF in accordance with any operational documents in effect as of the Effective Date or as subsequently developed or amended by ISO (other than Operating Procedures), ISO shall develop or amend such operational documents in coordination with MEPCO (or the Maine Local Control Center, as applicable), subject to the right of ISO to place such operating documents into effect in the event

of a dispute concerning such documents and the right of MEPCO to submit the dispute for resolution in accordance with the dispute resolution provisions set forth in Section 11.12 herein. Any such coordination and stakeholder consultation shall be conducted in accordance with the regulations implementing FERC's standards of conduct.

(h) In addition to the procedures listed in Schedule 3.02(g), MEPCO and the ISO may negotiate in good faith to include Additional MEPCO-TF Procedures for the operation of the MEPCO-TF in Schedule 3.02(h) to this MEPCO TOA. These procedures may include, but are not limited to, common operating instructions established between the ISO and MEPCO including those that address the functions and responsibilities of a MEPCO Control Station. If the functions and responsibilities of the MEPCO Control Station as stipulated in this Agreement are performed by a Local Control Center as of the Effective Date, then MEPCO may satisfy the MEPCO Control Station functions and responsibilities pursuant to this Agreement through its Local Control Center, and the Additional MEPCO-TF Procedures shall so specify. Such Additional MEPCO-TF Procedures shall be consistent with MEPCO's responsibilities set forth in Section 3.06, and shall be listed in Schedule 3.02(h). Following the Effective Date, this list may be added to or deleted from without the necessity of an amendment to this Agreement, but only in the following manner:

(i) at the direction of a Governmental Authority, provided that ISO and MEPCO shall be provided prior written notice of such changes; or

(ii) as agreed between ISO and MEPCO.

(i) ISO shall seek agreement with MEPCO, where time limitations do not make it impracticable to do so, on real-time operational decisions affecting the MEPCO-TF not otherwise specified in the Operating Procedures developed in accordance with Section 3.02(g) and the Additional MEPCO-TF Procedures developed in accordance with Section 3.02(h). In the absenee of such agreement, or if time limitations do not permit reaching agreement, ISO shall implement its operational decision. If such ISO decision is disputed, ISO's position shall control pending resolution of the dispute.

(j) ISO shall develop, maintain, and, if needed, implement the System Restoration Plan for the New England Transmission System, which shall include (if needed) MEPCO's existing Local Restoration Plans. ISO shall develop any modifications to the System Restoration Plan in consultation with MEPCO and shall incorporate into the System Restoration Plan any modifications developed by MEPCO to its Local Restoration Plan, provided that any modifications to the MEPCO Local Restoration Plan are subject to ISO's approval in order to coordinate and promote the reliability of the Restoration Plans. The extent to which the MEPCO-TF is subject to the requirements for participation in the ISO's System Restoration Plan will be determined on a facility-by-facility basis and such requirements will be included in the applicable Operating Procedures to which the MEPCO-TF must comply.

(k) ISO shall coordinate voltage and reactive dispatch of facilities to the extent normal schedules are unable to be maintained by the Maine Local Control Center.

(l) ISO shall direct the implementation of emergency procedures, including inter-Control Area emergency energy transactions, in coordination with the Maine Local Control Centers in accordance with applicable NERC/NPCC Requirements.

(m) ISO shall have the authority to perform the following tasks in relation to compliance with current or future MEPCO responsibilities:

(i) perform all compliance and monitoring responsibilities of ISO, including the issuance of sanction letters, with respect to existing or successor NERC or NPCC compliance programs associated with standards, criteria and measurements for which MEPCO is responsible and accountable to ISO. To the extent that ISO receives a sanction letter from NERC or NPCC that is substantially related to the actions of MEPCO, ISO may issue a sanction letter to MEPCO;

(ii) perform all compliance and monitoring responsibilities of ISO associated with Operating Procedures and Additional MEPCO-TF Procedures relating to standards, criteria and measurements that MEPCO is responsible for and accountable to ISO. Such responsibilities shall include audits of MEPCO for compliance with Operating Procedures and Additional MEPCO-TF Procedures to the extent ISO determines such audits are necessary and the issuance of sanction letters;

(iii) perform periodic audits of the Maine Local Control Center's and MEPCO's performance of the functions listed in Sections 3.06 (a)(i), (ii), (iii), (vii), (viii), (ix) and (x) in accordance with applicable Operating Procedures and applicable reliability standards, including audits to monitor compliance with the ISO Information Policy and applicable standards of conduct consistent with FERC Order No. 2004 in performing these functions. Such Maine Local Control Station audits addressing MEPCO-TF shall generally be conducted no more frequently than once every three years, provided that ISO shall have the authority to conduct an audit more frequently if it determines that circumstances so require. The ISO will make every attempt to schedule such audits at the same time as the audit of the Maine Local Control Center scheduled to address similar issues under Section 3.02 (i)(iii) of the Transmission Operating Agreement with PTOs.

All audits conducted pursuant to this Section 3.02(m) shall be conducted by ISO or by an independent third party, in a manner consistent with generally accepted auditing standards, with expenses of ISO (or the third-party auditor) borne by ISO and recovered through its administrative tariff. MEPCO shall bear its own expenses in complying with the audit. Such audits shall be conducted during normal business or operational hours and with reasonable notice. The scope of each audit and the process for conducting the audit will be discussed with and agreed to by MEPCO in advance.

Nothing in this Section 3.02(m) shall imply that a sanction letter shall include any financial or other penalties. Nothing in this Section 3.02(m) shall limit the right of ISO to separately file proposals at FERC to assess financial or other penalties against any entity or shall limit the right of MEPCO to comment on or protest any such proposals.

In the event that any Governmental Authority is established as the successor to NERC or NPCC or that a Governmental Authority assumes responsibility for performing the audit functions contemplated by this Section 3.02(m), the Parties shall negotiate in good faith over modifications to this Section 3.02(m) that are appropriate to address such changes in circumstances.

(n) The ISO shall monitor and control, in accordance with the facility ratings established by MEPCO in accordance with Section 3.06, on a real-time basis, power flows on the system, voltage and system frequency; and

(o) The ISO shall coordinate with the Maine Local Control Center or MEPCO on the settings for MEPCO owned dynamic reactive resources, FACTS controllers, special protection systems, PARS, and other similar dynamic equipment that affects power flows over MEPCO-TF, and approve or direct changes to such settings.

(p) If at any time, a Party provides notice to the other Party that it believes NERC and NPCC documents that are not NERC/NPCC Requirements have been modified so as to expand the scope of the functions to be performed by ISO or MEPCO, the Parties shall consider in good faith changes to this Agreement that will allow the Parties to follow such guidelines; provided, however, that, the Parties shall have no obligation to agree to such changes. If the Parties cannot agree to such changes, the dispute resolution procedures of Section 11.12 shall be utilized. Nothing in this Section 3.02(p) shall be construed to excuse any Party from complying with applicable NERC/NPCC Requirements.

**3.03 Transmission Services and OATT Administration.**

(a) ISO shall administer Schedule 20B of the ISO ~~Tariff~~ OATT in the manner specified in this Section 3.03. ISO's OATT administration responsibilities shall include those enumerated below:

(i) ISO shall receive, confirm, schedule, curtail and interrupt real-time External Transactions over the MEPCO-TF in accordance with the ISO Tariff, including Schedule 20B of the ISO OATT~~Tariff~~. The ISO shall develop and publish any necessary or appropriate procedures consistent with the ISO Tariff, including Schedule 20B of the ISO OATT~~Tariff~~, to describe how it will receive, confirm, schedule, curtail and interrupt real-time External Transactions over the MEPCO-TF.

(ii) ISO shall calculate TTC for the New Brunswick/MEPCO interface and total MEPCO/Pool Transmission Facility interface and determine the associated TTC calculation methodology (consistent with applicable NERC/NPCC Requirements and applicable regulatory standards), provided that modifications to the calculation methodology as it exists on the Effective Date shall be developed by ISO in consultation with MEPCO. The TTC for the New Brunswick/MEPCO interface and total MEPCO/Pool Transmission Facility interface shall be posted by the ISO on the MEPCO Transmission Provider Page on the ISO OASIS.

(iii) ISO shall operate and maintain the ISO OASIS (or a successor system) as required by FERC; provided, however, that such system shall conform to the requirements for such systems as specified by FERC;

(iv) Except for MEPCO provided Ancillary Service No. 1, Scheduling, System Control and Dispatch Service, ISO shall procure and act as supplier of last resort of Ancillary Services, including arranging for the sale and purchase of emergency capacity and energy with neighboring Control Areas, in accordance with a FERC -accepted or approved--Tariff.

(b) MEPCO shall administer Schedule 20B of the ISO OATT~~Tariff~~ in the manner specified in this Section 3.03. MEPCO's OATT administration responsibilities shall include those enumerated below:

(i) On or after the Effective Date, MEPCO shall continue to have the right, in accordance Schedule 20B of the ISO OATT~~Tariff~~, to enter into service agreements or other contractual arrangements whereby it can make available transmission service over the MEPCO-TF. MEPCO's administration of such service agreements shall include the posting of service offerings, responding to requests for service and ensuring that any resulting transmission reservations are posted on its Transmission Provider Page on the ISO OASIS.

(ii) Upon receipt of a Completed Application for transmission service from ISO, MEPCO shall respond to Customers and administer transmission service as set forth in Schedule 20B.

(iii) MEPCO shall file with or report to FERC all new, modified or terminated Transmission Service Agreements.

(iv) MEPCO shall supply and customers must take Ancillary Service No. 1, Scheduling, System Control and Dispatch Service;

(v) For the sole purpose of offering transmission service over internal points on the MEPCO-TF MEPCO shall calculate the individual TTCs for the Orrington, Maxcy's and Maine Yankee points on the MEPCO-TF, and determine the associated TTC calculation methodology (consistent with applicable NERC/NPCC Requirements and applicable regulatory standards). The TTC for the for Orrington, Maxcy's and Maine Yankee points on the MEPCO-TF shall be posted by MEPCO on the MEPCO Transmission Provider Page on the ISO OASIS.

(vi) MEPCO shall calculate ATC for the MEPCO-TF and determination of the ATC calculation methodology consistent with applicable NERC/NPCC Requirements and other applicable regulatory standards. Modifications to the calculation methodology as it exists on the Effective Date shall be developed by MEPCO in consultation with ISO.

(vii) The ATC for the MEPCO-TF shall be posted by MEPCO on the MEPCO Transmission Provider Page on the ISO OASIS. MEPCO may enter into contracts with other entities, including ISO, to calculate and post ATC on the MEPCO Transmission Provider Page on the ISO OASIS. If ISO is performing such services for other Transmission Providers, ISO shall do so for MEPCO, if so

requested by MEPCO, at nondiscriminatory fees equivalent to fees charged others for the same services.

(viii) MEPCO shall administer the MEPCO-TF Transmission Provider Page on the ISO OASIS (or a successor system) as required by FERC.

(c) The ISO and MEPCO as applicable, shall receive and respond to requests by Large Generating Facilities and Small Generating Facilities to be interconnected to the MEPCO-TF and shall perform system impact and facilities studies (and execute and administer agreements for such studies) in accordance with Schedule 22 and Schedule 23 of the ISO ~~Tariff~~ OATT.

3.04 **Application Authority.**

(a) Except as set forth in 3.04(e), MEPCO shall have the sole authority to submit filings under Section 205 of the Federal Power Act for any changes to Schedule 20B of the ISO OATT and any accompanying schedules and attachments. These rights include but are not limited to:

(i) establishing or revising MEPCO's revenue requirements for MEPCO-TF used for the provision of transmission service;

(ii) establishing or revising rates or charges for transmission services over the MEPCO-TF;

(iii) setting the recovery of MEPCO's investment in an Interconnection or Elective Transmission Upgrade that enters commercial service after the effective date of this Agreement; and

(iv) establishing or revising charges for the recovery of any MEPCO stranded costs;

(v) establishing or revising charges for unauthorized use;

(vi) establishing or revising charges for parallel flows resulting from new transmission interconnections between Maine and eastern Canada;

(vii) any terms and conditions of Interconnection Service with any entities connecting with the MEPCO-TF, subject to Section 2.04 and Schedule 20B, provided that Interconnection Agreements associated with Interconnection Service shall not include any operating arrangements and Coordination Agreements that ISO may enter into with operators of neighboring Control Areas in accordance with Section 3.02(c);

(viii) establishing or revising any terms and conditions of transmission service over MEPCO-TF.

MEPCO shall not have the authority to revise rates, terms and conditions in a manner that would abridge the rights granted to ISO in Section 3.04(b).

MEPCO shall provide written notification to ISO and MEPCO customers of any filing described in sub-paragraphs (i), (ii), and (v) through (viii) above, which notification shall include a detailed description of the filing, at least thirty (30) days in advance of a filing. MEPCO shall retain the right to modify aspects of any filing authorized by this Section 3.04(a) after it provides written notification to ISO and MEPCO customers, and shall provide notification to ISO and MEPCO Customers of any material modification to such filings.

With respect to any filing described in sub-paragraphs (i), (ii), and (v) through (viii) above, MEPCO shall include in any filing a statement that, in the good faith judgment of MEPCO, the proposal will not be inconsistent with the design of the ISO Markets, as accepted or approved by FERC. In the event ISO believes that a proposed filing described in sub-paragraphs (i), (ii), and (v) through (viii) above, would have such an inconsistency, it shall so advise MEPCO and MEPCO and ISO shall consult in good faith to resolve any ISO concerns, but, if such disagreement cannot be resolved, MEPCO may submit a filing under Section 205, provided that MEPCO's filing (including the transmittal letter for such filing) to FERC shall include any written statement provided by ISO setting forth the basis for ISO's concerns. With respect to any transmission rates of MEPCO that are not subject to FERC jurisdiction under Section 205 or otherwise, MEPCO shall have the right to establish rates and charges, in accordance with applicable law and submit such rates and charges, if required, to the appropriate agency for a determination that the rates and charges satisfy the applicable standards.

MEPCO shall consult with ISO to determine whether ISO will need to make any software modifications in order to implement any filing authorized by subparagraphs (i), (ii), and (v) through (vii) of this Section 3.04(a) and when any needed software modifications could reasonably be expected to be implemented. MEPCO's filing to FERC (and the transmittal letter for such a filing) shall include any written statement provided by ISO setting forth the basis for any software-related implementation concerns raised by ISO. ISO shall make Commercially Reasonable Efforts to implement any needed software modifications by the effective date accepted by the FERC for a filing authorized by this Section 3.04(a), provided that, if ISO has exercised such Commercially Reasonable Efforts, a failure to implement needed software modifications by the FERC-accepted effective date shall not constitute an event of default by ISO under this Agreement or subject ISO to financial damages.;

(b) The ISO shall have the authority to submit filings under Section 205 of the Federal Power Act to establish and to revise any terms and conditions of the ISO Tariff, and any separate ISO tariffs, relating to the New England Transmission System (including those provisions under the ISO Tariff that relate to the scheduling, curtailment and interruption of External Transactions over the MEPCO-TF) and/or the New England Markets. Notwithstanding any other provisions of this agreement: (A) the ISO shall not have the authority to revise such terms and conditions in a manner that would abridge the rights granted to MEPCO in Section 3.04(a); (B) the ISO shall not have the authority to eliminate Point-to-Point Transmission Service provided under Schedule 20B; (C) the ISO shall not file to change the terms and conditions of Schedule 20B in a way that eliminates advanced reservations or any rates and other mechanisms for the recovery of wholesale stranded costs; (D) the ISO shall not have the authority to modify such terms and conditions in a manner that would eliminate the Schedule 20B distinction

between firm and non-firm transmission service; (E) the ISO shall not have the authority to transfer to any third party the ISO's Section 205 rights to revise the terms and conditions of Transmission Service or the authority to enter into agreements with any group of stakeholders to submit filings under Section 205 of the Federal Power Act to change the terms and conditions of Transmission Service where such proposed changes are not supported by the ISO but are approved by a vote of the stakeholder group.

(c) ISO shall provide written notification of any proposed filing under this subsection to MEPCO and stakeholders, which notice shall include a detailed description of the proposed filing, at least 30 days prior to the filing. ISO shall consult with MEPCO and stakeholders and will consider any comments MEPCO or any stakeholder provides in developing its filing. ISO shall retain the right to modify aspects of any filing authorized by this subsection after it provides written notification to MEPCO and stakeholders and shall provide notification to MEPCO and stakeholders of any material modification to such filings. In addition, ISO shall consult with MEPCO to determine whether the filing will have any adverse impact on MEPCO's service charges, or on the ability of MEPCO to recover its charges. If MEPCO concludes in its good faith judgment that the filing will have any such effects, ISO and MEPCO will make every reasonable effort to resolve the concerns of MEPCO. In the event that MEPCO's concerns cannot be resolved, ISO may, nevertheless, make a filing under Section 205 provided that, except as provided in the next sentence, such a filing will not become effective until such time as the Commission issues an order determining the proposal set forth in the filing to be consistent with the standard applicable under Section 205 of the Federal Power Act. ISO may request that FERC permit a filing authorized by this subsection to go into effect on an interim basis, notwithstanding the conclusion of MEPCO, provided that ISO shall include in such filing (and the transmittal letter for such a filing) any written statement provided by MEPCO setting forth the basis for MEPCO's concerns. If FERC grants ISO's request to permit the filing to go into effect on an interim basis, the filing will become effective, subject to refund, on the date specified in FERC's order.

(d) ISO shall have no authority to submit a filing under Section 205 of the Federal Power Act to modify any provision of the Schedule 20B for which MEPCO retains authority to make a Section 205 filing pursuant to subsection (a). MEPCO shall have no authority to submit a filing under Section 205 of the Federal Power Act to modify any provision of the ISO Tariff for which ISO retains responsibility for pursuant to subsection (b). ISO reserves its rights to intervene in, comment on or protest any filing made by MEPCO, and to submit proposals for the consideration of MEPCO and MEPCO reserve its rights to intervene in, comment on or protest any filing made by ISO, and to submit proposals for the consideration of ISO.

(e) In the event ISO determines that a change in the design of any provision of the ISO Tariff which is the subject of retained Section 205 rights by MEPCO pursuant to subsection (a) is required because such provision is inconsistent with the design of the ISO Markets, and such inconsistency will, if not remedied before relief would be available in a proceeding under Section 206 of the Federal Power Act, will either: (i) substantially and adversely affect the efficiency or competitiveness of the New England Markets, or (ii) substantially and adversely affect the reliability of the New England Bulk Power System, a senior officer of ISO shall notify MEPCO of its determination. Upon receipt of such notification, MEPCO and the ISO shall diligently work together to arrive at appropriate changes in the rates

to alleviate the conditions that led to this notification being given, while protecting the rights of MEPCO to fully recover its revenue requirements and the amount of incentive payments associated with FERC-accepted or approved incentive arrangements. If MEPCO and the ISO agree on a solution to this issue, MEPCO shall make a filing at FERC under Section 205 consistent with such agreement.

If MEPCO and the ISO cannot agree on a mutually acceptable Section 205 filing to address this issue within a period of thirty (30) days, and MEPCO does not make a Section 205 filing within the thirty (30) day period, then the ISO shall have the authority to submit a filing under Section 205 of the Federal Power Act as permitted herein provided that such a Section 205 filing shall not be submitted until MEPCO has an opportunity to meet with representatives of the ISO Board of Directors, if so requested with reasonable notice. Any such ISO filing permitted herein: (1) shall not abrogate any existing firm rights for transmission service over the MEPCO transmission facilities, (2) shall not eliminate advanced reservation requirements or (3) shall not modify the rates that MEPCO charges for services provided under Schedule 20B of the ~~Tariff~~ISO OATT; and ISO may, with the approval of FERC, place its proposal into effect, while the proceeding on ISO's filing is pending before FERC, for a period no longer than fifteen (15) months, provided that the replacement charge proposal of ISO is subject to refund and surcharge, as necessary to restore the status quo ante if FERC does not ultimately approve that proposal. To place its replacement rate design proposal into effect, ISO shall bear the burden of persuading FERC that: (i) ISO's replacement proposal is consistent with the standard applicable under Section 205 of the Federal Power Act; (ii) ISO's determination regarding the inconsistency of the existing design of the ISO Markets and the impact of that inconsistency as set forth in the first sentence of this subsection, is correct; and (iii) ISO's proposal will not adversely affect the rights of MEPCO to fully recover its rates or charges or that would result in any costs previously approved or accepted for recovery under either a federal or state-jurisdictional rate thereafter becoming unrecoverable under either a federal or state-jurisdictional rate. If ISO concludes that the delay in filing required by the notice provisions of this subsection would result in a material adverse effect on the efficiency or competitiveness of the markets administered by the ISO or the reliability of the New England Bulk Power System in the circumstances, ISO shall (i) provide such notice to MEPCO as is possible under the circumstances; and (ii) may make a filing under Section 206.

(f) In the event ISO concludes that a filing to establish or to revise the terms and conditions listed in subsection (b) is required and that providing the notification or consultation required under subsection (b) for such filing would result in an unanticipated material adverse effect on the efficiency or competitiveness of the New England Markets or the reliability of the New England Bulk Power System in the circumstances, ISO: (i) shall provide such notification to MEPCO and stakeholders or undertake such consultation with MEPCO and stakeholders as is possible under the circumstances; and (ii) may submit a filing under Section 205 to establish or to revise the terms and conditions listed in Section 3.04 (b) upon issuance of a written statement setting forth the circumstances that do not permit such notification or consultation.

(g) In the event MEPCO concludes that a filing to establish or to revise the charges as stipulated under subsection (a) is required and that providing the notification or consultation required under subsection (a) for such filing would result in a material adverse financial effect on MEPCO, MEPCO: (i) shall provide such notification to the ISO and MEPCO

Customers or undertake such consultation with ISO as is possible under the circumstances; and (ii) may make a Section 205 filing to establish or to revise the charges as stipulated under subsection (a) upon issuance of a written statement setting forth the circumstances that do not permit such notification or consultation.

(h) ISO shall have sole authority to submit Section 205 filings to recover its administrative, capital and other costs (including the collection of funds from Transmission Customers to support payment of FERC annual charges with respect to transmission service for which ISO is the transmission provider as defined in FERC rules and orders) including the design of any charges therefore (the "ISO Administrative Charge").

(i) Nothing in this Agreement shall restrict in any way the rights of ISO or of MEPCO to submit an application under Section 206 of the Federal Power Act for revisions to the rates, terms and conditions of service under the ISO Tariff.

(j) Nothing in this Agreement shall restrict in any way the rights of MEPCO to submit a proposal under Section 205 of the Federal Power Act to participate in, join, or become an ITC pursuant to Attachment M of the ISO ~~Tariff~~ OATT and, upon approval of such proposal, to withdraw from this Agreement in accordance with Section 10 of this Agreement.

**3.05 ISO's Responsibilities.**

(a) In addition to its other obligations under this Agreement, in performing its obligations and responsibilities hereunder, and in accordance with Good Utility Practice, ISO shall:

(i) maintain system reliability;

(ii) in all material respects, act in accordance with applicable Laws and conform to, and implement, all applicable reliability criteria, policies, standards, rules, regulations, orders, license requirements and all other applicable NERC/NPCC Requirements, and other applicable reliability organizations' reliability rules, and all applicable requirements of federal or state laws or regulatory authorities; and

(iii) act without undue preference to any Party.

(b) ISO shall obtain and retain all necessary authorizations of FERC and other regulatory authorities to function as the New England RTO and shall possess the characteristics and perform the functions required for that purpose.

**3.06 MEPCO's Responsibilities.**

The functions and responsibilities of the MEPCO Control Station shall be performed by the Maine Local Control Center.

(a) From and after the Effective Date, MEPCO shall, in accordance with Good Utility Practice:

(i) direct, physically operate, repair, and maintain its MEPCO-TF in accordance with this Agreement, applicable Law, applicable Operating Procedures and Additional MEPCO-TF Procedures in a manner that will not have an adverse impact on the New England Transmission System;

(ii) the Maine Local Control Center will carry out the orders of the ISO for the purpose of scheduling power transfers, over MEPCO-TF, with external Control Areas, including the notification of ramp time, duration, and magnitude;

(iii) MEPCO shall provide ISO with reasonable notice of any change to the facility or the Maine Local Control Center and shall coordinate with ISO to ensure that such a change will not adversely affect the reliable operation of the New England Transmission System. MEPCO shall have the responsibility to ensure that the Maine Local Control Center will: operate the MEPCO-TF on a 24 hour basis, implement the instructions, orders and directions received from ISO in the exercise of its Operating Authority in accordance with Section 3.02, and perform the following functions in accordance with applicable Operating Procedures and/or Additional MEPCO-TF Procedures:

(A) switching and tagging;

(B) real-time monitoring of the MEPCO-TF;

(C) security analysis;

(D) dispatch voltage and reactive power (within the capability of the MEPCO-TF equipment provided that ISO shall dispatch voltage and reactive power to the extent the Maine Local Control Center is unable to maintain normal voltage schedules;

(E) coordinate with ISO the development of settings for MEPCO owned dynamic reactive resources, FACTS controllers, special protection systems, PARS, and other similar dynamic equipment that affects power flows;

(F) implementation of MEPCO Local Restoration Plan and development of modifications to MEPCO Local Restoration Plans, subject to the approval of ISO in order to coordinate and promote the reliability of the Restoration Plans (the extent to which MEPCO-TF is subject to the requirements for participation in the ISO or a Local Restoration Plan will be determined on a facility-by-facility basis and such requirements will be included in the applicable Operating Procedures to which the MEPCO-TF must comply);

(G) operation and maintenance of communication systems and software;

(H) implementation of voltage reduction measures (only as applicable under the Operating Procedures for MEPCO-TF);

(I) implementation of Load Shedding (only as applicable under the Operating Procedures for MEPCO-TF);~~and~~

(J) coordinate with ISO with respect to congestion management efforts and, to the extent applicable, demand-side management and distributed generation efforts; and~~.~~

(K) coordinate with other entities interconnected with the New England Transmission System and the MEPCO-TF.

(iv) cooperate with ISO's performance of the monitoring and audits in connection with all monitoring and compliance provisions detailed in Sections 3.02(m) of this Agreement;

(v) establish ratings and rating procedures for MEPCO-TF;

(vi) collaborate with the ISO with respect to:

(A) the development of Rating Procedures for MEPCO Transmission Facilities;~~,~~

(B) the establishment of ratings for upgrades to the MEPCO Transmission Facilities; and

(C) the establishment of any changes to existing ratings for the MEPCO Transmission Facilities in effect as of the Effective Date.

To the extent there is any disagreement between the ISO and MEPCO concerning Rating Procedures or the rating of the MEPCO-TF, such disagreement shall be the subject of good faith negotiations between MEPCO and the ISO, provided that; (x) MEPCO's position concerning such Rating Procedures or Transmission Facility ratings shall govern until MEPCO and the ISO agree on a resolution to such disagreement; and (y) nothing in this Section 3.06(a)(vi) shall limit the rights of the ISO or MEPCO to submit a filing under Section 206 of the Federal Power Act with respect to MEPCO Transmission Facility ratings or Rating Procedures. During any collaboration or discussions concerning Transmission Facility ratings, MEPCO shall continue to provide the ISO with up-to-date ratings information in accordance with the applicable Rating Procedures.

(vii) undertake operating actions in accordance with any tariffs or rate schedules approved or accepted by FERC;

(viii) provide ISO with the right to use a level of communications capacity (and maintain the equipment associated with this capacity in accordance with Good Utility Practice) on its telecommunication assets and equipment attached to or associated with MEPCO-TF consistent with practice prior to the Effective Date in order to supply reliability-related data including meter, voice and data communications; continue to receive and send telemetry to and from MEPCO-TF ; provide for the receipt of such information and MEPCO-TF substations, and provide metering data and/or telemetry to ISO as reasonably necessary for ISO to perform its obligations under this Agreement and the ISO Tariff; provided that MEPCO shall have the unfettered right to use communications capacity on its telecommunication assets and equipment attached to or associated with MEPCO-TF for other business purposes to the extent such capacity is not being used by ISO as of the Effective Date; and provided further that as required by the Schedule 22 Large Generator Interconnection Agreement and Schedule 23 Small Generator Interconnection Agreement in the ISO ~~Tariff~~OATT, MEPCO shall include provisions in its Interconnection Agreements with generators after the Effective Date providing for the installation and maintenance of sufficient communications capability to allow ISO to exercise its Operating Authority with respect to such generators;~~.~~

(ix) notify ISO prior to making changes to the operational status of MEPCO's MEPCO-TF and provide information on the operational status of MEPCO-TF consistent with practice prior to the Effective Date;

(x) provide for or arrange to provide ISO with revenue metering data;

(xi) in all material respects, comply with all applicable laws, regulations, orders, permits, license requirements, and with all applicable NERC/NPCC Requirements, other applicable reliability organizations' local reliability rules, and all applicable requirements of federal or state laws or regulatory authorities; and

(xii) Nothing in this Agreement shall modify or alter the obligations of MEPCO under Grandfathered Transmission Agreements.

(b) Operation of MEPCO-TF During A System Failure. Existing Operating Procedures for use during a System Failure shall be utilized by ISO and MEPCO. Any modifications to the Existing Operating Procedures for use during a System Failure or new Operating Procedures for use during a System Failure shall be developed by ISO in the manner specified in Section 3.02(g). The procedures for use during a System Failure shall provide that, in situations where immediate action is required, the Maine Local Control Center shall have the authority to take the following reliability actions at a minimum, provided that MEPCO or the Maine Local Control Center shall coordinate with ISO as soon as practicable upon taking such action:

(i) Undertake those operational functions with respect to MEPCO-TF undertaken by ISO under non-System Failure conditions;

(ii) Re-energize MEPCO-TF following breaker trips;

(iii) Implement emergency Load Shedding and voltage reduction measures and subsequent restoration;

(iv) Implement Voltage/VAR control;

(v) Adjust PARS settings;

(vi) Take such other measures necessary, consistent with Good Utility Practice, to respond to a System Failure.

Nothing in this Section 3.06(b) shall limit the right of MEPCO pursuant to Section 3.07 to take any action(s) that it deems necessary to prevent loss of human life, injury to persons and/or damage to property.

**3.07 Reserved Rights of MEPCO.**

(a) Notwithstanding any other provision of this Agreement to the contrary, MEPCO shall retain all of the rights set forth in this Section 3.07; provided, however, that such rights shall be exercised in a manner consistent with applicable NERC/NPCC Requirements and applicable regulatory standards. This Section 3.07 is not intended to reduce or limit any other rights of MEPCO as a signatory to this Agreement or under the ISO Tariff.

(i) Nothing in this Agreement shall restrict any rights: (A) of MEPCO that is a party to a merger, acquisition or other restructuring transaction to make filings under Section 205 of the Federal Power Act with respect to MEPCO's reallocation or redistribution of revenues or the assignment of MEPCO's rights or obligations, to the extent the Federal Power Act requires such filings; or (B) of MEPCO to terminate its participation in this Agreement pursuant to Article X of this Agreement.

(ii) Except as expressly provided in the grant of Operating Authority to ISO, MEPCO retains all rights that it otherwise has incident to its ownership of, and legal and equitable title to, its assets, including its MEPCO-TF and all land and land rights, including the right to build, acquire, sell, lease, merge, dispose of, retire, use as security, or otherwise transfer or convey all or any part of its assets, subject to MEPCO's compliance with Section 2.05 of this Agreement. Subject to Article X, MEPCO may, directly or indirectly, by merger, sale, conveyance, consolidation, recapitalization, operation of law, or otherwise, transfer all or any portion of MEPCO's MEPCO-TF subject to this Agreement but only if such transferee or successors shall agree in writing to be bound by terms of this Agreement to the extent that, upon such event, the MEPCO Transmission Facilities remain within the New England Transmission System and service over the MEPCO Transmission Facilities will continue to be provided under the ISO Tariff.

(iii) Any expansion or modification by MEPCO of its MEPCO-TF, any facilities constructed by MEPCO to connect the facilities of a current or proposed Transmission Customer to such MEPCO-TF, and/or any new transmission facilities constructed by MEPCO shall be subject to MEPCO's right to recover,

pursuant to appropriate financial arrangements and tariffs or contracts, all costs prudently incurred or prudently committed to be incurred, plus a return on invested equity and other capital, associated with constructing and owning or financing such facilities, expansions or modifications to its Transmission Facilities.

(iv) The responsibilities granted to ISO under this Agreement shall not affect the rights of MEPCO to modify or expand its MEPCO-TF, nor confer upon ISO any authority to direct MEPCO to modify or expand its MEPCO-TF.

(v) MEPCO shall have the right to adopt and implement, consistent with Good Utility Practice, procedures and to take such actions it deems necessary to protect its facilities from physical damage or to prevent injury or damage to persons or property.

(vi) MEPCO retains the right to take whatever actions, consistent with Good Utility Practice, it deems necessary to fulfill its obligations under applicable Law.

(vii) Nothing in this Agreement shall be construed as limiting in any way the rights of MEPCO to make any filing with any applicable state or local or federal regulatory authority other than FERC.

(viii) Subject to Section 2.04, MEPCO shall retain the right to enter into Interconnection Agreements with transmission owners, generators and other entities connecting with the MEPCO-TF and to file such agreements for approval or acceptance with FERC.

(ix) MEPCO shall have the right to retain one or more subcontractors to perform any or all of its obligations under this Agreement. The retention of a subcontractor pursuant to the terms of this Section 3.07 shall not relieve MEPCO of its primary liability for the performance of any of its obligations under this Agreement.

(b) Any and all other rights and responsibilities of MEPCO related to the ownership or operation of its MEPCO-TF not expressly assigned to ISO under this Agreement will remain with MEPCO.

(c) Nothing in this Agreement shall be deemed to impair or infringe on any rights or obligations of MEPCO under the Federal Power Act and FERC's rules and regulations thereunder, provided that any such rights are not inconsistent with the express terms of this Agreement. Nothing contained in this Agreement shall be construed to limit in any way the right of MEPCO to take any position, including opposing positions, in any administrative or judicial proceeding or filing by the ISO or other parties, notwithstanding that such proceeding or filing may be undertaken or made, explicitly or implicitly, pursuant to this Agreement.

**3.08 <u>Repair and Maintenance of Transmission Facilities.</u>**

(a) <u>Planning, Scheduling, and Approval of Transmission Facility Outages</u>.

(i) MEPCO shall submit to the ISO long-term plans for Transmission Facility outages, shall submit to the ISO schedules for Transmission Facility outages, and shall obtain ISO approval for Transmission Facility outages in accordance with, and to the extent required by Market Rule 1.

(ii) Notwithstanding any of the foregoing, nothing in this Section 3.08 shall be construed to require MEPCO to reschedule an outage of a Transmission Facility or to require MEPCO to refrain from initiating switching and tagging procedures to take a Transmission Facility out of service or place it back into service to the extent MEPCO determines that such outage or actions are necessary to prevent injury or damage to persons or property or to protect its facilities from physical damage, in accordance with Section 3.07(a)(v) of this Agreement.

(b) Recovery of Transmission Outage Rescheduling Costs. MEPCO shall have the right to file a schedule to the Schedule 20B under the ISO ~~Tariff~~ OATT that will provide for reimbursement to MEPCO for any direct costs incurred by MEPCO due to ISO's rescheduling or revocation of a previously Scheduled or Approved Outage.

(c) Annual Assessment of Outage Coordination Efforts. ISO shall prepare and issue annual public reports on the scheduling and coordination of transmission outages. Each such annual report shall: (i) assess the accuracy of the ISO's estimation of congestion and RMR cost impacts and the accuracy of MEPCO and other inputs used in such estimation (ii) assess any long term impacts of ISO's exercise of its authority to require the rescheduling of transmission maintenance outages in accordance with Section 3.08(a) and; (iii) include analyses and data which could allow MEPCO to identify potential opportunities for incentives based on efficient coordination of outages and other operational measures that will reduce congestion costs or increase operational flexibility. ISO shall provide a draft of each such annual report to MEPCO and interested stakeholders prior to issuing a final report and shall consider the input of MEPCO and interested stakeholders in preparing such reports, subject to any applicable restrictions set forth in the ISO Information Policy on file with FERC.

(d) Development of Incentive Proposals. Notwithstanding any other provision in this Agreement, the ISO will apply reasonable efforts to work actively with MEPCO to analyze alternatives including incentives adopted in other markets and to provide input for use by MEPCO in developing the design of incentive rates or mechanisms for regional congestion cost reduction. The ISO will work with other stakeholders in a similar fashion if so requested. Any such incentive proposal shall be filed by MEPCO with FERC in accordance with Section 3.04(a). Such incentive mechanisms shall be designed to further improve coordination of outages or operational measures in a manner that will reduce overall congestion or RMR costs. Any MEPCO incentive must be approved or accepted by FERC. MEPCO shall attempt to reach agreement with the ISO before filing an incentive proposal with FERC. The ISO may submit filings to the FERC (including a protest or a complaint under Section 206 of the Federal Power Act) raising any questions or concerns that it may have concerning MEPCO's specific incentive proposal, provided that the ISO shall not contend that an incentive proposal is inappropriate or oppose the proposal on the ground that MEPCO has agreed to the provisions of Section 3.08 of this Agreement.~~;~~

(e) Market Monitoring of Outage Scheduling. The Market Monitoring Unit of the ISO shall monitor the outage scheduling activities of MEPCO. The Market Monitoring Unit of the ISO shall have the right to request that MEPCO provide information to the Market Monitoring Unit concerning MEPCO's scheduling of MEPCO-TF outages, including the rescheduling or cancellation of any Planned, Scheduled or Approved Outage, and MEPCO shall provide such information to the Market Monitoring Unit in accordance with Section 11.07(c) of this Agreement.

(f) Damage or Destruction of MEPCO-TF. If, at any time during the Term, any of MEPCO's MEPCO-TF are damaged or destroyed, then, MEPCO shall determine, in its sole discretion, consistent with Good Utility Practice and applicable Law, whether or not (and if so, in what manner) to restore or cause the restoration of such damaged or destroyed MEPCO-TF to substantially the same condition, character or use as existed before the damage or destruction, if at all, provided that MEPCO shall consult with ISO prior to making such determination and shall comply with the requirements specified in Section 2.05.

**3.09 Invoicing, Collection and Disbursement of Cnstomer Payments.**

MEPCO shall be responsible for invoicing, collection and disbursement of customer payments, provided that MEPCO may enter into a separate agreement with another entity to perform such services.

**3.10 Grandfathered Transmission Agreements.**

Notwithstanding any other provision of this Agreement, Grandfathered Transmission Service Agreements, Grandfathered Intertie Agreements and Grandfathered Interconnection Agreements (hereinafter collectively referred to as "Grandfathered Transmission Agreements"), as listed in Schedule 3.10, will continue to be effective for the terms of such agreements.

**3.11 Subcontractors.**

MEPCO acknowledges and agrees that, subject to the terms set forth herein, including Section 6.06, ISO has the right to retain one or more subcontractors to perform any or all of its obligations under this Agreement. The retention of a subcontractor pursuant to the terms of this Section 3.11 shall not relieve ISO of its primary liability for the performance of any of its obligations under this Agreement.

**3.12 No Impairment of ISO's Other Legal Rights and Obligations.**

Nothing in this MEPCO TOA shall be deemed to impair or infringe on any other rights or obligations of ISO under the Federal Power Act and FERC's rules and regulations thereunder, including ISO's rights and obligations to submit filings to recover its administrative, capital, and other costs, provided that any such rights are not inconsistent with the express terms of this Agreement. During the Term of this MEPCO TOA, ISO shall:

(a) have the rights and obligations to design, develop, operate, maintain and administer the New England Markets and congestion pricing mechanisms (including the

exclusive right to make Section 205 filings relating to the Market Rules in accordance with Section 3.04), and

(b) have the right to undertake actions relating to congestion pricing and management in accordance with this Agreement, ISO Market Rules, and applicable FERC orders.

Nothing in this MEPCO TOA shall be deemed to impair or infringe on such rights and obligations.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

### 4.01 Representations and Warranties of MEPCO.

As of the time of execution of this Agreement, MEPCO represents and warrants to ISO as follows:

(a) Organization. It is duly organized, validly existing and in good standing under the laws of the state of its organization.

(b) Authorization. It has all requisite power and authority to execute, deliver and perform this Agreement; the execution, delivery and performance by MEPCO of this Agreement have been duly authorized by all necessary and appropriate action on the part of MEPCO; and this Agreement has been duly and validly executed and delivered by MEPCO and constitutes the legal, valid and binding obligations of MEPCO, enforceable against MEPCO in accordance with its terms.

(c) No Breach. The execution, delivery and performance by MEPCO of this Agreement will not result in a breach of any terms, provisions or conditions of any agreement to which MEPCO is a party which breach has a reasonable likelihood of materially and adversely affecting MEPCO's performance under this Agreement.

(d) MEPCO Transmission Facilities. The MEPCO-TF listed by MEPCO in Schedule 2.01(a) constitute all MEPCO-TF owned by MEPCO in New England that are subject to this Agreement.

(e) No Warranty Regarding MEPCO's MEPCO-TF. In connection with MEPCO's grant of operating authority to ISO over the MEPCO-TF pursuant to the terms of this agreement, such MEPCO-TF are being made available pursuant to this agreement to ISO "AS IS, WHERE IS," and MEPCO is not making any representations or warranties, written or oral, statutory, express or implied, concerning such MEPCO-TF, including, in particular, any warranty of merchantability or fitness for a particular purpose, all of which are hereby expressly excluded and disclaimed. The foregoing provision is not intended to limit or condition any obligation of MEPCO expressly provided for elsewhere in this Agreement.

**4.02 Representations and Warranties of ISO.**

As of the time of execution of this Agreement, ISO represents and warrants to MEPCO as follows:

(a) Organization. It is duly organized, validly existing and in good standing under the laws of the state of its organization.

(b) Authorization. It has all requisite power and authority to execute, deliver and perform this Agreement; the execution, delivery and performance by ISO of this Agreement have been duly authorized by all necessary and appropriate action on the part of ISO; and this Agreement has been duly and validly executed and delivered by ISO and constitutes the legal, valid and binding obligation of ISO, enforceable against ISO in accordance with its terms.

(c) No Breach. The execution, delivery and performance by ISO of this Agreement will not result in a breach of any of the terms, provisions or conditions of any agreement to which ISO is a party which breach has a reasonable likelihood of materially and adversely affecting ISO's performance under this Agreement.

## ARTICLE V

## COVENANTS OF MEPCO

**5.01 Covenants of MEPCO.**

MEPCO covenants and agrees that during (i) the Term, or (ii) the period expressly specified herein, as applicable, MEPCO shall comply with all covenants and provisions of this Article V, except to the extent ISO and MEPCO consent in writing to waive such covenants or performance is excused pursuant to Section 11.11(b).

**5.02 Financial Statements and Filings.**

If MEPCO's financial statements, permit applications or any other filing with any Governmental Authority are publicly available, MEPCO shall, upon request by ISO, provide ISO information sufficient to allow ISO to locate such financial statements, permit applications or other filings, including the date and place of the filing of the relevant documents.

**5.03 Expenses.**

Except to the extent specifically provided herein, all costs and expenses incurred by MEPCO in connection with the negotiation of this Agreement shall be borne by MEPCO; provided that nothing herein shall prevent MEPCO from recovering such expenses in accordance with applicable law.

**5.04 Consents and Approvals.**

(a) MEPCO shall exercise Commercially Reasonable Efforts to promptly prepare and file all necessary documentation to effect all necessary applications, notices, petitions, filings and other documents, and shall exercise Commercially Reasonable Efforts to obtain (and will cooperate with ISO in obtaining) any consent, acquiescence, authorization, order or approval of, or any exemption or nonopposition by, any Governmental Authority required to be obtained or made by MEPCO in connection with this Agreement or the taking of any action contemplated by this Agreement.

(b) MEPCO shall exercise Commercially Reasonable Efforts to obtain consents of all other third parties necessary to the performance of this Agreement by MEPCO. MEPCO shall promptly notify ISO of any failure to obtain any such consents and, if requested by ISO, shall provide copies of all such consents obtained by MEPCO.

(c) Nothing in this Section 5.04 shall require MEPCO to pay any sums to a third party, including any Governmental Authority, excluding filing fees paid to any Governmental Authority in connection with a filing necessary or appropriate to further action.

**5.05 Notice and Cure.**

MEPCO shall notify ISO in writing of, and contemporaneously provide ISO with true and complete copies of any and all information or documents relating to, any event, transaction or circumstance, as soon as practicable after it becomes Known to MEPCO, that causes or shall cause any covenant or agreement of MEPCO under this Agreement to be breached or that renders or shall render untrue any representation or warranty of MEPCO contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance. MEPCO shall use all Commercially Reasonable Efforts to cure such event, transaction or circumstance as soon as practicable after it becomes known to MEPCO. No notice given pursuant to this Section 5.05 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit ISO's right to seek indemnity under Article IX.

## ARTICLE VI

## COVENANTS OF ISO

**6.01 Covenants of ISO.**

ISO covenants and agrees that during (i) the Term, or (ii) the period expressly specified herein, as applicable, ISO shall comply with all covenants and provisions of this Article VI, except to the extent the Parties consent in writing to a waiver of such covenants or performance is excused pursuant to Section 11.11(b).

**6.02 Financial Statements and Filings.**

(a) To the extent not provided to stakeholders generally or made publicly available by ISO, ISO shall make available to MEPCO: (i) quarterly unaudited financial

statements within sixty (60) days after each quarter end and (ii) annual audited financial statements within one hundred twenty (120) days after each fiscal year end. In each instance, the financial statements made available by ISO pursuant to (i) and (ii) above shall be prepared in accordance with Generally Accepted Accounting Principles and shall be true and correct in all material respects.

(b) If financial statements, permit applications or any other filing with any Governmental Authority are publicly available, ISO shall, upon request by MEPCO, provide MEPCO information sufficient to allow MEPCO to locate such financial statements, permit applications or other filings including the date and place of the filing of the relevant documents.

**6.03 <u>Expenses.</u>**

Except to the extent specifically provided herein, all costs and expenses incurred by ISO in connection with the negotiation of this Agreement shall be borne by ISO; provided that nothing herein shall prevent ISO from recovering such expenses in accordance with applicable law.

**6.04 <u>Consents and Approvals.</u>**

(a) ISO shall exercise Commercially Reasonable Efforts to promptly prepare and file all necessary documentation to effect all necessary applications, notices, petitions, filings and other documents, and shall exercise Commercially Reasonable Efforts to obtain (and will cooperate with MEPCO in obtaining) any consent, acquiescence, authorization, order or approval of, or any exemption or nonopposition by, any Governmental Authority required to be obtained or made by ISO in connection with this Agreement or the taking of any action contemplated by this Agreement.

(b) ISO shall exercise Commercially Reasonable Efforts to obtain consents of all other third parties necessary to performance of this Agreement by ISO. ISO shall promptly notify MEPCO of any failure or anticipated failure to obtain any such consents and, if requested by MEPCO, shall provide copies of all such consents obtained by ISO.

(c) Nothing in this Section 6.04 shall require ISO to pay any sums to a third party, including any Governmental Authority, excluding filing fees paid to any Governmental Authority in connection with a filing necessary or appropriate to discharge its obligations hereunder.

**6.05 <u>Notice and Cure.</u>**

ISO shall notify MEPCO in writing of, and contemporaneously shall provide MEPCO with true and complete copies of any and all information or documents relating to, any event, transaction or circumstance, as soon as practicable after it becomes Known to ISO, that causes or shall cause any covenant or agreement of ISO under this Agreement to be breached or that renders or shall render untrue any representation or warranty of ISO contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance. ISO shall use all Commercially Reasonable Efforts to cure such event, transaction or circumstance as soon as practicable after it becomes Known to ISO. No notice given pursuant to this Section 6.05 shall have any effect on the representations, warranties, covenants or agreements contained

in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit any right of MEPCO to seek indemnity under Article IX.

**6.06 Management Agreements.**

ISO shall not enter into any management agreement relating to the provision of transmission services with any Person, including MEPCO, unless such agreement: (a) has been approved by FERC; (b) docs not violate ISO's Code of Conduct and is on an arms-length basis; or (c) if for an aggregate amount of $1,000,000 or more for a contract with any Participant in the ISO Markets, including MEPCO, is the result of a competitive solicitation process, the outcome of which is based on factors that include, among others, skill, qualifications, costs, reputation and associated risks.

**6.07 ISO Line of Business; Non-Profit-Status.**

ISO shall not be operated on a for-profit basis. This provision is not intended to require ISO to maintain its status as an entity not subject to federal or state taxes, to require ISO to remain a Delaware not-for-profit corporation or to assure that in any particular year that ISO's revenues do not exceed its expenses. ISO shall not pay dividends or use its net earnings other than to offset RTO operating and capital expenses and maintain reasonable reserves.

## ARTICLE VII

## TAX MATTERS

**7.01 Responsibility for MEPCO Taxes.**

MEPCO shall prepare and file all Tax Returns and other filings related to its Transmission Business and MEPCO-TF and pay any Tax liabilities related to its Transmission Business and MEPCO-TF. ISO shall not be responsible for, or required to file, any Tax Returns or other tax related reports for MEPCO and shall have no liability for any Taxes related to MEPCO's Transmission Business or MEPCO-TF. ISO and MEPCO hereby agree that, for tax purposes, MEPCO-TF shall be deemed to be owned by MEPCO.

**7.02 Responsibility for ISO Taxes.**

ISO shall prepare and file all Tax Returns and other filings related to its operations and pay any Tax liabilities related to its operations. MEPCO shall not be responsible for, or required to, file any Tax Returns or other reports for ISO and shall have no liability for any Taxes related to ISO's operations.

## ARTICLE VIII

## RELIANCE; SURVIVAL OF AGREEMENTS

**8.01 <u>Reliance; Survival of Agreements.</u>**

Notwithstanding any right of any Party (whether or not exercised) to investigate the accuracy of any of the matters subject to indemnification by any other Party contained in this Agreement, each of the Parties has the right to rely fully upon the representations, warranties, covenants and agreements of each other Party contained in this Agreement. The provisions of Sections 11.01, 11.07, 11.11 and 11.15 and Articles VII and IX shall survive the termination of this Agreement.

## ARTICLE IX

## INDEMNIFICATION; INSURANCE; ASSUMPTION OF LIABILITIES

**9.01 <u>Indemnification.</u>**

(a) Subject to Section 9.06(b) through 9.06(d), (i) MEPCO shall release, indemnify, and hold harmless the ISO from and against any and all damages, losses, liabilities, obligations, claims, demands, suits, proceedings, recoveries, judgments, settlements, costs and expenses, court costs, attorney fees, and all other obligations (each, an "Indemnifiable Loss") asserted against the ISO by a Person that is not a Party to this Agreement (a "Third Party") including but not limited to any action by a MEPCO employee, to the extent alleged to result from, arise out of or be related to MEPCO's acts or omissions that give rise to such Indemnifiable Loss; and (ii) the ISO shall release, indemnify, and hold harmless MEPCO from and against any Indemnifiable Loss asserted against MEPCO by a Third Party, including but not limited to any action by an ISO employee, to the extent alleged to result from, arise out of or be related to the ISO's acts or omissions that give rise to such Indemnifiable Loss, including an ISO directive and/or instructions to a Party.

(b) The indemnification by the ISO set forth in Section 9.01(a)(ii) above shall be limited to the extent that MEPCO's liability would be limited by any applicable Law and arises from a claim by (i) MEPCO in its role as a Transmission Customer or (ii) a customer of MEPCO.

(c) MEPCO shall release, indemnify, and hold harmless the ISO from and against any Environmental Damages that the ISO becomes subject to as a result of its exercise of Operational Authority over MEPCO-TF, to the extent such Environmental Damages arose prior to the Effective Date or did not result from the ISO's acts or omissions.

(d) MEPCO and/or the ISO each hereby (i) waives any defense or immunity it might otherwise have under applicable workers' compensation laws or any other statute, or

judicial decision, disallowing or limiting such indemnification and (ii) consents to a cause of action for indemnity and/or contribution in connection with such indemnification.

**9.02 Notice of Proceedings.**

Each party entitled to receive indemnification under this Agreement (each, an "Indemnitee") shall promptly notify the party who holds an indemnification obligation hereunder (in each case, the "Indemnifying Party") of any Indemnifiable Loss in respect of which such Indemnitee is or may be entitled to indemnification pursuant to Section 9.01. Such notice shall be given as soon as reasonably practicable after the Indemnitee becomes aware of the Indemnifiable Loss and that any such claim or proceeding may give rise to an indemnification obligation hereunder. Such notice shall describe the nature of the loss or proceeding in reasonable detail and shall indicate, if practicable, the estimated amount of the Indemnifiable Loss that has been or may be sustained by the Indemnitee. The delay or failure of such Indemnitee to provide the notice required pursuant to this Section 9.02 shall not release the Indemnifying Party from any indemnification obligation which it may have to such Indemnitee except (a) to the extent that such failure or delay materially and adversely affects the Indemnifying Party's ability to defend such action or increases the amount of the Indemnifiable Loss, and (b) that the Indemnifying Party shall not be liable for any costs or expenses of the Indemnitee in the defense of the claim, suit, action or proceeding during such period of failure or delay.

**9.03 Defense of Claims.**

(a) Unless and until the Indemnifying Party (i) acknowledges in writing its obligation within ten (10) calendar days of the Indemnitee's notice of a claim, suit, action or proceeding, and (ii) assumes control of the defense of such claim, suit, action or proceeding in accordance with Section 9.03(b), the Indemnitee shall have the right, but not the obligation, to contest, defend and litigate, with counsel of its own selection, any claim, action, suit or proceeding by any third party alleged or asserted against such Indemnitee in respect of, resulting from, related to or arising out of any matter for which it is entitled to be indemnified hereunder, and the reasonable costs and expenses thereof shall be subject to the indemnification obligations of the Indemnifying Party hereunder.

(b) Upon acknowledging in writing its obligation to indemnify an Indemnitee to the extent required pursuant to this Article IX and paying all reasonable costs incurred by such Indemnitee in its defense, including reasonable attorney's fees, the Indemnifying Party shall be entitled, at its option (subject to Section 9.03(d)), to assume and control the defense of such claim, action, suit or proceeding at its expense with counsel of its selection, subject to the prior reasonable approval of the Indemnitee.

(c) Neither the Indemnifying Party nor the Indemnitee shall be entitled to settle or compromise any such claim, action, suit or proceeding without the prior written consent of the other; provided, however, that such consent shall not be unreasonably withheld.

(d) Following the acknowledgment of the indemnification and the assumption of the defense by the Indemnifying Party pursuant to Section 9.03(b), the Indemnitee shall have the right to employ its own counsel and such counsel may participate in such action, but the fees

and expenses of such counsel shall be at the expense of such Indemnitee, when and as incurred, unless: (i) the employment of counsel by such Indemnitee has been authorized in writing by the Indemnifying Party; (ii) the Indemnitee shall have reasonably concluded and specifically notified the Indemnifying Party that there may be a conflict of interest between the Indemnifying Party and the Indemnitee in the conduct of the defense of such action; (iii) the Indemnifying Party shall not in fact have employed independent counsel reasonably satisfactory to the Indemnitee to assume the defense of such action and shall have been so notified by the Indemnitee; (iv) the Indemnitee shall have reasonably concluded and specifically notified the Indemnifying Party that there may be specific defenses available to it which are different from or additional to those available to the Indemnifying Party or that such claim, action, suit or proceeding involves or could have a material adverse effect upon the Indemnitee beyond the scope of this Agreement; or (v) the Indemnifying Party shall not have taken reasonable steps necessary to defend diligently such action within twenty (20) calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps. If clause (ii), (iii), (iv) or (v) of the preceding sentence shall be applicable, then counsel for the Indemnitee shall have the right to direct the defense of such claim, action, suit or proceeding on behalf of the Indemnitee and the reasonable fees and disbursements of such counsel shall constitute indemnifiable legal or other expenses hereunder.

(e) If the amount of any Indemnifiable Loss incurred by an Indemnitee, at any time subsequent to the making of an indemnity payment by an Indemnifying Party in respect thereof, is reduced by recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other entity, the amount of such reduction, less any costs, expenses or premiums incurred in connection therewith (together with interest thereon from the date of payment thereof at the Prime Rate) shall promptly be repaid by the Indemnitee to the Indemnifying Party. In the event that the claim, demand or suit giving rise to an Indemnifiable Loss is ultimately adjudicated, if a Final Order confirms that the Indemnitee was not entitled to indemnification hereunder, then the amount advanced by the Indemnifying Party in respect of such Indemnifiable Loss (together with interest thereon from the date of payment thereof at the Prime Rate) shall promptly be paid by the Indemnitee to the Indemnifying Party.

**9.04 <u>Subrogation.</u>**

Upon payment of any indemnification by a party pursuant to this Article IX, the Indemnifying Party, without any further action, shall be subrogated to any and all claims that the Indemnitee may have relating thereto, and such Indemnitee shall at the request and expense of the Indemnifying Party cooperate with the Indemnifying Party and give at the request and expense of the Indemnifying Party such further assurances as are necessary or advisable to enable the Indemnifying Party vigorously to pursue such claims.

**9.05 <u>Insurance.</u>**

(a) The ISO shall at all times, at its own cost and expense, carry and maintain or cause to be carried and maintained throughout the Term: (i) liability and errors and omissions insurance (including blanket coverage for contractual liability), insuring the ISO against liability for injury or death to persons, damage to property and environmental restoration, (ii) worker's compensation insurance, (iii) property insurance and (iv) directors' and officers' insurance. The

amount of the insurance coverages and deductibles shall generally be comparable to other independent system operators or RTOs, taking into consideration the relative size of the ISO and its contractual and tariff liabilities as compared to the other system operators or RTOs administering similar market structures. In assessing the comparable coverages and deductibles, the ISO may rely on the advice of its insurance consultants.

(b) MEPCO will maintain property insurance on its Transmission Facilities and liability insurance in accordance with good utility practice. MEPCO may self insure such amount to the extent it currently self insures similar policies and amounts.

(c) All insurance required under this Section 9.05 by outside insurers shall be maintained with insurers qualified to insure the obligations or liabilities under this Agreement and having a Best's rating of at least B+ VIII (or an equivalent Best's rating from time to time of B+ VIII), or in the event that from time to time Best's ratings are no longer issued with respect to insurers, a comparable rating by a nationally recognized rating service or such other insurers as may be agreed upon by the Parties.

(d) MEPCO shall be listed as additional insured parties on the liability and errors and omissions insurance required to be maintained by the ISO and the ISO shall be listed as an additional insured party on the liability insurance maintained by MEPCO. Upon execution of this Agreement, and when requested thereafter, each Party shall furnish each other Party with certificates of all such insurance policies setting forth the amounts of coverage, policy numbers, and date of expiration for such insurance in conformity with the requirements of this Agreement.

(e) The insurance policies maintained by the ISO hereunder shall not be canceled, terminated or the terms thereof modified or amended without at least thirty (30) days' prior notice to MEPCO.

(f) If any insurance policy required to be maintained by the ISO hereunder shall not be available to the ISO on a commercially reasonable basis (taking into account both terms and premiums), the ISO shall obtain a written report of an independent insurance advisor of recognized national standing, chosen by MEPCO and reasonably acceptable to the ISO, confirming in reasonable detail that such insurance policy, in respect of amount or scope of coverage, is not available on a commercially reasonable basis from insurers of recognized standing. During any period with respect to which any insurance policy required by this Agreement is not commercially available, the ISO shall nevertheless maintain insurance that approximates such required insurance policy as closely as commercially practical, to the extent it is available on a commercially reasonable basis from insurers of recognized standing. If any insurance policy which was previously not held or discontinued because of its commercial unavailability later becomes available on a commereially reasonable basis, the ISO shall obtain or reinstate such insurance.

**9.06 <u>Assumption of Liability.</u>**

(a) MEPCO shall be liable to the ISO, and the ISO shall be liable to MEPCO, for losses, liabilities, damages, diminution in value, obligations, claims, proceedings, fines, deficiencies and expenses (collectively, "Losses") caused by such Party's grossly negligent acts or omissions or willful misconduct (including the grossly negligent acts or omissions or willful

misconduct of such Party's directors, Affiliates, members, officers, employees, agents, and contractors) in connection with the performance of such Party of its obligations under this Agreement; and no Party shall be liable to another Party for any incidental, indirect, special, exemplary, punitive or consequential damages, including lost revenues or profits, even if such damages are foreseeable or the damaged Party has advised such Party of the possibility of such damages and regardless of whether any such damages are deemed to result from the failure or inadequacy of any exclusive or other remedy. The foregoing limitations shall not apply to the right of the Parties to seek indemnification under this Agreement in accordance with Section 9.01.

(b) Nothing in this Agreement shall be deemed to affect the right of the ISO to recover its costs due to liability under this Article IX through the ISO Participants Agreement or the ISO Administrative Tariff.

(c) The ISO shall not be liable to MEPCO with respect to any damages incurred by MEPCO that are directly attributable to the ISO's reliance on facility ratings established by MEPCO.

(d) MEPCO shall not be liable to any other transmission owner, any other party and/or the ISO by reason of this Agreement (whether based on contract, indemnification, warranty, tort, strict liability or otherwise) for: (i) any acts or omissions taken or done in compliance with, or good faith attempts to comply with, the directives and/or instructions of the ISO, except in cases of the gross negligence or willful misconduct MEPCO; and/or (ii) any costs and expenses relating to the operation, repair, maintenance or improvement of any Transmission Facility of the ISO or any other transmission owner.

## ARTICLE X

## TERM; DEFAULT AND TERMINATION

**10.01 Term; Termination Date.**

(a) Term and Effective Date.

(i) Term. Subject to the terms set forth in this Section 10.01, the initial term of this Agreement (the "Initial Term") shall commence on the Effective Date and shall continue until January 31, 2010. Subject to the terms set forth in this Section 10.01, the Initial Term shall be extended automatically for additional two-year periods (each, an "Additional Term"). MEPCO may withdraw from this Agreement effective at the end of the Initial Term or the end of any Additional Term by providing no less than 180 days' prior notice of such withdrawal to the other Party. Together, the Initial Term and the Additional Term(s), if any, shall constitute the term (the "Term") of this Agreement.

(ii) Effective Date. The "Effective Date" shall be the date on which ISO and MEPCO unanimously agree to place this Agreement and related agreements and documents into effect.

(iii) This Agreement shall terminate upon Commission approval or acceptance of (1) MEPCO becoming a ~~Participating Transmission Owner (PTO)~~ under the ~~Transmission Operating Agreement (TOA)~~ between the PTOs and ISO, and (2) MEPCO including MEPCO-TF under the ISO Tariff in a manner such that MEPCO's revenue requirements are recovered thereunder and not from separate charges to MEPCO Transmission Customers under Schedule 20B to the ISO OATT.

(b) MEPCO Termination During The Term. Subject to Section 10.01(d), MEPCO may terminate this Agreement at any time during the Term if any of the following shall have occurred:

(i) upon a ISO event of default in accordance with Section 10.03(a), provided that MEPCO shall exercise this right in accordance with Section 10.03(b)(i).

(ii) if a Final Order of FERC, a Final Order of a Federal court or a Federal law sets forth a change in policy stating that (A) the federal government no longer encourages the participation of transmission owners in RTOs and such Final Order or law affirmatively states that transmission owners participating in an RTO may withdraw therefrom; or (B) that the recovery of costs for existing MEPCO-TF will be subject to any change in policy which would prevent MEPCO from recovering the costs of such MEPCO-TF on a regulated cost-of-service basis; provided that withdrawal pursuant to (A) or (B) of this provision shall require notice to the other Parties not less than 180 days prior to the Termination Date established pursuant to Section 10.01(d).

(iii) FERC issues an order putting into effect changes to the relative rights and responsibilities of MEPCO and ISO under this Agreement, including changing the scope and definition of Operating Authority, so as to materially adversely affect the interests of MEPCO, unless MEPCO has agreed to such changes in accordance with Section 11.04; provided that a withdrawal pursuant to this provision shall require notice to the other Party not less than 180 days prior to the Termination Date established pursuant to Section 10.01(d); and MEPCO providing a notice of termination pursuant to this provision shall be required to rescind such notice if FERC issues a subsequent order prior to the Termination Date so as to eliminate the changes to the relative rights and responsibilities of MEPCO and ISO under this Agreement.

(iv) MEPCO has entered into an agreement to form or join an ITC in accordance with Attachment M of the ISO ~~Tariff~~ OATT which has been accepted for filing by the FERC, provided that termination pursuant to this provision shall be effective concurrent with the effective date of such agreement.

(v) MEPCO has obtained authorization from the FERC to join another control area, RTO or other similar organization in connection with a merger with or acquisition by another entity.

(c) Termination By ISO. ISO may terminate its obligations under this Agreement and surrender its Operating Authority over the MEPCO-TF if any of the following shall have occurred:

(i) the withdrawal of one or more transmission owners from ISO, and, as a result of such withdrawal, ISO cannot maintain system reliability or administer efficient and competitive markets.

(ii) FERC issues an order putting into effect material changes in the liability and indemnification protections afforded to ISO under this Agreement or the ISO Tariff, provided that: (A) withdrawal pursuant to this provision shall require notice to the other Party not less than 180 days prior to the Termination Date established pursuant to Section 10.01(d); and (B) ISO shall be required to rescind such notice if FERC issues a subsequent order prior to the Termination Date so as to eliminate the material changes to such liability and indemnification protections.

(iii) upon a MEPCO event of default in accordance with Section 10.04(a), provided that ISO shall exercise this right in accordance with Section 10.04(b)(i).

(iv) FERC issues an order putting into effect an amendment or modification of this Agreement that materially adversely affects ISO's ability to carry out its responsibilities under this Agreement, unless ISO has agreed to such changes in accordance with Section 11.04, provided that: (A) withdrawal pursuant to this provision shall require notice to MEPCO not less than 180 days prior to the Termination Date established pursuant to Section 10.01(d); and (B) ISO shall be required to rescind such notice if FERC issues a subsequent order prior to the Termination Date so as to eliminate the material adverse effect to ISO's ability to carry out it responsibilities under this Agreement.

(v) upon a MEPCO event of default in accordance with Section 10.04(a), provided that ISO shall exercise this right in accordance with Section 10.04(b)(i).

(d) Actions Prior To Termination. Upon submission of a written notice of termination by MEPCO, MEPCO submitting such notice shall commence the development of a plan under which Operating Authority shall be transferred from ISO to another entity. The Termination Date with respect to MEPCO or ISO shall not occur until both: (a) ISO and MEPCO have agreed upon a plan addressing the technical, operational and market issues associated with the transfer of Operating Authority in connection with such termination and such plan has been implemented, provided that: (i) if the Parties are unable to reach agreement on such plan, any affected Party shall not have the right to submit the matter to FERC for resolution without additional negotiation under Section 11.12; (ii) with respect to a termination pursuant to Section 10.01(a), MEPCO shall not be required to remain a Party to this Agreement for longer than one year after providing notice of termination; and (iii) in the event of a default by ISO, MEPCO may require that ISO immediately make arrangements for the orderly transfer of ISO's invoicing and collection functions with respect to MEPCO, if applicable, prior to the

Termination Date in accordance with Section 10.03(b); and (b) all required regulatory approvals, if any, have been obtained for such termination.

(e) Approvals. Notwithstanding any other provision contained herein or in any other document to the contrary, any termination requested under this Section 10.01 shall be effective: (1) unless a party to this Agreement seeking to challenge the request demonstrates that the requested termination is contrary to the public interest under the Mobile-Sierra Doctrine and (ii) subject to the FERC's determination under Section 205 of the Federal Power Act that the termination is just, reasonable and not unduly discriminatory or preferential. If MEPCO is exercising its right to terminate in accordance with this Section 10.01, MEPCO shall file with the FERC, pursuant to Section 205 of the FPA, the tariffs and rate schedules applicable to transmission service over its Transmission Facilities to become effective upon such termination.

(f) Continuing Obligations. The terminating Party shall have the following continuing obligations following termination of this Agreement:

(i) All financial obligations incurred and payments applicable to the time period prior to the Termination Date shall be honored by the terminating Party in accordance with the terms of this Agreement, and each Party shall remain liable for all obligations arising hereunder prior to the Termination Date.

(ii) MEPCO, if terminating, shall file a replacement transmission tariff to replace the affected portion of the ISO Tariff, unless FERC rules no longer require the filing of such a tariff or no longer has jurisdiction over MEPCO's Tariff.

**10.02 Release of Operating Authority.**

(a) Upon the Termination Date, ISO's right and obligation to exercise Operating Authority over the MEPCO-TF shall promptly cease, and, in accordance with Section 10.01, ISO shall be deemed to have released and returned, and MEPCO (or its designee) shall have assumed, Operating Authority over the MEPCO-TF on the Termination Date.

(b) After the Termination Date, ISO shall take Commercially Reasonable Efforts to assist MEPCO or MEPCO's designee in resuming performance of the functions comprising Operating Authority.

(c) The expenses associated with any termination under Section 10.01 shall be at MEPCO's expense unless (1) the termination is by ISO pursuant to Section 10.01(c)(ii) or (iii), or (2) pursuant to Section 10.03 in the event of a ISO default.

**10.03 Events of Default of ISO.**

(a) Events of Default of ISO. Subject to the terms and conditions of this Section 10.03, the occurrence of any of the following events shall constitute an event of default of ISO under this Agreement:

(i) Failure by ISO to perform any material obligation set forth in this Agreement and continuation of such failure for longer than thirty (30) days after the receipt by ISO of written notice of such failure from MEPCO; provided, however, that if ISO is diligently pursuing a remedy during such thirty day (30) period, said cure period shall be extended for an additional thirty (30) days or as otherwise agreed by MEPCO;

(ii) If there is a dispute between ISO and MEPCO as to whether ISO has failed to perform a material obligation, the cure period(s) provided in Section 10.03(a)(i) above shall run from the point at which a finding of failure to perform has been made by a Governmental Authority;

(iii) Failure of ISO to pay when due any other amounts payable to MEPCO by ISO pursuant to this MEPCO TOA within thirty (30) days of the due date; or

(iv) Any attempt (not including consideration of strategic options or entering into exploratory discussions) by ISO to transfer an interest in, or assign its obligations under, this Agreement, except as otherwise permitted hereunder;

(v) The exercise of Operating Authority or other responsibilities under this Agreement in a manner that results in a material amount of damage to or the destruction of MEPCO's MEPCO-TF due to the willful misconduct or gross negligence of ISO or the repeated and persistent exercise by ISO of its Operating Authority in a manner that subjects the MEPCO-TF to the significant risk of a material amount of damage, provided that exercise by ISO of its Operating Authority over the MEPCO-TF both in accordance with the Operating Procedures and within the ratings established by MEPCO for the MEPCO-TF shall not be considered to subject the MEPCO-TF to risk of damage and further provided that nothing in this Section 10.03(a)(v) shall be deemed to excuse ISO from complying with its obligations under this MEPCO TOA or to limit the other events of default specified in this Section 10.03(a);.

(vi) With respect to ISO, (A) the filing of any petition in bankruptcy or insolvency, or for reorganization or arrangement under any bankruptcy or insolvency laws, or voluntarily taking advantage of any such laws by answer or otherwise or the commencement of involuntary proceedings under any such laws, (B) assignment by ISO for the benefit of creditors; or (C) allowance by ISO of the appointment of a receiver or trustee of all or a material part of its property if such receiver or trustee is not discharged within thirty (30) days after such appointment.

(b) Remedies for Default. If an event of default by ISO occurs and is continuing, MEPCO shall have the right to avail itself of any or all of the following remedies, all of which shall be cumulative and not exclusive:

(i) To terminate this Agreement in accordance with Section 10.01(d); provided that if ISO contests such allegation of an ISO event of default, this Agreement shall remain in effect pending resolution of the dispute, but any applicable notice period shall run during the pendency of the dispute;

(ii) To demand that ISO shall immediately make arrangements for the orderly transfer of Operating Authority over MEPCO's MEPCO-TF and assist MEPCO or MEPCO's designee in resuming performance of the functions comprising Operating Authority, provided that: (A) MEPCO shall not be liable for the reimbursement of ISO for any costs and expenses incurred by ISO in connection therewith; (B) ISO and MEPCO shall agree upon a plan addressing the technical and operational issues associated with such transfer of Operating Authority, as such plan has been implemented; and (C) if the Parties are unable to reach agreement on such plan, any affected Party shall have the right to submit the matter to FERC for resolution without additional negotiation under Section 11.12;

(iii) To make any payment or perform or comply with any agreement that ISO shall be obligated to pay, perform or comply with under this Agreement and the amount of reasonable expenses (including attorneys' fees and any other reasonable professionals' fees and expenses) of MEPCO incurred in connection with such payment or the performance of or compliance with any such agreement shall be payable by ISO upon demand;

(iv) To obtain such specific performance and/or an injunction to prevent breaches of this Agreement and to enforee specifically the terms and conditions hereof; and/or

(v) To obtain damages pursuant to the indemnity provisions of Sections 9.01 and 9.06 of this Agreement.

**10.04 <u>Events of Default of MEPCO.</u>**

(a) <u>Events of Default of MEPCO</u>. Subject to the terms and conditions of this Section 10.04, the occurrence of any of the events listed below shall constitute an event of default of MEPCO under this Agreement (in each instance, a "MEPCO Default"):

(i) Failure by MEPCO to perform any material obligation set forth in this Agreement and continuation of such failure for longer than thirty (30) days after the receipt by MEPCO of written notice of such failure from ISO, provided, however, that if MEPCO is diligently pursuing a remedy during such thirty day (30) period, said cure period shall be extended for an additional thirty (30) days or as otherwise agreed by ISO;

(ii) If there is a dispute between ISO and MEPCO as to whether MEPCO has failed to perform a material obligation, the cure period(s) provided in Section 10.04(a)(i) above shall run from the point at which a finding of failure to perform has been made by a Governmental Authority;

(iii) With respect to MEPCO, (A) the filing of any petition in bankruptcy or insolvency, or for reorganization or arrangement under any bankruptcy or insolvency laws, or voluntarily taking advantage of any such laws by answer or otherwise or the commencement of involuntary proceedings under any such laws, (B) assignment by MEPCO for the benefit of creditors; or (C) allowance by MEPCO of the appointment of a receiver or trustee of all or a material part of its property if such receiver or trnstee is not discharged within thirty (30) days after such appointment; or

(b) Remedies for Default. If an event of default by MEPCO occurs and is continuing, ISO shall have the following remedies, all of which shall be cumulative and not exclusive:

(i) terminate this Agreement in accordance with Section 10.01(d); provided that if MEPCO contests such allegation of MEPCO event of default, this Agreement shall remain in effect pending resolution of the dispute, but any applicable notice period shall run during the pendency of the dispute;

(ii) such specific performance and/or an injunction to prevent breaches of this Agreement and to enforce specifically the terms and conditions hereof; or

(iii) obtain damages pursuant to the indemnity provisions of Sections 9.01 and 9.06.

(c) Notwithstanding anything to the contrary herein, nothing in this Section 10.04 shall be deemed to give ISO or any ISO agent or designee the right to exercise any functions other than those enumerated as Operating Authority in Section 3.02 or the right to take physical control of MEPCO-TF.

## ARTICLE XI

## MISCELLANEOUS

### 11.01 Notices.

Unless otherwise expressly specified or permitted by the terms hereof, all communications and notices provided for herein shall be in writing and any such communication or notice shall become effective (a) upon personal delivery thereof, including by overnight mail or courier service, (b) in the case of notice by United States mail, certified or registered, postage prepaid, return receipt requested, upon receipt thereof, or (c) in the case of notice by facsimile, upon receipt thereof; *provided that* such transmission is promptly confirmed by either of the methods set forth in clauses (a) or (b) above, in each case addressed to each party and copy party hereto at its address set forth in Schedule 11.01 or, in the case of any such party or copy party hereto, at such other address as such party or copy party may from time to time designate by written notice to the other party hereto; *further provided* that a notice given in connection with this Section 11.01 but received on a day other than a Business Day, or after business hours in the situs of receipt, will be deemed to be received on the next Business Day.

**11.02 Supersession of Prior Agreements.**

With respect to the subject matter hereof, this Agreement (together with all schedules and exhibits attached hereto) constitutes the entire agreement and understanding among the Parties with respect to all subjects covered by this Agreement and supersedes all prior discussions, agreements and understandings among the Parties with respect to such matters, including those agreements set forth on Schedule 11.02 attached hereto. To the extent that such other agreements address subjects addressed in this Agreement, this Agreement shall govern.

**11.03 Waiver.**

Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by Law or otherwise afforded, shall be cumulative and not alternative.

**11.04 Amendment; Limitations on Modifications of Agreement.**

Except as otherwise specifically provided herein, this Agreement shall only be subject to modification or amendment by mutual agreement of MEPCO and ISO.

(a) In light of the foregoing, the Parties agree that they shall not rely to their detriment on any purported amendment, waiver or other modification of any rights under this Agreement unless the requirements of this Section 11.04 are satisfied and further agree not to assert equitable estoppel or any other equitable theory to prevent enforcement of this provision in any court of law or equity, arbitration or other proceeding.

(b) Absent the agreement of the Parties to any proposed change hereof or an amendment hereof pursuant to Section 11.04(a), the standard of review for changes to the following sections of this Agreement (or changes to any schedules associated with such sections) proposed by a Party, a non-party or the Federal Energy Regulatory Commission acting sua sponte shall be the "public interest" standard of review under the Mobile-Sierra Doctrine: 2.01, 2.03, 3.01, 3.02, 3.03, 3.04, 3.05, 3.06, 3.07, 3.09, 3.10, 3.12, 4.01(e), 6.06, 6.07, 9.01, 9.06, 10.02, 10.03, 10.04, 11.04(a)-(d), 11.06, 11.15, 11.17(d) and Article I, as it applies to the foregoing sections. Absent the agreement of the Parties to any proposed change hereof or an amendment hereof pursuant to Section 11.04(a), with respect to changes to the remaining provisions of this Agreement proposed by a Party, a non-party or the Federal Energy Regulatory Commission acting sua sponte, the standard of review shall be that provided under Section 206 of the Federal Power Act.

(c) Notwithstanding the Parties' rights under Section 3.04 hereof, neither ISO nor MEPCO shall propose to modify or amend the ISO Tariff (including Schedule 20B) nor any other tariff, rate schedule, procedure (including Operating Procedures), protocol, or agreement applicable to ISO or MEPCO in any manner that would limit, alter, or adversely affect the rights and responsibilities of the non-proposing Party under this Agreement or that would otherwise be inconsistent with the provisions of this Agreement unless: (i) MEPCO and ISO have entered

into a prior written agreement to make corresponding modifications to this Agreement in accordance with this Section 11.04, or (ii) if the corresponding modifications to the provisions of this Agreement enumerated in Section 11.04(c) above are required, the proposing Party also requests FERC to find (or FERC has already so found) that the corresponding modifications are required under the "public interest" standard of review under the Mobile-Sierra Doctrine or (iii) if corresponding modifications to the remainder of the Agreement are required, the proposing Party also requests FERC to find (or FERC has already so found) that the corresponding modifications are required under the standard of review under Section 206 of the Federal Power Act.

(d) The parties shall notify stakeholders of proposed amendments to this Agreement by posting such amendments on the ISO website prior to the filing of such amendments with FERC.

**11.05 No Third Party Beneficiaries.**

Except as provided in Article IX, it is not the intention of this Agreement or of the Parties to confer a third party beneficiary status or rights of action upon any Person or entity whatsoever other than the Parties and nothing contained herein, either express or implied, shall be construed to confer upon any Person or entity other than the Parties any rights of action or remedies either under this Agreement or in any manner whatsoever.

**11.06 No Assignment; Binding Effect.**

Neither this Agreement nor any right, interest or obligation hereunder may be assigned by a Party (including by operation of law) without the prior written consent of the other Party in its sole discretion and any attempt at assignment in contravention of this Section 11.06 shall be void. MEPCO may assign or transfer any or all of its rights, interests and obligations hereunder upon the transfer of its assets through sale, reorganization, or other transfer, provided that:

(a) MEPCO's successors and assigns shall agree to be bound by the terms of this Agreement except that MEPCO's successors and assigns shall not be required to be bound by any obligations hereunder to the extent that MEPCO has agreed to retain such obligations; and

(b) notwithstanding (a), MEPCO shall assign or transfer to any new owner of the MEPCO-TF subject to this Agreement all of the rights, responsibilities and obligations associated with the physical operation of the MEPCO-TF as well as all of the rights, responsibilities and obligations associated with the ISO's Operating Authority with respect to the MEPCO-TF, further provided that the new owner shall have the right to retain one or more subcontractors to perform any or all of its responsibilities or obligations under this Agreement.

Subject to the foregoing, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective permitted successors and assigns. No assignment shall be effective until MEPCO receives all required regulatory approvals for such assignment.

**11.07 Further Assurances; Information Policy; Access to Records.**

(a) Each Party agrees, upon another Party's request, to make Commercially Reasonable Efforts to execute and deliver such additional documents and instruments, provide information, and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and of the transactions contemplated hereby.

(b) ISO shall, upon MEPCO's request, make available to MEPCO any and all information within ISO's custody or control that is necessary for MEPCO to perform its responsibilities and obligations or enforce its rights under this Agreement, provided that such information shall be made available to MEPCO only to the extent permitted under the ISO Information Policy and subject to any applicable restrictions in the ISO Information Policy, including provisions of the ISO Information Policy governing the confidential treatment of non-public information, and provided further that any MEPCO employee or employee of the Maine Local Control Center shall comply with such ISO Information Policy and any applicable standards of conduct to prevent the disclosure of such information to any unauthorized Person. Any dispute concerning what information is necessary for MEPCO to perform its responsibilities and obligations or enforce its right under this Agreement shall be subject to dispute resolution under Section 11.12 of this Agreement.

(c) MEPCO shall, upon ISO's request,

(i) make available to ISO any and all information within MEPCO's custody or control that is necessary for ISO to perform its responsibilities and obligations or enforce its rights under this Agreement, provided that such information shall be shall be made available to ISO only to the extent permitted under the ISO Information Policy and subject to any applicable restrictions in the ISO Information Policy, including provisions of the ISO Information Policy governing the confidential treatment of non-public information, and provided further that any ISO employee shall comply with such ISO Information Policy and any applicable standards of conduct to prevent the disclosure of such information to any unauthorized Person. Any dispute concerning what information is necessary for ISO to perform its responsibilities and obligations or enforce its right under this Agreement shall be subject to dispute resolution under Section 11.12 of this Agreement, and

(ii) make reasonable efforts to provide information and support in response to ISO's requests within ISO's requested time frames and shall comply with all deadlines set forth in the ISO Planning Process, as specified in the ISO Tariff.

(d) If, in order to properly prepare its Tax Returns, other documents or reports required to be filed with Governmental Authorities or its financial statements or to fulfill its obligations hereunder, it is necessary that ISO or MEPCO be furnished with additional information, documents or records not referred to specifically in this Agreement, and such information, documents or records are in the possession or control of ISO or MEPCO, ISO or MEPCO shall use its best efforts to furnish or make available such information, documents or records (or copies thereof) at ISO's or MEPCO's request, cost and expense. Any information

obtained by ISO or MEPCO in accordance with this paragraph shall be subject to any applicable provisions of the ISO Information Policy.

(e) Notwithstanding anything to the contrary contained in this Section 11.07:

(i) no Party shall be obligated by this Section 11.07 to undertake studies or analyses that such Party would not otherwise be required to undertake or to incur costs outside the normal course of business to obtain information that is not in such Party's custody or control at the time a request for information is made pursuant to this Section 11.07;

(ii) if MEPCO and ISO are in an adversarial relationship in litigation or arbitration (other than with respect to litigation or arbitration to enforce this Section 11.07), the furnishing of information, documents or records by ISO or MEPCO in accordance with this Section 11.07 shall be subject to applicable rules relating to discovery;

(iii) no Party shall be compelled to provide any privileged and/or confidential documents or information that are attorney work product or subject to the attorney/client privilege; and

(iv) no Party shall be required to take any action that impairs or diminishes its rights under this Agreement, diminishes any other Party's obligations under this Agreement or otherwise lessens the value of this Agreement to such Party.

**11.08 <u>Business Day.</u>**

Notwithstanding anything herein to the contrary, if the date on which any payment is to be made pursuant to this Agreement is not a Business Day, the payment otherwise payable on such date shall be payable on the next succeeding Business Day with the same force and effect as if made on such scheduled date and, provided such payment is made on such succeeding Business Day, no interest shall accrue on the amount of such payment from and after such scheduled date to the time of such payment on such next succeeding Business Day.

**11.09 <u>Governing Law.</u>**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware including all matters of construction, validity and performance without regard to the conflicts-of-laws provisions thereof.

**11.10 <u>Consent to Service of Process.</u>**

Each of the Parties hereby consents to service of process by registered mail, Federal Express or similar courier at the address to which notices to it are to be given, it being agreed that service in such manner shall constitute valid service upon such party or its respective successors or assigns in connection with any such action or proceeding; provided, however, that nothing in this Section 11.10 shall affect the right of any such Parties or their respective successors and permitted assigus to serve legal process in any other manner permitted by

applicable Law or affect the right of any such Parties or their respective successors and assigns to bring any action or proceeding against any other one of such Parties or its respective property in the courts of other jurisdictions.

### 11.11 Specific Performance; Force Majeure.

(a) Specific Performance. The Parties specifically acknowledge that a breach of this Agreement, whether or not an Event of Default, and notwithstanding any cure period in Section 10.03(b), would cause each of the non-breaching Parties to suffer immediate and irreparable harm due to the unique relationship among the Parties. The Parties hereto shall be entitled to seek specific performance and/or an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and conditions hereof in any court of competent jurisdiction, such remedy being in addition to any other remedy to which any Party may be entitled at law or in equity.

(b) Force Majeure. A Party shall not be considered to be in default or breach under this Agreement, and shall be excused from performance or liability for damages to any other party, if and to the extent it shall be delayed in or prevented from performing or carrying out any of the provisions of this Agreement, except the obligation to pay any amount when due, in consequence of any act of God, labor disturbance, failure of contractors or suppliers of materials (not including as a result of non-payment), act of the public enemy or terrorists, war, invasion, insurrection, riot, fire, storm, flood, ice, explosion, breakage or accident to machinery or equipment or by any other cause or causes (not including a lack of funds or other financial causes) beyond such Party's reasonable control, including any order, regulation, or restriction imposed by governmental, military or lawfully established civilian authorities. Any Party claiming a force majeure event shall use reasonable diligence to remove the condition that prevents performance, except that the settlement of any labor disturbance shall be in the sole judgement of the affected Party.

### 11.12 Dispute Resolution.

The Parties agree that any dispute arising under this Agreement shall be the subject of good-faith negotiations between the affected Parties and that each Party shall designate one or more representatives with the authority to negotiate the matter in dispute to participate in such negotiations. The Parties shall engage in such good-faith negotiations for a period of not less than 60 calendar days, unless: (a) a Party identifies exigent circumstances reasonably requiring expedited resolution of the dispute by FERC or a court or agency with jurisdiction over the dispute; or (b) the provisions of this Agreement otherwise provide a Party the right to submit a dispute directly to FERC for resolution. Any other dispute that is not resolved through good-faith negotiations may, by any party, be submitted for resolution by FERC or a court or agency with jurisdiction over the dispute upon the conclusion of such negotiations. Any Party may

request that any dispute submitted to FERC for resolution be subject to FERC settlement procedures. Notwithstanding the foregoing, any dispute arising under this Agreement may be submitted to arbitration or any other form of alternative dispute resolution upon the agreement of all affected Parties to participate in such an alternative dispute resolution process.

**11.13 <u>Invalid Provisions.</u>**

If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any Party under this Agreement shall not be materially and adversely affected thereby, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) the court holding such provision to be illegal, invalid or unenforceable may in lieu of such provision add as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as it deems appropriate; provided that nothing in this Section 11.13 shall limit a Party's right to appeal conditions to regulatory approval in accordance with Section 11.17(d).

**11.14 <u>Headings and Table of Contents.</u>**

The headings of the sections of this Agreement and the Table of Contents are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

**11.15 <u>Liabilities; No Joint Venture.</u>**

(a) The obligations and liabilities of ISO and MEPCO arising out of or in connection with this Agreement shall be several, and not joint, and each Party shall be responsible for its own debts, including Taxes. No Party shall have the right or power to bind any other Party to any agreement without the prior written consent of such other Party. The Parties do not intend by this Agreement to create nor does this Agreement constitute a joint venture, association, partnership, corporation or an entity taxable as a corporation or otherwise. No express or implied term, provision or condition of this Agreement shall be deemed to constitute the parties as partners or joint venturers.

(b) To the extent any Party has claims against any other Party, such Party may only look to the assets of the other Party for the enforcement of such claims and may not seek to enforce any claims against the directors, members, officers, employees, affiliates or agents of such other Party who, each Party acknowledges and agrees, have no liability, personal or otherwise, by reason of their status as directors, members, officers, employees, affiliates or agents of that Party, with the exception of fraud or willful misconduct.

**11.16 <u>Counterparts.</u>**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

The parties hereto agree that any document or signature delivered by facsimile transmission shall be deemed an original executed document for all purposes hereof.

**11.17 Conditions Precedent.**

Notwithstanding anything to the contrary in this Agreement, this Agreement shall not be effective with respect to any Party unless all of the conditions precedent set forth in this Section 11.17 shall have been satisfied or waived.

(a) Required Regulatory Approvals. All final required regulatory approvals shall have been obtained and be in full force and effect and shall not be subject to the satisfaction of any condition or conditions that, if accepted, would: (i) in the case of MEPCO, in the reasonable judgment of MEPCO, in the aggregate have a material adverse effect on the value of MEPCO's MEPCO-TF, its expected level of transmission revenues, or its electric utility business, revenues, or financial condition, unless MEPCO waives said condition, provided however, that with respect to any required regulatory approval obtained from a Governmental Authority of a State, the condition set forth in this clause shall apply only if MEPCO operates its Transmission Business within such State; and (ii) in the case of ISO, in its reasonable judgment, have a material adverse effect on ISO's ability to perform its obligations under this or any other agreement to which it is subject, unless ISO waives such condition.

(b) Board Consent. The board of directors of each Party, in its sole discretion, shall have authorized and approved such Party's executing, delivering and performing this Agreement.

(c) Additional Conditions Precedent. Additional conditions precedent are listed on Schedule 11.17(c).

(d) Right to Appeal Conditions to Regulatory Approval. In the event that a Governmental Authority conditions its regulatory approval of this Agreement on acceptance of a contractual provision, contractual modification, or any other condition or ruling related to formation of ISO that is not acceptable to any Party, such Party shall have the option of agreeing to permit this Agreement to become effective with the condition or ruling to which it objects and appeal the propriety of the condition or ruling to courts of competent jurisdiction; provided that, in the event a Final Order requires a vacation or modification of such objectionable condition or ruling, this Agreement shall thereupon be modified consistent with that Final Order; provided, however, that the other Party may exercise their rights to withdraw from or terminate this Agreement pursuant to Section 10.01(b) or Section 10.01(d), as applicable.

**11.18 Preserved Rights.**

No Party, by executing this Agreement, shall waive any rights to seek rehearing of a Commission order or to appeal a Commission order, including Commission orders concerning the terms and conditions of the NEPOOL tariff and market rules in effect prior to the Operations Date to the extent such terms and conditions have been incorporated into the ISO Tariff. The Parties expressly reserve the rights to pursue all pending requests for rehearing or appeals of such orders, and to file pleadings relating to such requests for rehearing or appeals, to the same extent as if the NEPOOL tariff were still in effect. Changes to the ISO Tariff shall be made to the extent necessary to comply with the results of a Commission rehearing order or judicial

appeal concerning the terms and conditions of the NEPOOL tariff and market rules in effect prior to the Operations Date to the extent such terms and conditions have been incorporated into the ISO Tariff. The foregoing sentence shall not be deemed to prevent a Party from expressing its views to the Commission or a court regarding the foregoing compliance filing.

**11.19 MEPCO TOA and ISO Tariff Impact due to the NRI Project.**

Subject to Section 11.04, the Parties agree to review and, as necessary modify, their authorities and responsibilities under this MEPCO TOA ("Review/Negotiation Process") at least 12 months prior to the operational date of the North East Reliability Interconnection Project (otherwise referred to as the NRI Project or the Second New Brunswick Tie). Such operational date shall be determined based on the NRI Project projected schedule as reported in the ISO Regional System Planning process. This review shall be limited to assuring that the authorities and responsibilities under this MEPCO TOA and the ISO Tariff remain consistent with the Parties' intent herein.

(a) The Review/Negotiation Process shall consist of the following steps:

(i) Within a period of no greater than 90 days, MEPCO, in consultation with the ISO, shall develop a proposal for presentation to the PTOs that addresses the inclusion of the MEPCO-TF under Regional Network Service ("roll-in") within the ISO ~~Tariff~~OATT;

(ii) From the date of the initial presentation to the PTOs (and other stakeholders, as appropriate), but in no event greater than 120 days, MEPCO shall attempt negotiate with the PTOs a final, mutually agreed upon proposal for roll in of the MEPCO-TF; and

(iii) Following the agreement of a final roll-in proposal by the PTOs and support by the stakeholders, MEPCO shall, at least 60 days prior to the operational date of the NRI Project and in conjunction with the PTOs and the ISO, shall prepare and file the proposal with FERC.

(b) If within the time frames established above, a consensus roll-in proposal is not achieved or the FERC rejects or substantially modifies a proposal on file with it, MEPCO agrees to work with the ISO to develop an alternative proposal.

(c~~d~~) If at any time during the Review/Negotiation Process one or both Parties to this Agreement conclude that negotiations are at am impasse, the matter may be addressed pursuant to Section 11.04. Until such time as the matter in dispute is resolved or is under consideration before the FERC, the terms and conditions of this MEPCO TOA shall remain in effect.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officer of each party as of the date first above written.

[INSERT NAMES OF MEPCO]

Case 1:26-cv-00518-KFW Document 1-2 Filed 10/09/26 Page 137 of 155 PageID #: 327

**[INSERT NAMES OF ISO]**

**Schedule 1.01**
**Schedule of Definitions**

Additional Term. "Additional Term" shall have the meaning ascribed thereto in Section 10.01(a) of this Agreement.

Additional MEPCO-TF Procedures. "Additional MEPCO-TF Procedures" shall have the meaning ascribed thereto in Section 3.02(h).

Agreement. This MEPCO Transmission Operating Agreement, as it may be amended from time to time.

Ancillary Service. Those services that are necessary to support the transmission of electric capacity and energy from resources to loads while maintaining reliable operation of the transmission system in accordance with Good Utility Practice.

ATC. Available Transfer Capability.

Back-up Control Center. The control center established by ISO as a back-up to the ISO Control Center.

Business Day. Any day other than a Saturday or Sunday or an ISO Holiday, as posted by the ISO on its website.

Chester SVC Facility: The Chester SVC Facility is a generator/sink of VARS interconnected to MEPCO-TF. It is not owned by MEPCO nor is it a transmission facility. The Chester SVC Facility was constructed to maximize imports from eastern Canada as part of the construction of the HQ HVDC Phase II Project. Its costs are recovered via a bilateral contract with New England Hydro Corporation (NH Hydro). NH Hydro pays Chester a monthly support fee that covers the construction cost and ongoing O&M costs of the SVC. NH Hydro bills all Phase II Participants to recover its payments to Chester. Most Phase II Participants recover their support payments via regional rates as originally allowed by the Restated NEPOOL Agreement and now by the ISO-NE Tariff No. 3. Section II 49.

Commercially Reasonable Efforts. A level of effort which in the exercise of prudent judgment in the light of facts or circumstances known, or which should reasonably be known, at the time a decision is made, can be expected by a reasonable person to accomplish the desired result in a manner consistent with Good Utility Practice and which takes the performing party's interests into consideration. "Commercially Reasonable Efforts" will not be deemed to require a Person to undertake unreasonable measures or measures that have a significant adverse economic affect on such Person, including the payment of sums in excess of amounts that would be expended in the ordinary course of business for the accomplishment of the stated purpose.

Commission. The Federal Energy Regulatory Commission.

Control Area. An electric power system or combination of electric power systems, bounded by metering, to which a common automatic generation control scheme is applied in order to:

(a) match, at all times, the power output of the generators within the electric power system(s) and capacity and energy purchased from entities outside the electric power system(s), with the load within the electric power system(s);

(b) maintain scheduled interchange with other Control Areas, within the limits of Good Utility Practice;

(c) maintain the frequency of the electric power system(s) within reasonable limits in accordance with Good Utility Practice and applicable NERC/NPCC Requirements; and

(d) provide sufficient generating capacity to maintain operating reserves in accordance with Good Utility Practice.

Coordination Agreement. An agreement between ISO and the operator(s) of one or more neighboring Control Areas addressing issues including interchange scheduling, operational arrangements, emergency procedures, energy for emergency and reliability needs, the exchange of information among Control Areas, and other aspects of the coordinated operation of the Control Areas.

Effective Date. "Effective Date" shall have the meaning ascribed thereto in Section 10.01(a)(ii) of this Agreement.

Elective Transmission Upgrade. A Transmission Upgrade that is participant funded (i.e., voluntarily funded by an entity or entities that have agreed to pay for all of the costs of such Transmission Upgrade), and is not: (i) a Generator Interconnection Related Upgrade; (ii) a Reliability Transmission Upgrade (including a NEMA Upgrade, as appropriate); (iii) an Market Efficiency Transmission Upgrade (including a NEMA Upgrade, as appropriate); or (iv) initially proposed in an Elective Transmission Upgrade Application filed with the ISO in accordance with Section II.47.2 of the ISO Tariff on a date after the addition or modification already has been otherwise identified in the current ISO Transmission Plan (other than as an Elective Transmission Upgrade) in publication as of the date of that application.

Environmental Damages. Any cost, damages, expense, liability, obligation or other responsibility arising from or under Environmental Law consisting of or relating to:

(a) any environmental matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products);

(b) fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and response, investigative, remedial or inspection costs and expenses arising under Environmental Law;

(c) financial responsibility under Environmental Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment or other

remediation or response actions ("Cleanup") required by applicable Environmental Law (whether or not such Cleanup has been required or requested by any Governmental Authority or any other Person) and for any natural resource damages; or

(d) any other compliance, corrective, investigative, or remedial measures required under Environmental Law.

Environmental Laws. Any Law now or hereafter in effect and as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to pollution or protection of the Environment, health or safety or to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

Excluded Assets. "Excluded Assets" shall havc the meaning ascribed thereto in Section 2.03 of this Agreement.

Exigent Circumstances. Circumstances such that the ISO determines in good faith that (i) failure to immediately implement a proposed Tariff filing authorized under Sections 3.04(c) and 3.04(e) of this Agreement would substantially and adversely affect (A) System reliability or security, or (B) the competitiveness or efficiency of the New England Markets, and (ii) invoking the procedures set forth in Sections 3.04(c) and 3.04(e) of this Agreement would not allow for timely redress of the ISO's concerns.

Existing Operating Procedures. "Existing Operating Procedures" shall have the meaning ascribed thercto in Section 3.02(g) of this Agreement.

External Transactions. Interchange transactions between the ISO Transmission System and neighboring Control Areas.

FACTS. Flexible AC Transmission Systems.

FERC. The Federal Energy Regulatory Commission.

Final Order. An order issued by a Governmental Authority in a proceeding after all opportunities for rehearing are exhausted (whether or not any appeal thereof is pending) that has not been revised, stayed, enjoined, set aside, annulled or suspended, with respect to which any required waiting period has expired, and as to which all conditions to effectiveness prescribed therein or otherwise by law, regulation or order have been satisfied.

FPA. The Federal Power Act.

Generally Accepted Accounting Principles. The widely accepted set of rules, conventions, standards, and procedures for reporting financial information, as established by the Financial Accounting Standards Board.

Good Utility Practice. Any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and

expedition. Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather includes all acceptable practices, methods, or acts generally accepted in the region.

Governmental Authority. The government of any nation, state or other political subdivision thereof, including any entity exercising executive, military, legislative, judicial, regulatory, or administrative functions of or pertaining to a government, not including MEPCO or ISO.

Grandfathered Interconnection Agreement. An agreement or agreements for the interconnection of any party to the MEPCO-TF that has been executed or approved by an applicable Governmental Authority prior to the Effective Date and that is set forth in Schedule 3.10 to this Agreement.

Grandfathered Intertie Agreement. An agreement or agreements for the provision of transmission service over a Control Area intertie or for the interconnection of the MEPCO-TF with facilities outside the New England Control Area that has been executed or approved by an applicable Governmental Authority prior to the Effective Date and that is set forth in Schedule 3.10 of this Agreement.

Grandfathered Transmission Service Agreements. An agreement or agreements that sets forth the terms and conditions for transmission service between MEPCO and its customer(s) on the MEPCO-TF that has been executed or approved by an applicable Governmental Authority prior to the Effective Date and that is set forth in Schedule 3.10.

Grandfathered Transmission Agreements. "Grandfathered Transmission Agreements" shall consist of all Grandfathered Transmission Service Agreements, Grandfathered Interconnection Agreements and Grandfathered Intertie Agreements.

Independent Transmission Company or ITC. A transmission entity that assumes certain responsibilities in accordance with Attachment M of the ISO ~~Tariff~~OATT, subject to the acceptance or approval of the FERC and a finding of the FERC that the transmission entity satisfies applicable independence requirements.

Initial Term. "Initial Term" shall have the meaning ascribed thereto in Section 10.01(a) of this Agreement.

Interconnection Agreement. An agreement or agreements for the interconnection of any entity to the MEPCO-TF.

Interconnection Standard. The applicable interconnection standards set forth in the ISO ~~Tariff.~~OATT.

ISO Administrative Charge. "ISO Administrative Charge" shall have the meaning ascribed thereto in Section 3.04(h) of this Agreement.

ISO Control Center. The primary control center established by ISO for the exercise of its Operating Authority and the performance of functions as an RTO.

ISO Default. "ISO Default" shall have the meaning ascribed thereto in Section 10.03(a) of this Agreement.

ISO Information Policy. The information policy set forth in the ISO Tariff.

ISO OATT. The ISO Open Access Transmission Tariff, Section II of the ISO Tariff, as in effect from time to time.

ISO Tariff. The ISO Transmission, Markets and Services Tariff, FERC Electric Tariff No. 3, as in effect from time to time.

ISO-NE (or ISO). ISO New England Inc, the RTO for New England authorized by FERC to perform the functions required pursuant to FERC's Order 2000 and FERC's corresponding regulations.

Knowledge. With respect to a Party, the collective actual knowledge of the directors and members of management of such Party, after reasonable inquiry by them of selected employees of such Party whom they believe, in good faith, to be the persons generally responsible for the subject matters to which the knowledge is pertinent. "Known" shall have the meaning correlative to "Knowledge."

Law. Any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, other requirement or rule of law.

Large Generating Unit. A Large Generating Facility as defined in Schedule 22 of the ~~Tariff~~OATT.

Load Shedding. The systematic reduction of system demand by temporarily decreasing load.

Local Control Center. Those control centers now in existence (including the CONVEX, REMVEC, Maine and New Hampshire control centers) or established by MEPCO in accordance with Section 3.06 of this Agreement that are separate from the ISO Control Center and perform certain functions in accordance with this Agreement.

Market Rules. The rules describing how the ISO Markets are administered.

Market Monitoring Unit. Any market monitoring unit established by the ISO, including any internal market monitoring unit of the ISO and any independent market monitoring unit of the ISO.

MEPCO Transmission Facility. The a 345 kV transmission line, which is owned and operated by MEPCO, connected to Central Maine Power Company at the Maine Yankee Substation in Wiscasset Maine, and at the Maxcy's Substation in Windsor, Maine to Bangor Hydro Electric Company at Orrington, Maine and at its northern end, at the Canadian border to a similar 345 kV transmission line owned by New Brunswick Power ("MEPCO Transmission Facilities" or "MEPCO-TF").~~;~~

Mobile-Sierra Doctrine. The "Mobile-Sierra Doctrine" shall mean the public interest standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956).

MEPCO Default. "MEPCO Default" shall have the meaning ascribed thereto in Section 10.04(a) of this Agreement.

MEPCO Local Restoration Plan. The restoration plan developed by MEPCO with respect to MEPCO's MEPCO-TF.

MEPCO-TF. "MEPCO-TF" shall have the meaning ascribed thereto in Section 2.01 of this Agreement.

MEPCO TOA. This Transmission Operating Agreement, as it may be amended from time to time.

NERC. The North American Electric Reliability Council.

NERC/NPCC Requirements. NPCC criteria, guides, and procedures, NERC reliability standards, and NERC operating policies and planning standards (until such time as they are replaced by NERC reliability standards) and any successor documents.

New England Control Area. The Control Area consisting of the interconnected electric power system or combination of electric power systems in the geographic region consisting of Vermont, New Hampshire, Maine, Massachusetts, Connecticut and Rhode Island.

New England Markets. Markets or programs (including congestion pricing and design and implementation of FTRs) for the purchase of energy, capacity, ancillary services, demand response services or other related products or services that are offered in the New England Control Area and that are administered by the ISO pursuant to rules, rates, or agreements on file from time to time with the Commission.

New England Transmission System. The system comprised of the transmission facilities over which the ISO has operational jurisdiction, including the Transmission Facilities of the PTOs and the transmission system of any ITC formed pursuant to Attachment M to the ISO ~~Tariff~~OATT.

NPCC. The Northeast Power Coordinating Council.

OASIS. The Open Access Same-Time Information System of ISO.

Operating Authority. "Operating Authority" shall have the meaning ascribed thereto in Section 3.02 of this Agreement and shall include the responsibilities set forth in Section 3.05.

Operating Limits. The transfer limits for a transmission interface or generation facility.

Operating Procedures. The operating manuals, procedures, and protocols relating to the exercise of Operating Authority over the MEPCO-TF, as such guides, manuals, procedures, and protocols may be modified from time to time in accordance with Section 3.02(g) of this Agreement.

~~Effective Date. "Effective Date" shall have the meaning ascribed thereto in Section 10.01(a)(ii) of this Agreement.~~

Order 2000. FERC's Order No. 2000, *i.e.*, *Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 809 (January 6, 2000), FERC Stats. & Regs. ¶31,089 (1999), *order on reh'g*,

Order No. 2000-A, 65 Fed. Reg. 12,088 (March 8, 2000), FERC Stats. & Regs. ¶31,092 (2000), *petitions for review pending sub nom.*, Public Utility District No. 1 of Snohomish County, Washington v. FERC, Nos. 00-1174, *et al.* (D.C. Cir).

PARS. Phase angle regulators.

Party or Parties. A "Party" shall mean ISO or MEPCO, as the context requires. "Parties" shall mean MEPCO and ISO.

Person. An individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, government or any department or agency thereof, or any other entity.

Pool Transmission Facility ("PTF"). The transmission facilities owned by a transmission owner that meet the criteria specified in Section II.49 of the ISO Tariff.

Rating Procedures. Procedures related to the establishment of ratings for MEPCO-TF or related to changes to existing ratings of MEPCO-TF (collectively "Rating Procedures").

Reliability Authority. "Reliability Authority" shall have the meaning established by NERC, as such definition may change from time to time, provided such definition of Reliability Authority shall not be inconsistent with the specific rights and responsibilities of ISO and MEPCO under this Agreement.

Restoration Plans. The System Restoration Plan and all MEPCO Local Restoration Plans.

RMR. Reliability must run resources.

RTO. An independent entity that complies with Order No. 2000 and FERC's corresponding regulations (or an entity that complies with all such requirements except for the scope and regional configuration requirements), as determined by the FERC.

~~ISO Administrative Charge. "ISO Administrative Charge" shall have the meaning ascribed thereto in Section 3.04(h) of this Agreement.~~

~~ISO Control Center. The primary control center established by ISO for the exercise of its Operating Authority and the performance of functions as an RTO.~~

~~ISO Default. "ISO Default" shall have the meaning ascribed thereto in Section 10.03(a) of this Agreement.~~

~~ISO Information Policy. The information policy set forth in the ISO Tariff.~~

~~ISO Tariff. The ISO Open Access Transmission Tariff, as in effect from time to time.~~

System Failure. Widespread telecommunication, hardware or software failure or systemic ISO hardware or software failures that makes it impossible to receive or process bid information, dispatch resources, or exercise Operating Authority over the MEPCO-TF.

Tax or Taxes. All taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state or local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, including interest, penalties or additions attributable thereto.

Tax Return. Any return, report, information return, or other document (including any related or supporting information) required to be supplied to any authority with respect to Taxes.

Term. "Term" shall have the meaning ascribed thereto in Section 10.01(a) of this Agreement.

Termination Date. "Termination Date" shall mean the date of termination established in accordance with Section 10.01(e) of this Agreement.

TOA. Theis Transmission Operating Agreement between the Participating Transmission Owners (PTOs) and the ISO, as it may be amended from time to time.

Transmission Business. The business activities of MEPCO related to the ownership, operation and maintenance of its MEPCO-TF.

Transmission Customer. Any entity taking Transmission Service under the ISO Tariff.

Transmission Owner. "Transmission Owner" shall have the meaning ascribed thereto in the ISO Tariff.

Transmission Service. The non-discriminatory, open access transmission services provided to customers by MEPCO in accordance with Schedule 20B of the ISO TariffOATT.

TTC. Total Transfer Capability.

VAR. Volt-Amps Reactive.

**Schedule 2.01(a)**

**List of MEPCO Transmission Facilities**

| Circuit # | Stations | Voltage (kV) |
|---|---|---|
| 388 | Orrington-Maxcy's | 345 |
| 392 | Maxcy's-Maine Yankee | 345 |
| 396 | Keswick-Chester-Orrington | 345 |

| Transformer # | Station | Voltage (kV) |
|---|---|---|
| T1 | Orrington | 345/115 |

| Interconnected Facility | Interconnection Point | Operating Range (MVAR) |
|---|---|---|
| The Chester SVC Facility located in Chester, Maine* | Circuit #396 in Chester, Maine | +450 Capacitive<br>-125 Inductive |

* The inclusion of the Chester SVC on this Schedule 2.01(a) is for the sole purpose of granting Operating Authority of said facility to ISO. The Chester SVC is not a MEPCO Transmission Facility.

## Schedule 3.02(c)

**List of Interconnection Agreements and Tariffs Applicable to External Transactions**

1. ISO NEW ENGLAND INC., TRANSMISSION, MARKETS AND SERVICES TARIFF, FERC ELECTRIC TARIFF NO. 3, Effective February 1, 2005

~~2.~~

## Schedule 3.02(g)

**List of Existing Operating Procedures**

1. ISO New England Manual 6 – Financial Transmission Rights
2. ISO New England Manual 11 – Market Operations
3. ISO New England Manual 20 – Installed Capacity
4. ISO New England Manual 27 – Tariff Accounting
5. ISO New England Manual 28 – Market Rule 1 Accounting
6. ISO New England Manual 29 – Billing
7. ISO New England Manual 35 – Definitions And Abbreviations
8. ISO New England Manual 36 – Forward Reserve
9. ISO New England Manual – ISO-NE Load Response Program
10. ISO New England Operating Procedure No. 1 "Central Dispatch Operating Responsibility and Authority of ISO New England, the Local Control Centers and Market Participants"
11. ISO New England Operating Procedure No. 2 "Maintenance Of Communications, Computers, Metering, and Computer Support Equipment"
12. ISO New England Operating Procedure No. 3 "Transmission Outage Scheduling"
13. ISO New England Operating Procedure No. 4 "Action During a Capacity Deficiency"
14. ISO New England Operating Procedure No. 5 "Generation Maintenance and Outage Scheduling"
15. ISO New England Operating Procedure No. 6 "System Restoration"
16. ISO New England Operating Procedure No. 7 "Action In An Emergency"
17. ISO New England Operating Procedure No. 8 "Operating Reserve and Regulation"
18. ISO New England Operating Procedure No. 9 "Scheduling and Dispatch of External Transactions"
19. ISO New England Operating Procedure No. 10 "Analysis and Reporting of Power System Emergencies"
20. ISO New England Operating Procedure No. 11 "Black Start Capability Testing Requirements"
21. ISO New England Operating Procedure No. 12 "Voltage and Reactive Control"
22. ISO New England Operating Procedure No. 13 "Standards For Voltage Reduction and Load Shedding Capability"
23. ISO New England Operating Procedure No. 14 "Technical Requirements for Generation, Dispatchable and Interruptible Loads"
24. ISO New England Operating Procedure No. 16 "Transmission System Data"
25. ISO New England Operating Procedure No. 17 "Load Power Factor Correction"
26. ISO New England Operating Procedure No. 18 "Metering and Telemetering Criteria"
27. ISO New England Operating Procedure No. 19 "Transmission Operations"
28. ISO New England Operating Procedure No. 20 "Cold Weather Event Operations"
29. ISO New England Compliance Procedure
30. ISO New England Compliance and Enforcement Process For Enhanced NPCC Reliability and NERC Standards
31. Master/Local Control Center Procedure #1 "Nuclear Plant Transmission Operations"

32. Master/Local Control Center Procedure #2 "Abnormal Conditions Alert"
33. Master/Local Control Center Procedure #3 "Test Procedure For Local Control Center Satellite Phone Communications"
34. Master/Local Control Center Procedure #4 "Rules for Generator Unit Control Modes, Limits and Dispatch Terminology"
35. Master/Local Control Center Procedure #5 "Procedure for Millstone Point Station Generation Reduction"
36. Master/Local Control Center Procedure #6 "Procedure for Evacuation of ISO New England Control Room"
37. Master/Local Control Center Procedure #7 "Processing Transmission Outage Applications"
38. Master/Local Control Center Procedure #8 "Coordination of Generator Voltage Regulator Outages"
39. Master/Local Control Center Procedure #9 "Operation of the Chester Static VAR Compensator (SVC)"
40. Master/Local Control Center Procedure #10 "Generator Governor Control and Operation"

**<u>Schedule 3.02(h)</u>**

**List of Existing Additional MEPCO-TF Procedures**

**[Intentionally left blank]**

**Schedule 3.10**

**List of Grandfathered Transmission Agreements**

1. Permit Authorizing Maine Electric Power Company, Inc. to Construct, Operate, Maintain and Connect Electric Transmission Facilities at the International Border between the United States and Canada. July 25, 1969 (FPC Docket No. E-7486).

2. Order Authorizing Transmission of Electricity to Canada, July 21, 1970 (FPC Docket No. E-7534)

3. Order Amending Prior Order Authorizing Exportation of Electric Energy to a Foreign Country, February 25, 1977, Effective date November 1, 1976 (FPC Docket No. 7534)

4. Chester SVC Partnership Agreement, dated as of July 1, 1990

5. The Chester SVC Partnership Basic Operating Agreement, originally dated as of July 1, 1990 and recently extended through July 1, 2010. (FERC ER05-1278-000)

6. The Phase II Maine Electric Power SVC Facilities Support Agreement, dated as of October 1, 1988.

7. The Assignment and Purchase and Sale Agreement (between MEPCO and Chester SVC Partnership), dated as of July 1, 1990.

8. The Ground Lease Agreement (between MEPCO and Chester SVC Partnership), dated as of July 1, 1990.

9. The Chester SVC Partnership, Limited Recourse Senior Notes, Note Agreement, Dated as of December 20, 1990.

**Schedule 11.01**

**Notices**

Maine Electric Power Company

R. Scott Mahoney
Secretary and Clerk
83 Edison Drive
Augusta, Maine 04336

207-621-3955 (tel)
207-621-4714 (fax)

Hariph Smith
Director
83 Edison Drive
Augusta, Maine 04336

207-621-7800 (tel)
207-621-7869 (fax)

ISO New England

Kathleen A. Carrigan
SVP & General Counsel
ISO-NE
330 Whitney Ave.
Holyoke, MA 01040
413-540-4260 (tel)
413-535-4379(fax)

## Schedule 11.02

### Superseded Agreements

1. Letter Agreement between NEPEX and MEPCO dated October 12, 1970.

2. Interconnection Agreement between the New Brunswick Electric Power Commission and Central Maine Power and its subsequent assignment to MEPCO, both dated July 31, 1969.

# Schedule 11.17(c)

## Additional Conditions Precedent

**[Intentionally left blank]**

Document Content(s)

00F8E976-66E2-5005-8110-C31FAFC91712.TIF ................................1